

# JUDICIARY

3041
[handwritten]

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

Process No. 000.05.065208-7

Findings.

BANCO SANTOS S.A., in extrajudicial liquidation, insolvent corporation, established in this Capital City, through its appointed liquidator, requires the enactment of voluntary bankruptcy, alleging that during the process of law, after reclassifications and balancing of its assets and liabilities, an exposed liability of BR$ 2,236,078,000.00 emerged, apart from any other damages that can otherwise increase the aforementioned amount, to the extent that this fact alone, reveals its situation of total insolvency. To return to normal conditions, a minimum amount of BR$ 2,450,875,000.00 would be required.

Moreover, not being this the only matter, during the initial civil proceedings carried out by the Central Bank of Brazil, it was confirmed in regard to its administration that several irregular activities by the former administrators and controller took place, some of them involving the participation of the debtors themselves, which eventually hindered examinations and assessments from investors and market analysts regarding its true financial situation. Furthermore, operations that had the purpose of transferring or divert resources to non-financial institutions or hide non-existing assets from previous fiscal years, were common.

In addition, the harmful operations practiced by the institution prior to the intervention decreed on 11.12.2004 are specifically mentioned, with irregular and illegal operations, which not only affect the bank's creditors, but also the financial system, a characteristic of the practice of bankruptcy crimes which led to insolvency and extrajudicial liquidation.

Once the petition was processed, an earlier statement from the company that owns most of the petitioner's share capital was provided. Such statement contests the conclusions of the Central Bank of Brazil about the existence of a large unsecured liability, concluding that the responsible one for the current situation of Banco Santos was the latter one due to its unreasonable actions.

[Illegible signature or initials]

20/9/2005



COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO

1



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

The conclusions from the Investigation Committee were attached to the records assigned by the Central Bank of Brazil.

Opinion of the Public Ministry in order to accept the initial petition.

The report.

I hereby decide.

Undeniably, in accordance with the documentation accompanying the petition for voluntary bankruptcy, and also the conclusions of the Investigation Committee of the Central Bank, the petitioner's assets are infinitely inferior to its debts, with no possibility of coverage of half of the unsecured credit amount.

In public civil action proposed by the Public Ministry against the administrators of the entity in liquidation, unsecured liabilities in the amount of BR$ 2,235,802,000.00 were established based on the Central Bank's conclusions, apart from unquantified damages, notably the investment funds and BNDES (Brazilian Development Bank), showing ominous management of the Bank, more importantly, the practice of illegal acts, many of them characterizing a crime.

Among other matters, irregular operations with debentures characterized by public offerings without prior registration at the Securities Commission; purchase of already canceled rural product registrations with the transfer of bank's assets to legal entities linked to its controller, irregular operations involving export credit granting contracts ("export notes"); use of public resources (BNDES) for purposes other than those provided by law or contract, in addition to loans to associated companies and their use of those funds for active flexible options (disguised loans) were found during the course of the investigation.



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3043
[handwritten]

There is no doubt in the sense that, even for financial institutions, it is possible to declare bankruptcy pursuant to the provisions of Law No. 6024/74, expressly applying in conformance to article 197 of the current legislation.

On the topic, Fabio Ulhôa Coelho states that the exclusion of these commercial entities from the provisions of the new bankruptcy law is partial, "as long as, when these entities are involved in regular business transactions, they are subjected to bankruptcy decrees, just like any other business. But if the Central Bank decrees intervention or extrajudicial liquidation, it shall no longer be able to declare bankruptcy at the request of a creditor. In such cases, the bankruptcy may only occur at the request of the intervener (intervention) or the liquidator (extrajudicial liquidation), properly authorized by the Central Bank." (Comments about the New Bankruptcy and Corporate Recovery, page 199, Ed Saraiva).

In short, the legal requirements that authorize the acceptance of the petition are present, notably, the authorization of the Central Bank, the existence of assets inferior than half of the unsecured liabilities, excluding the seriousness of the facts uncovered in the investigations, evidence of bankruptcy crimes, and others (Article 21, "b", of Law 6.024/74).

There is no reason for a prior accounting assessment to calculate the value of assets and liabilities, as intended by the controlling institution. The numbers about the petitioner's financial situation are explained in pages 267/289 of the Investigation Committee's conclusions.

Basically, the bank's assets consist of loans, several of them of uncertain nature, having numerous judicial actions in which its debtors invoke the jurisdictional provision for the proclamation of the extinction of their obligations in lieu of compensation or due to simulated operations.



COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO

[Illegible signature or initials]

3

20/9/2005



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3044
[handwritten]

Besides not counting with the relevant elements to justify such a preliminary production of evidence not provided for in the legislation in force, the fact is that the severity of the issues found in this specific case, call for the immediate adjudication of bankruptcy, to allow, as soon practicable, for the investigation of crimes and the recovery, however small, of the rights of the vast amount of affected creditors.

It should be noted that, prior to the intervention carried out by BAGEN, the controlling shareholder admitted in writing that he/she is adding to page 2457, the status of "technical default", depending, for his/her survival, on the granting of the discount rate for the public funds.

For these reasons, I declare the defendant in bankruptcy, whose directors were, at the time of the intervention: Edemar Cid Ferreira, Ricardo Ferreira de Souza e Silva, Ricardo Ancênde Gribel, Mario Arcângelo Martinelli, Clive José Vieira Botelho, Gustavo Durazzo, Sebastião Geraldo Toledo da Cunha, Abner Parada Júnior, Antonio Rubens de Almeida Neto, Carlos Eduardo Guerra de Figueiredo, Carlos Endré Pavel, Francisco Sérgio Ribeiro Bahia, José Mariano Drumond Filho, Márcio Serpejante Peppe, mentioned in page 12, setting a legal term of 90 days from the date of petition.

I further determine the following:

1) A period of 15 days for credit reviews;

2) Suspension of proceedings and foreclosures against the bankrupt entity, with the legal exceptions;

3) Prohibition of liens or encumbrances of assets against the bankrupt entity;

4) Annotation next to JUCESP, so to record the word "bankrupt" in the records, as well as the inability to carry out business activities;

[Illegible signature or initials]

4

20/9/2005



COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3045
[handwritten]

5) I appoint Mr. **Vânio César Pickler Aguiar**, a business administrator, as the Judicial Administrator, being registered the total impossibility of continuing business activities of the bankrupt entity;

6) Subpoena of the Public Ministry, communication by letter to the Public Treasury, and publication of the notice, as provided in the sole paragraph of article 99 of Law 11101/2005;

7) Summons to the administrators of the bankrupt entity to provide their statements, in accordance with article 104 of the aforementioned law, starting on **October 18th, 2005 at 2:00 pm**, under penalty of perjury.

8) Other administrators of fact and law, and members of the Board of Directors referred to in the records, may also testify regarding what happened;

9) Registration of the collection of the goods which seizure injunction has already been issued;

10) In due course, after hearing the Judicial Administrator, I shall decide on the creditors' board.

Let it be published, registered, and notified.

São Paulo, September 20th, 2005.

**[Illegible signature]**
**Caio Marcelo Mendes de Oliveira**
**Law Judge**

---

**CERTIFICATE**

I hereby certify and attest that the bankruptcy sentence was recorded in the Book of Sentence Registrations No. *02/2005*, pages *41/45*, under no *122/*2005. On *September 20th, 2005*. I, [Illegible signature], Nilva Leonardi, clerk, subscribe.

---



COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO

20/9/2005



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3046
[handwritten]

---

**DATE**

On _September 20th, 2005_, I received these records from the registry office. I, [Illegible signature], clerk, subscribed.

---



COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO

6

20/9/2005

09/23

3070
[handwritten]

## JUDICIARY
São Paulo
District of São Paulo – Central Civil Court
2nd Chamber of Bankruptcy and Judicial Reorganization
2nd Office of Bankruptcy and Judicial Reorganization
Pça João Mendes Júnior, no number, 16th floor, rooms 1616/1624 – Postal Code 01501-900 –
São Paulo – SP – Telephone: 3242-0400 x 1666

### JUDICIAL ADMINISTRATOR AGREEMENT

On September 21st, 2005, in this city and District of the Capital State of São Paulo, in the courtroom of the Hon. Law Judge, Dr. Caio Marcelo Mendes de Oliveira, incumbent upon the 2nd Chamber of Bankruptcy and Judicial Reorganization, appeared, together with myself - identified below-, Mr. Vânio Cesar Pickler Aguiar, with ID no. 6695001, Taxpayer Identification Number 017.384.459-68, address at Rua Dona Elisa Pereira de Barros, 715, Jardim Paulistano - São Paulo - SP, Telephone: 3818-9000, whom the judge appointed the commitment to faithfully and truthfully carry out the duties of Judicial Administrator of the **Bankruptcy Records of Banco Santos S.A. – Entity in Extrajudicial Liquidation pursuant to the sentence pronounced on 09/20/2005.**

Accepting the commitment, he promised to faithfully comply with the duties under penalty of perjury, and in accordance with article 33 of Law 11101/2005.

I have certified, read and found the herein record duly signed and in compliance. I, _____ Helena M. Hernesdorft, Technical Judicial Clerk, typed. I [Illegible signature], Alessandra Almeida Santos Nunes, Clerk Director, subscribed.


**[Illegible signature]**
**Caio Marcelo de Oliveira Mendes**
**Law Judge**


**[Illegible signature]**
**Vânio Cesar Pickler Aguiar**
**Duly Sworn**




COPY EXTRACTED FROM THE
COURT OF JUSTICE OF SÃO PAULO

District of São Paulo – Central Civil Court
2nd Chamber of Bankruptcy and Judicial Reorganization
2nd Office of Bankruptcy and Judicial Reorganization

Case no. 000.05.065208-7
Action: Voluntary Bankruptcy

- Petitioner: Banco Santos S/A, with headquarters in this Capital, at **Rua Dona Elisa Pereira de Barros No. 715, Jardim Europa - SP, Postal Code 01456-000 - Sao Paulo, Tax ID No. 58.257.619/0001-66,** represented by the Judicial Administrator, **Vânio Cesar Pickler Aguiar, a Brazilian citizen, ID no. 6605001, Tax ID no. 017.384.459-68**.

    **Alesçandra Almeida Santos Nunes**, **Clerk Director** of the 2nd Chamber of Bankruptcy and Judicial Reorganization of this District of São Paulo, pursuant to the law.
    **CERTIFIES**, at the request of the party concerned, that she has reviewed the records of the aforementioned process in her office, which were distributed to this office on 06/17/2005, being the aforementioned individuals the parties involved. Amount in Question: BR$ 1,000,000.00. **Object:** Voluntary bankruptcy required under article 21, paragraph b of Law No. 6024 of 03/13/1974, through the appointed liquidator, Mr. Vânio Cesar Pickler Aguiar, having a previous intervention from the Central Bank on November 12th, 2004, pursuant to article 1 of the Civil Code, articles 5 and 15, subsection I, paragraphs "a" and "b", § 1 of Law 6024/74, in light of the economical-financial situation, deterioration of liquidity and infringement of the rules that govern the banking regulations. Having the intervener submitted a report under article 11 of the referred law to the Central Bank (02.11.05), and having carried out the assessment about the main operational practices and assets and liabilities of Banco Santos, the negative net worth was calculated at BR$ 2,236,078,000.00. According to the initial petition, damage to the Bank assets were due to actions of former administrators and controller, activities which can be summarized as operations to transfer or divert funds to non-financial companies, or covering inexistent assets from prior fiscal years. In light of indications of the occurrence of bankruptcy crimes and the complexity of the business and severity of the facts established, the extrajudicial liquidation was decreed by the Central Bank on May 4th, 2005, based on the report submitted by the intervener. At a later date, the voluntary bankruptcy request was introduced by the liquidator for declaration of bankruptcy of Banco Santos S/A. **Proceedings**: I certify that through sentence dated September 20th, 2005, the bankruptcy was decreed, appointing Mr. Vânio Cesar Pickler Aguiar, ID No. 6605001, Taxpayer Identification Number 017.384.459-68 as the Judicial Administrator. I further certify that page 3070 contains a commitment signed by the Judicial Administrator, dated 09/21/2005. Of them, I confirm the custody of the object with the progress reported. **NOTHING MORE**. The aforementioned is true and I attest. São Paulo, September 27th, 2005. I [Illegible signature] (Cleonice Farhate) Clerk, typed. I, [Illegible signature] (Alesçandra Almeida Santos Nunes) Clerk Director, verified and subscribed.

To the State: Exempt

Code 13.00.2.000

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

2nd Office of Bankruptcy and Judicial Reorganization

Praça João Mendes Júnior, no number, 16th floor, rooms 1616/1624 – Postal Code 01591900 –
São Paulo – SP – Telephone: 3242-0400

## CERTIFICATE OF STATUS OF THE JUDICIAL PROCESS

**ALESÇANDRA A SANTOS NUNES, Clerk Director** of the 2nd Chamber of Bankruptcy and Judicial Reorganization of the District of São Paulo, pursuant to the law, etc.

**CERTIFIES**, at the request of the interested party who, while searching in the Registry, verified:

Case No. **583.00.2005.065208-3/000000-000**                     Order: **22/2005**

**Action:** Voluntary bankruptcy

**Distribution Date**: 06/17/2005

**Petitioned by:**

BANCO SANTOS S/A – INSOLVENT ESTATE, Tax ID No. 58.257.619/0001-66, represented by the Judicial Administrator, Mr. Vanio Cesar Picker de Aguiar, ID No. 6605001, Taxpayer Identification Number 017.384.459-68, with address at Rua Dona Elisa Pereira de Barros, No. 715, Jardim Paulistano - São Paulo - SP

**Purpose of the action**

Bankruptcy required under article 21, paragraph b of Law 6024 of 03/13/1974.

**Certifies** that through sentence dated 09/20/2005, the bankruptcy of Banco Santos S/A was declared, appointing Mr. Vanio Cesar Pickler de Aguiar as the Judicial Administrator (duly sworn on page 3070 and qualified above), setting a term of 15 days for the credit reviews, and the legal term for bankruptcy within the 60 days prior to the decree of intervention from the Central Bank of Brazil, which took place on 11/12/2004, establishing the suspension of lawsuits and foreclosures against the bankrupt entity, with the legal exceptions. Further and finally, certifies that its records are in the process of determination of assets and liabilities. São Paulo / SP, December 19th, 2007. I [Illegible signature] (ALESÇANDRA A SANTOS NUNES), Clerk Director, registration No. 315930, typed, verified, signed, and certify.

**[Illegible signature]**
**ALESÇANDRA A SANTOS NUNES**
DIRECTOR OF DIVISION
REG. 315930-2

Stamp from the 2nd Office of
Bankruptcy and Judicial
Reorganization

FEDTJ: Exempt                                                    Page 1 of 1



# PODER JUDICIÁRIO

### São Paulo

2ª Vara de Falências e Recuperações Judiciais



Processo nº 000.05.065208-7

Vistos.

BANCO SANTOS S.A., em liquidação extrajudicial, sociedade anônima fechada, estabelecida nesta Capital, através do seu liquidante nomeado, requer a decretação de autofalência, aduzindo que, durante o procedimento previsto em lei, após reclassificações e balanceamento de seus ativos e passivos, apurou-se um passivo a descoberto da ordem de R$ 2.236.078.000,00, afora outros prejuízos que ainda podem elevá-lo, de tal sorte que este fato, por si só, revelaria a sua situação de total insolvência. Para retornar à situação de normalidade, necessitaria de aporte mínimo de valor de R$ 2.450.875.000,00.

Ainda segundo a inicial, não bastasse esta situação, verificou-se – em relação à sua administração -, durante a tramitação de inquérito instaurado pelo Banco Central do Brasil, diversas práticas irregulares pelos ex-administradores e controladores, algumas delas com participação dos próprios devedores, que acabaram por impedir exames e avaliação de investidores e analistas do mercado sobre a sua real situação financeira. Mais ainda, eram comuns operações que tinham por objetivo transferir ou desviar recursos para empresas não financeiras ou cobrir ativos insubsistentes de exercícios anteriores.

Prossegue, mencionando especificamente as operações danosas praticadas pela instituição, antes da intervenção decretada em 12.11.2004, com operações irregulares e ilegais, que atingiram não só os credores do Banco, como também o sistema financeiro, caracterizada a prática de crimes falimentares, que acabaram por levá-lo à insolvência e à liquidação extrajudicial.

Processado o pedido, facultou-se manifestação prévia da sociedade detentora da grande maioria do capital social do reqte., que impugna as conclusões do Banco Central do Brasil sobre a existência de grande passivo a

1

20/9/2005


CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO



# PODER JUDICIÁRIO

## São Paulo

2ª Vara de Falências e Recuperações Judiciais



descoberto, concluindo que teria sido a ação desordenada deste último a responsável pela situação de dificuldades em acabou se encontrando o Banco Santos.

Foram juntadas aos autos as conclusões da Comissão de Inquérito instaurado pelo Banco Central do Brasil.

Parecer do Ministério Público no sentido do acolhimento da pretensão inicial.

É o relatório.

Passo a decidir.

Inegavelmente, à vista da documentação que acompanha o requerimento de autofalência e, também, das conclusões da Comissão de Inquérito do Banco Central, o ativo da reqte. é infinitamente inferior aos seus débitos, não havendo qualquer possibilidade de cobertura de metade do montante dos créditos quirografários.

Em ação civil pública proposta pelo Ministério Público, contra os administradores da sociedade em liquidação, apurou-se passivo a descoberto, com base nas conclusões do inquérito do BACEN, da ordem de R$ 2.235.802.000,00, afora prejuízos não quantificados, notadamente a fundos de investimento e ao BNDES, demonstrando gestão nefasta na administração do Banco e, mais ainda, a prática de atos ilícitos, muitos deles a caracterizar crime.

Entre outros, constatou-se, durante a tramitação de inquérito, operações irregulares com debêntures, caracterizando emissão pública, sem registro prévio na Comissão de Valores Mobiliários; aquisição de cédulas de produtos rural já quitadas, com transferência de valores do Banco para pessoas jurídicas ligadas a seu controlador; operações irregulares com contratos de cessão de créditos de exportação ("export notes"); aplicação de recursos públicos (BNDES) com finalidade diversa da prevista em lei ou contrato, além




CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO

20/9/2005



# PODER JUDICIÁRIO

## São Paulo

2ª Vara de Falências e Recuperações Judiciais



de empréstimos a empresas coligadas e aplicações em opções flexíveis ativas (empréstimos dissimulados).

Nenhuma dúvida no sentido de que, mesmo para as instituições financeiras é possível a decretação de falência, em face da disposições da Lei nº 6.024/74, mandada aplicar expressamente pelo art. 197 da novel legislação.

Sobre o tema, afirma Fábio Ulhôa Coelho que a exclusão dessas sociedades empresárias das disposições da nova lei falitária é parcial, "na medida em que elas, quando se encontram no exercício regular da atividade financeira, sujeitam-se à decretação da falência, como qualquer outra empresária. Mas, se o Banco Central decreta intervenção ou liquidação extrajudicial, esta não poderá mais falir a pedido de credor. Nesses casos, a quebra somente pode verificar-se a pedido do interventor (na intervenção) ou do liquidante (na liquidação extrajudicial), devidamente autorizados pelo Banco Central." (Comentários à Nova Lei de Falências e de Recuperação de Empresas, pág. 199, Ed. Saraiva).

Em suma, estão presentes os requisitos legais que autorizam o acolhimento da pretensão, notadamente a autorização do Banco Central, existência de ativo inferior à metade do passivo quirografário, sem contar a gravidade dos fatos constatados em inquérito e de fundados indícios de crimes falimentares e outros (art. 21, "b", da Lei 6.024/74).

Nenhum motivo para realização prévia de perícia contábil para apuração dos valores do ativo e do passivo, como pretendido pela instituição controladora. Os números da situação econômico-financeira do reqte. estão explicitados à f. 267/289 das conclusões da Comissão de Inquérito.

Basicamente, os ativos do Banco são constituídos por créditos, muitos de duvidosíssima liquidação, havendo dezenas de ações judiciais em que os seus devedores invocam provimento jurisdicional para a proclamação de extinção de suas obrigações pela ocorrência de compensação ou por operações simuladas.

3

20/9/2005


CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO



# PODER JUDICIÁRIO

## São Paulo

2ª Vara de Falências e Recuperações Judiciais



Além de não haver elementos relevantes, trazidos por ela, que justificassem essa produção preliminar de prova, não prevista na legislação vigente, o fato é que a gravidade das ocorrências constatadas no caso específico. aconselham a decretação desde logo da falência, para permitir, o quanto antes, a apuração de delitos e a recuperação, ainda que pequena, dos direitos da imensa massa de credores prejudicados.

Ressalte-se ainda que, antes da intervenção levada a efeito pelo BACEN, o acionista controlador da admitiu, em escrito que está juntado à f. 2457, a situação de "defaut técnico", dependendo, para sua sobrevivência, da concessão de redesconto pelos cofres públicos.

Em face do exposto, decreto a falência da reqda., cujos administradores eram, ao tempo da intervenção, Edemar Cid Ferreira, Ricardo Ferreira de Souza e Silva, Ricardo Ancêde Gribel, Mário Arcângelo Martinelli, Clive José Vieira Botelho, Gustavo Durazzo, Sebastião Geraldo Toledo da Cunha, Abner Parada Júnior, Antonio Rubens de Almeida Neto, Carlos Eduardo Guerra de Figueiredo, Carlos Endré Pavel, Francisco Sérgio Ribeiro Bahia, José Mariano Drumond Filho, Márcio Serpejante Peppe, referidos à f. 12, fixando o termo legal em 90 dias contados do pedido.

Determino ainda o seguinte:

1) o prazo de 15 dias para as habilitações de crédito;

2) suspensão de ações e execuções contra a falida, com as ressalvas legais;

3) proibição de atos de disposição ou oneração de bens da falida;

4) anotação junto à JUCESP, para que conste a expressão "falido" nos registros e a inabilitação para atividade empresarial;



4



CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO

20/9/2005



# PODER JUDICIÁRIO

### São Paulo

2ª Vara de Falências e Recuperações Judiciais



5) nomeio como administrador judicial o Sr. **Vânio César Pickler Aguiar,** administrador de empresas, ficando consignada a total impossibilidade de continuação das atividades da falida;

6) intimação do Ministério Público, comunicação por carta às Fazendas Públicas e publicação do edital, na forma do parágrafo único do artigo 99 da Lei 11.101/2005;

7) Intimem-se os administradores da falida para prestar declarações, na forma do artigo 104 da lei mencionada, a partir do **dia 18 de outubro de 2.005, às 14:00 horas,** sob pena de desobediência.

8) Outros administradores de fato e de direito e membros do Conselho de Administração, referidos nos autos, também poderão prestar declarações em função do que for ocorrendo;

9) Lavre-se o auto de arrecadação dos bens cujo arresto cautelar já foi determinado;

10) Oportunamente, ouvido o administrador judicial, deliberarei sobre a assembléia de credores.

P.R.I.

São Paulo, 20 de setembro de 2005.

**Caio Marcelo Mendes de Oliveira**
**Juiz de Direito**

---

**CERTIDÃO**

Certifico e dou fé que a r. sentença de f. foi registrada no Livro de Registro de Sentença de nº _02/2005_, às fls. _41/45_, sob nº _____ _122_ /2005. Em _20_ de _Setembro_ de 2005. Eu, _____, Nilva Leonardi, escrevente, subscrevi

---

5

20/9/2005



CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO



# PODER JUDICIÁRIO

### São Paulo

2ª Vara de Falências e Recuperações Judiciais



**DATA**

Em _20_ de _setembro_ de 2.005, recebi estes autos em cartório. Eu, _____, Escrevente, subscrevi

6



CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO

20/9/2005





# PODER JUDICIÁRIO
### SÃO PAULO
Comarca  São Paulo – Foro Central Cível
2ª Vara de Falências e Recuperações Judiciais
2º Ofício de Falências e Recuperações Judiciais
Pça João Mendes Junior s/nº, 16º andar - salas 1616/1624, Centro - - CEP 01501-000 -
São Paulo-SP, F. 3242-0400 R1666

### Compromisso de Administrador Judicial

Em 21 de setembro de 2005, nesta cidade e Comarca da Capital do Estado de São Paulo, na sala de audiências do MM. Juiz de Direito Titular da 2ª Vara de Falências e Recuperações Judiciais, Dr. Caio Marcelo Mendes de Oliveira, comigo escrevente identificado no final, compareceu o Sr. Vânio Cesar Pickler Aguiar, Rg. 6605001 SSP/PR, CPF/MF 017.384.459-68, com endereço à Rua Dona Elisa Pereira de Barros, 715, Jardim Paulistano – São Paulo – SP, Tel: 3818-9000, a quem o MM Juiz deferiu o compromisso de bem e fielmente desempenhar as funções de administrador judicial, nos autos da Falência de Banco Santos S.A – Em Liquidação Extrajudicial, conforme sentença proferida em 20/09/2005.

Prestado assim o compromisso, prometeu cumpri-lo com fidelidade, sob as penas e na forma do artigo 33 da lei 11.101/2005.

Para constar, lavrei este termo que, lido e achado conforme, vai devidamente assinado. Eu, _____ Helena M. Hermesdorff, Escrevente Técnico Judiciário, digitei. Eu, _____ Alessandra Almeida Santos Nunes, Escrivã-Diretora, subscrevi.

Caio Marcelo Mendes de Oliveira
Juiz de Direito

Vânio Cesar Pickler Aguiar
Compromissado



CÓPIA EXTRAÍDA NO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO

Comarca  São Paulo Foro Central Cível
2ª Vara de Falências e Recuperações Judiciais
2° Ofício de Falências e Recuperações Judiciais

Processo n° 000.05.065208-7
Ação: Autofalência

- Requerente: **Banco Santos S/A**, com sede nesta Capital, na **Rua Dona Elisa Pereira de Barros n°715, Jardim Europa - SP, CEP 01456-000 - São Paulo-SP, CNPJ/MF n° 58.257.619/0001-66**; representado pelo administrador judicial, **Vânio Cesar Pickler Aguiar, brasileiro,   RG n°6605001 SSP/SP, CPF/MF n°017.384.459-68.**

                              **Alesçandra Almeida Santos Nunes** , Escrivã-Diretora do 2° Ofício de Falências e Recuperações Judiciais desta Comarca São Paulo, na forma da lei.
                              **C E R T I F I C A**, atendendo a pedido de pessoa interessada, que revendo em Ofício a seu cargo os autos do processo ·acima mencionado, distribuído a este juízo em 17/06/2005, tendo como partes as pessoas acima mencionadas. Valor da Causa: R$ 1.000.000,00 .**Objeto**: Autofalência requerida com base no  artigo 21, alínea b da Lei 6.024 de 13/03/1974 através do liquidante nomeado, sr. Vânio Cesar Pickler Aguiar. Tendo havido anterior intervenção do Banco Central  em 12 de novembro de 2004,  com base no artigo 1° c.c. os artigos 5° e 15, inciso I, alíneas "a" e "b", § 1° da Lei 6.024/74, ante o comprometimento  da situação econômico- financeira, deterioração da situação de liquidez e infringências às normas que disciplina a norma bancária. Tendo o interventor, apresentado ao Banco Central ( 11.02.05 ) relatório nos termos do artigo 11 do referido diploma legal, realizado exame nas principais práticas operacionais e dos ativos e passivos do Banco Santos, apurando  patrimônio líquido negativo, no valor de R$2.236,078.000,00 . E segundo a petição inicial, lesões ao patrimônio do Banco decorreram de atos de ex administradores e controlador, consolidados em operação  para transferência ou desvio de recursos para   empresas não-financeiras ou cobrir ativos insubsistentes de exercícios anteriores.  E diante de indícios da ocorrência de crimes falimentares  e a complexidade dos negócios  e gravidade dos fatos apurados, foi  decretada a liquidação extrajudicial pelo Banco Central  em 04 de maio de 2005, com base no relatório  apresentado pelo interventor. E posteriormente interposto o pedido de autofalência pelo liquidante, para decretação da falência  do Banco Santos S/A.  **Trâmite**: Certifica que por sentença datada de 20 de setembro de 2005,  foi decretada a falência, nomeado administrador judicial o Sr. Vânio Cesar Pickler Aguiar, RG. 6605001, CPF/MF 017.384.459-68. Certifica ainda que a fls.  3070, consta compromisso assinado pelo administrador judicial, datado de 21/09/05.     Deles verificou que possuem o objeto declinado e que se encontram com o andamento mencionado. NA_DA_MAIS. O referido é    verdade    e    dou    fé.    São    Paulo, /////27     de     setembro /de/     2005. u,           )((_____(CleoniceFarhate)Escrevente,digitei.Eu, //////////////////             )_____ (Alesçandra Almeida Santos Nunes)  Escrivã-Diretora , confeи e subscrevi.

Ao Estado: isento

Cód. 13,00.2.000

PODER JUDICIÁRIO
SÃO PAULO
2ª Vara de Falências e Recuperações Judiciais
2º. Ofício de Falências e Recuperações Judiciais
Praça João Mendes Júnior, s/nº - 16º andar, salas 1618/1622 - CEP  01591900 - São Paulo - SP -
Fone: 3242-0400

## CERTIDÃO DE OBJETO E PÉ

**ALESÇANDRA A SANTOS NUNES**, Escrivã Diretora do 2º. Ofício de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, na forma da Lei, etc

**CERTIFICA**, atendendo a pedido de pessoa interessada que pesquisando em Cartório verificou constar :

Processo nº **583.00.2005.065208-3/000000-000**          Ordem : **22/2005**

**Ação**: Autofalência

**Data da distribuição :** 17/06/2005

**Requerido:**
BANCO SANTOS S/A - MASSA FALIDA, CNPJ/MF 58.257.619/0001-66, representado pelo administrador judicial Sr. Vanio Cesar Picker de Aguiar RG. 6605001 SSP/PR, CPF/MF 017.384.459-68, com endereço à Rua Dona Elisa Pereira de Barros, nº 715, Jardim Paulistano - São Paulo - SP

**Objeto**                              **da**                              **ação**

Falência requerida com base no artigo 21, alínea b da Lei 6.024 de 13/03/1974.

**Certifica** que por sentença datada de 20/09/2005, foi decretada a falência do Banco Santos S/A, nomeado administrador judicial o Sr. Vanio Cesar Pickler de Aguiar (compromissado a fls. 3070 e acima qualificado), fixando o prazo de 15 dias para as habilitações de crédito e o termo legal da quebra em 60 dias anteriores à decretação da intervenção do Banco Central do Brasil, que ocorreu em 12/11/2004, determinando a suspensão de ações e execuções contra a falida, com as ressalvas legais. Certifica mais e finalmente que os autos encontram-se em fase de realização do ativo e apuração do passivo. São Paulo/SP, 19 de dezembro de 2007. Eu, _____ (ALESÇANDRA A SANTOS NUNES), Escrivã-Diretora, matrícula 315930, digitei conferi, subscrevi e dou fé.

ALESÇANDRA A SANTOS NUNES
DIRETORA DE DIVISÃO
MATR. 315930-2

2.º Ofício de Falências e
Recuperações Judiciais
Fórum João Mendes Júnior
Drª ALESÇANDRA A. SANTOS NUNES
Diretora de Divisão
Praça Dr. João Mendes, s/nº

FEDTJ: isento

Página 1 de 1

# JUDICIARY

3515
[handwritten]

## São Paulo

### 2nd Chamber of Bankruptcy and Judicial Reorganization

Case No. 583.00.2005.065208-6/86

Findings.

This is a motion devised jointly by the administration of the insolvent estate, BANCO SANTOS S.A., and the PUBLIC MINISTRY OF THE STATE OF SÃO PAULO, aimed to extend the bankruptcy effects to several enterprises and individuals, on the grounds that, during the legal existence of the financial institution, fraudulent acts that resulted in diversion of its assets to the companies listed herein, took place.

Initially, the motion was presented by the Public Ministry, but was subscribed, a second time, by the insolvent estate's administrator, who limited the proceedings for extension only to EDEMAR CID FERREIRA, ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A., CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA, and FINSEC S.A. COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIROS.

And thus, the initial order was granted.

According to the motion summary originally submitted, the bankruptcy extension, by hypothesis, should include the contact person of the main partner of Banco Santos, Edemar Cid Ferreira, in accordance with article 81 of the existing Bankruptcy Law. He was a partner with unlimited liability, and therefore, he requested the bankruptcy, and as a consequence, his own, under article 106 of the Corporate Law.

[Illegible signature or initials]

1

# JUDICIARY

## São Paulo

3516
[handwritten]

### 2nd Chamber of Bankruptcy and Judicial Reorganization

It was argued at that time that the administrator of the bankrupt entity had committed a crime consisting on the omission of an entry that should appear on the accounting records in accordance with article 188, VII, of Law Decree 7661/45 and 10 of Law 7492/86.

He also made, through the company Alpha Negócios e Participações, payments close to the amount of one hundred million Brazilian reals to bank directors, with alterations of the financial statements, not recording the relevant expenses on the respective balance.

Also, the bankrupt entity had been using the procedure of transferring the records of bank employees to other companies, without the computation of the same, misrepresenting the balance, doing the same for the insurance costs, the building's cleaning and advertising expenses, transferring these to the responsibility of the company Procid Invest, "*providing an image of a good bottom line to the market*".

The initial investigation also references, and is based on actions of the bankrupt entity, which involve: a) fraud to the Risk Central of the Central Bank, b) operations with fraudulent flexible options of Bovespa indexes, without the payment of the mandatory fees and the Provisional Contribution on Financial Transactions c) insufficient capitalization of the Bank, even before the determination for providing doubtful credit from its assets, d) the administrator acting in their personal interest, donating bank's funds to other group companies; e) use of the bank's personnel also for personal interests f) unsuitable information to the auditing firm (pg. 47); g) use of the company PDR to pay debts of Atalanta Participações e Empreendimentos Ltda.; h) use of the companies Delta, Ômega, and Quality for diverting money from the bank.

[Illegible signature or initials]

2



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3517
[handwritten]

Also, according to the original investigation, the bankrupt company engaged in patrimonial promiscuity with the others mentioned, having a common registered headquarter, confusion of professional activities, use of the same operating structure, directors and trustees in common, besides identical partners, all causing confusion to those negotiating with the bankrupt entity.

The only resource generating companies were the bank itself, and E-Financial, which provided services to it. The other companies, notably, Atalanta, Hyles, Cid Collection, Maremar, and Finsec, had no operational activity and were controlled by others abroad with the purpose of laundering money taken from the bank itself, being of use for the perpetration of fraud, with existing control from the administrator of the bank upon them.

The petitioners base it on operations that claim to have been harmful to the bankrupt entity, carried out by PDR Corretora de Mercadorias, which used to capture securities from credit unions and farm products that would be used for the payment of Atalanta Participações' expenses, mainly for the construction of a valuable residential property at Rua Gália, 120, and also for diverting assets abroad. Former controlling partner, Edemar, is the homeowner, residing in the same, and has control over the art collection and other assets on behalf of the company Cid Collection.

With these considerations, a motion to determine extension of the bankruptcy was formulated, the administrator was appointed, with or without a formal declaration of bankruptcy, and Edemar Cid Ferreira is identified, incidentally, as the true owner of the assets of the companies Atalanta, Hyles, Cid Collection, Maremar, and Finsec.

They also asked for the forfeiture of books, provisional collection of assets, prohibition on transferring rights pertaining to the company E-Financial Technology e Serviços Ltda., and suspension of the lease agreement.

[Illegible signature or initials]



# JUDICIARY

São Paulo

3518
[handwritten]

2nd Chamber of Bankruptcy and Judicial Reorganization

In preliminary injunction (pages 1623/1626), this Court granted the provisional collection of assets of these companies, which was consolidated with the files that are included with the procedure.

Written statements were presented.

Edemar Cid Ferreira states that the rule of article 81 of the Bankruptcy Act cannot be applied as he cannot be considered a partner with unlimited liability when ongoing liability action exists, as established by Law 6024/74. He requested the termination of the proceeding.

Atalanta, Cid Collection, and Maremar (pg. 1850) claimed, in the preliminary process, the lack of active legitimacy of the Public Ministry, in sense that they were not cited and summoned to present their defense and, further, stating the unacceptable extension of the bankruptcy, pursuant to the law, and that the process should be treated as an autonomous action, with the preservation of the right to defense, attributing the jurisdictional amount to it. Further, they state that the replacement of procedural operations were inappropriate and, in their defense, claimed that the evidence used is unlawful, violating the confidentiality protected by law, particularly, by inappropriately accessing the existing emails from the systems of the bankrupt entity, which were to be removed from the records and destroyed. Grounds or evidence did not exist for disregarding the legal personality of the defendants, particularly fraud or diversion of resources or functions. They state that the dividends that the bankrupt entity paid to its controlling shareholder were almost entirely used for the capitalization of the bank itself, which could be proved through an accountant.

Next, considerations about the initial incorporation were argued, stating that Edemar Cid Ferreira, partner of Valence Enterprises Inc., donated his share to his wife even before the incorporation of the bankrupt entity, to segregate assets from the risk of banking activities (pg. 1878).



They admit that Edemar managed the companies on behalf of his wife, being its administrator in fact, being normal for him to behave as the owner of the residence at Rua Gália, 120.


According to the defense, the cultural and advertising activities of Edemar represented good business practices for the bankrupt entity. Márcia's assets were completely segregated from the business risk. They deny fraudulent acts and that the company PDR would have paid for Atalanta's expenses, or even the remittance of funds abroad. They further deny to have received money from Banco Santos. On the contrary, they received contributions from abroad, in regular exchange contracts. To summarize, they claim the legality of their operations and say that the transfer of works was done at the purchase price (pg. 1886).

Furthermore, they claim that the collaboration of personnel of an institution with the personal affairs of their superiors is normal. Finally, challenging the petition for the collection of assets, they claimed that the home at Rua Gália, 120 is excluded pursuant to Law 8009/90, requesting a rejection of the motion for bankruptcy extension, with a sentence provided through motion for clarification.


Hyles' defense relates to the others, asserting that its assets date back to 19 years prior to the incorporation of Banco Santos. The company belongs to Wailea Corporation, headquartered in the British Virgin Islands, which, in turn, belongs to Principal Enterprises, which shares are Márcia Cid Ferreira's. Hyles has a joint owner, with 26.45% of the property at Rua Gália, 120.


In its defense, Finsec S.A. states that its insolvency is not proven, which is the only possible way for bankruptcy, allowing only article 50 of the Civil Code, in case of abuse, for the effects of certain and specific relations to be extended to personal assets of the administrators of a legal entity. It was stated that Edemar Cid Ferreira was its indirect controller until February 2005, but now is controlled by the insolvent estate of Alsace Lorraine. With the declaration of bankruptcy, the control

[Illegible signature or initials]

5

# JUDICIARY

## São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

passed to its insolvent estate. He affirms that his business activity and securitization is legal, and regulated by Bacen. The bankrupt entity provided credit through cash payments. Its capital came from capital contributions of the controller Chory, with regular fund remittances from abroad. It denies the charges against it or any fraud when obtaining its share capital, or even confusion of assets with those of Banco Santos, petitioning the demand's rejection.

The administration of the bankrupt estate and the Public Ministry presented a petition in pages 2614 and 2615, excluding the extension of the companies mentioned therein, and appearing both as petitioners of the motion for extension.

About the defenses presented, the bankrupt estate (pages 2211 and the subsequent ones) and the Ministerial Body (pages 2697 and the subsequent ones) provided statements.

The records are documented with a copy of the criminal sentence dictated in Federal Court (pages 2487 and the subsequent ones) and other documents, to inform the interested parties.

The report.

I hereby decide.

Preliminary stray based on the defenses presented.

The matter of active legitimacy of the Public Ministry for the extension of the bankruptcy petition is resolved since the statements from this Court about the joint petition that the mentioned body signed along with the administration of the bankrupt estate, passing then the petition - which was initially granted only for the judicial administrator - is to be processed jointly.

[Illegible signature or initials]

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

This Court thinks that the important matter, unquestionably, is regarding the administration for the bankrupt estate's legitimacy for the motion for bankruptcy extension, pursuant to current legislation, since it must take the necessary steps to restore, to the fullest extent possible, its assets. Thus, nothing prevents the joint presentation (bankrupt estate and Public Ministry) of the motion because there are no reasons for the claims of the companies that are now being defended.

The claims pertaining to the lack of citation are also excluded because what is relevant is that those companies had the opportunity to present a defense, completely satisfying the constitutional requirement.

The motion for extension can and should be interpreted as a simple collection request for the integration of assets to the bankrupt estate. It is a simple matter, and it is not processed as an autonomous action.

In any case, the aforementioned companies came in front of the Court, after a notification about the petitions were made, and solid written defenses were presented, not suffering, therefore, any damages that may call for the invocation of article 214, section 1 of the Code of Civil Procedure, and the consequent lack of citation, as mentioned, was unnecessary.

For the same reasons, because of these being simple incidents, the formality of the jurisdictional amount is absolutely unnecessary.

The companies which are now defending themselves, claim the use of evidence they consider unlawful in the initial petition, claiming the violation of confidentiality protected by law. They refer to several e-mails attached to the initial petition, extracted from the bankrupt entity's system.

[Illegible signature or initials]

7

# JUDICIARY

3522
[handwritten]

## São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

Nothing could be more inaccurate, however.

With the declaration of extrajudicial liquidation, authentic administrative bankruptcy due to the serious reasons listed by the competent authority, it is evident that the bank's documents are now of public access.

It was therefore the responsibility of the liquidator appointed by Bacen or the administration of the estate, to arrange for the collection of those documents. Moreover, articles 22, II, "f" and 108, both from Law 11101/2005 state that the judicial administrator collects the debtor's property and documents.

About the hypothesis questioned, the diligence of the Public Ministry was authorized by this Court when it no longer had access to that documentation. It was, I repeat, of public access, and mainly of interest to the estate and creditors.

To say that this documentation would undermine the secrecy preserved by the constitution does not honor the truth because the officials of the bankrupt entity would not be able to use its premises for private purposes, as they are inherent to banking activities authorized by the State. In addition, what is observed is that such documentation was not refuted as to its content.

I hereby confirm about the defense presented by Edemar Cid Ferreira against the petition of bankruptcy extension to him as an individual.

On this topic, I note that there were very well justified claims by the Public Ministry, endorsed by the administration of the insolvent estate.

[Illegible signature or initials]

8

# JUDICIARY

São Paulo

3523
[handwritten]

2nd Chamber of Bankruptcy and Judicial Reorganization

It is not to deny that, the companies involved directly or indirectly to that person, whether or not in a formal way, have undeniable proprietorship characteristics. The statements heard by many administrators in this Court, the appropriateness of article 104 of the Law 11101/2005 showed, indeed, that even Mr. Edemar was directly responsible for the administration of the Bank, giving it an eminent personal character.

Moreover, this situation was well evidenced by the extensive investigation carried out by the Central Bank of Brazil, pursuant to current legislation, as well as him being completely linked to several illegal financial operations involving the bank and the companies affiliated to it.

However, it seems to me that, except for putting the label of bankrupt to one that probably deserved it, the acceptance of the intentions in the formal and practical aspect, is not appropriate.

The rule of art. 81 of Law 111001/2005, by its writing or by doctrinal understandings, only applies to the partners with unlimited liability, and Banco Santos was a duly registered corporation. Furthermore, since there is already public civil action pursuant to Law 6024/74, of which the aforementioned individual is already a defendant and, thus, may have his assets collected to pay for the administration's damages.

For these reasons, the extension of bankruptcy to Edemar Cid Ferreira is unnecessary.

But for the other companies, it is obvious that the extension of the collection of assets of Banco Santos is needed.

The link between them and the bank, with the purpose of hiding assets, is well established, either by copious documentation presented in the initial case, or through the evidence collected in the



# JUDICIARY

São Paulo

3524
[handwritten]

2nd Chamber of Bankruptcy and Judicial Reorganization

administrative investigation by the Central Bank of Brazil, who is now, through criminal proceedings, going against several administrators of Banco Santos, according to sentence copied on pages 2747 and subsequent.

The extension of bankruptcy is justified because all companies mentioned have not presented any economic purpose, and were used to abuse rights and hide assets, which frustrated action from creditors. There was centralization of businesses and interests of Banco Santos in its management. The companies are linked, in one way or another, and they all are ultimately controlled by Edemar Cid Ferreira or his wife.

They had the same control and its structure gave rise to undeniable confusion of assets.

It is known that these companies received funds that entered the country as investments of its controlled companies abroad, for very significant amounts.

The document of page 2265 and subsequent pages, shows the amount of US $ 51.7 million for Atalanta; US $ 2.6 million for Cid Collection; US $ 98.9 million for Finsec; and US $ 283.7 million for Maremar. And during the criminal proceedings: "*returning the capital diverted to the country involved* ", attaching the same importance (page 2776).

Edemar Cid Ferreira himself admitted having performed operations to frustrate the actions of creditors.

In his defense, it was said:

> "*Edemar Cid Ferreira was also a partner of Principle (former Valence), but donated his participation to Márcia Cid Ferreira in 1998, when nobody, not even the Central Bank, not even the illustrious Doutor Promotor, imagined that one could predict the bitter end of Banco Santos, which then began its rise. The reason was to provide assets completely dissociated from his to his wife, already separated by force of the matrimonial property regime*. "

[Illegible signature or initials]

10

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

The causes of Banco Santos' bankruptcy were well outlined in the extensive investigation by the Central Bank of Brazil.

According to that piece, "*the main cause of the fall of the institution was the systematic and deliberate bulky operations harmful to the Bank, which had as their intermediate counterparts, stakeholders or recipients of resources, companies that, according to prima facie evidence gathered (Chapter 3-1), would be controlled, owned, formally or informally linked, or used by former directors of Banco Santos or its controller. Carrying out several types of operations of this nature resulted in an impaired economic and financial situation, the inability of capitalizing, a net negative adjusted situation, and deterioration of liquidity*."

Further on the report, the rough operation performed by the administration of the bankrupt entity was mentioned:

"*Structured operations with Rural Product Bonds- CPR, called "Rent CPRs", through which farmers were issuing securities and, through "drawer contracts", were rented to intermediary companies, formally or informally linked to former directors of Banco Santos or its controller, receiving generally a small fraction of the face value of the rent. These related companies, in turn, by endorsement, would sell securities to Banco Santos for their alleged full value. In short, the Bank gave funds to the related companies, and in return, received inexistent assets on behalf of others (Chapter 3.2).*"

Besides this occurrence, which withdrew from the bank's reserves the amount of BR $ 461,884,362.25, updated for 2005, as viewed from page 2715 of the bankruptcy records, other serious issues occurred with the rental operation of "export notes", with concessions of loans to companies linked to former bank administrators or its parent companies, with disguised loans to clients through operations of buying unsecured flexible options and the issuance of instruments necessary for billing (chapter 3.6 of the investigation's findings), aside other matters harmful to the Bank.



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3526
[handwritten]

In the sentence pronounced by the Federal Court, it was stated that "*The investigations showed that several of the companies receiving such credits in their accounts belonged to, or operated with currency dealers or factoring companies*" (pg. 17 of the criminal sentence).

And the investigation committee of the Central Bank: "*It should be registered as well, that in chapter 4.2 there are several payments and numerous businesses without economic solvency, from which follows that Banco Santos's diverted funds were sent abroad by other means an not through Brazil's official exchange system, returning to the country through official channels, when there was a need* (pg. 23036, findings of the Investigation Committee).

In addition, there is no doubt about the incorporation of Bank of Europe Limited and its partner, Alsace Lorraine in 1996, headquartered in Antigua, a known tax haven. According to the criminal sentence, the bank was created to be a clandestine branch of Banco Santos, and served to receive diverted funds of the bank itself, existing testimonial evidence taken from former employees, in those records, that indicates that it actually belonged to the bankrupt entity (page 12227, criminal sentence). In international operations, the customers of Banco Santos, who had savings abroad, would take out loans in Brazil, in Brazilian Reals, and provided their savings as collateral (known internally at Banco Santos as "*M-Fora*" or "*Pledge - Collateral Agreement*"), receiving as a result, "*participations*" or promissory notes that Alsace Lorraine, among others, issued and which were held in the Bank of Europe. With these operations, Brazilian Reals of Banco Santos were released for its customers in Brazil, and Alsace kept the dollar value overseas. In the criminal sentence, there is reference to three such operations, notably, in the cases of Odebrecht S.A., Biossintética Farmacêutica Ltda., and Antilles Embalagens Editora e Gráfica S.A.

[Illegible signature or initials]

12



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3527
[handwritten]

In the committee's records, Alsace's clients loss is confirmed (see Banco Santos) at around US$ 225 million.

In chapter 4.2 of the Central Bank's Investigation Committee (pg. 22980 and subsequent ones) the engineering used for diverting resources from Banco Santos is detailed.

In the same criminal sentence, the return of part of the diverted funds back into the country with reference to the settled exchange contracts was confirmed, according to page 27/29 of that sentence, which concluded:

> "*In that way, part of the diverted bank funds returned to the country to maintain cash flow and counterbalance, through simulated operations, the institution's balance sheet, making payments to officers and directors, to pay for expenses unrelated to the company's purpose, such as maintenance to its chairman's mansion, and invest in property and artwork and decoration, completing thereby the integration of capital, the cycle of laundering funds from the financial management of the financial institution…*" (pages 02/46) "- pg. 2778.

And the connection of entrepreneurial companies that hereby defend themselves about these incidents, to Banco Santos, is notorious.

In the final report of the aforementioned Investigation Committee (article 43 of Law 6024/74), the names of numerous companies here and abroad, linked to the Bank, its controller or family, formally or informally, are included. Among them, there are explicit references to Finsec, and Cía. Securitizadora Ltda., controlled by the offshores Chory and Bluecrown, both listed in Table 1 of page 2658 (of the bankruptcy files).

[Illegible signature or initials]

13



# JUDICIARY

3528
[handwritten]

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

An unqualified individual was appointed as Director of Finsec. This person stated (pg. 2.683/1.684) to have a company with Mr. Edemar. This statement proves the connection of this company to the controller of the Bank, placing there someone who he could manipulate. Also, according to a mentioned testimony, Joaquim Gomes de Almeida, accepted the proposal made by Álvaro Zuccheli Cabral, director of the bankrupt entity, to sign documents on behalf of Finsec.

The testimony of Andréa Sano Alencar to the Federal Police, mentioned the incorporation of Finsec and of Creditar by contractors, at the request of the Bank's Legal Department.

The conclusion of the Investigation Committee was that Finsec was used in securitization transactions, as a purchaser of the debts belonging to Banco Santos.

In its submissions before this Court, one of the leading directors of the Bank (Clive José Botelho) states:

> "... *It was commonly said in the Bank that FINSEC belonged to the controller, you don't buy a problematic credit for a value which was not worth it if it was not the controller's himself, and was also the case that, the company itself that would audit the balance, knew that it was an indirect way of the investors to capitalize on a purchase of bad credit* (pg. 5325, bankruptcy records). "

It should be noted that it had its opening on 3.30.2000, controlled on 4.5.2000 by Chory Investments Corp., based in the British Virgin Islands. It received funds originating from foreign exchange operations, using them to purchase credits from the bank (pg. 264 of the Investigation Committee, Process 583.00.2005.091647-5).



# JUDICIARY

São Paulo

3529
[handwritten]

2nd Chamber of Bankruptcy and Judicial Reorganization

It should be noted that this company, Finsec, for the claims that has before this Court, is not found, and does not have a known address, even though, when convenient, appears in Court, duly represented, as in this case.

About Maremar, Ruy Ramazini's testimony (pg. 2686 of bankruptcy records), its director, confirmed that this was a company belonging to the family of Banco Santos' controller. Its function was to bring from abroad the large amounts that, after passing through various operations of questionable economic reasoning, the Bank used to capitalize. Maremar's funds were sent by the offshore, Principle Enterprises (former Valence), based in Panama. In the same interview mentioned above, he states:

> "that in the capacity of attorney of this company, the respondent signed, together with Dr. Vera Lúcia Rodrigues da Silva, legal instruments necessary for the increase of capital, with funds coming from abroad to then formalize the loans to Mrs. Márcia de Maria Costa Cid Ferreira"

The one who holds formal control of Principle Enterprises is Mrs. Márcia de Maria Costa Cid Ferreira.

In the electronic files of Banco Santos, a letter from 11.26.2001, signed by Principle, addressed to the Swiss Bank Corporation, seeking the transfer of US$ 70,000.00 from its account to credit the account of Edemar Cid Ferreira, held at that bank, is included (pg. 15596 of the Investigation Committee).

Márcia Cid Ferreira is a partner of Hyles, Atalanta, and Cid Collection. Atalanta is controlled by Blueshell, headquartered in the British Virgin Islands, and is controlled by Wailea, like Cid Collection. It is true that Wailea's representative in Brazil is Rodrigo Cid Ferreira, son of former Controller of Banco Santos.

[Illegible signature or initials]

15

3530
[handwritten]

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

The Central Bank's Investigation Committee's report (pg. 2692) indicates that these companies received directly or indirectly, assets from abroad, resulting from unexplained economic activities, benefiting Edemar Cid Ferreira. And the report continues: "*Hyles was represented by the secretary of Mr. Edmar, Vera Lúcia Rodrigues da Silva, and his sister, Edna Ferreira de Souza; Atalanta was represented by Vera Lúcia and Ruy Ramazini. In the testimony that the latter gave before the Investigation Committee, he admitted to being the attorney for both companies at Vera Lúcia's request, the aforementioned secretary.*"

Those two companies are the exact owners of the famous property at Rua Gália, 120, mansion where the former controller of Banco Santos resides.

In page 2693 of the record, there is evidence that the property at Rua Gália, 120, is administered by twenty people, among them, a manager hired by Atalanta, and also "*the company has been especially incorporated for the construction and administration of the property at Rua Gália, 120, residence of Mr. Edmar, with funds coming from abroad.*"

In her testimony, Edna Ferreira informs that she holds minority shares in the company Atalanta at the request of her sister in law, Edemar'a wife, ignoring the company's activities.

Also, Cid Ferreira Collection, owner of the artwork gathered by Banco Santos' controller, has received funds from abroad through its controller, Wailea Corporation, whose responsible party, in Brazil, as said, is the son of the Bank's former Controller.

Page 37 of the criminal sentence, verifies references of the Central Bank's investigation records, indicating that the companies Maremar, Atalanta, and Cid Collection, received in exchange

[Illegible signature or initials]

16



# JUDICIARY

São Paulo

3531
[handwritten]

2nd Chamber of Bankruptcy and Judicial Reorganization

operations, the amounts of US $ 306,410,243.21, US $ 51,748,000.00, and US $ 2,560,000.00, respectively. And it further mentioned:

> "Edmar Cid Ferreira's relatives, namely, his mother, wife, sister, and nephew, integrate, with an almost negligible number of shares, the share capital of national trading companies, whose majority partners are always **offshore** companies based in tax havens. These companies' nominees in Brazil are Edemar Cid Ferreira's relatives.

> The national companies do not have effective social objects, same as foreign companies. The first ones have, as tax addresses, rooms neighboring commercial premises. The latter ones resort to the same address in their home country, often using one like the post office responsible for their incorporation.

> At one point, the unknown foreign companies discover that investing in the national companies can be a good business, and inject millions of dollars into the Brazilian "developments" over the years.

> The above contradicts the most basic logic. It is, indeed, the materialization of money laundering's last stage, known as integration, when the product of a previous crime rejoins the formal economy. We face an old and well known strategy to give the appearance of legitimate capital coming from criminal origins. In this strategy, domestic companies receiving investments from their foreign partners, are in fact, the same national partners protected by the secrecy guaranteed by **offshore** companies headquartered in tax havens.

> In case 2006.61.81004274-8, Márcia de Maria Costa Cid Ferreira, contrary to the statements provided for the police investigation, asserts that she is

[Illegible signature or initials]

17

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

the controlling shareholder of Principle Enterprises, a successor of Valence Enterprises, albeit without presenting documents that effectively prove this assertion .

In the tax statement for fiscal year 1986, Márcia reported 133 (one hundred and thirty three) shares of Valence Enterprises Inc., with a share value of US $3,000.00 (three thousand dollars), adding up to US $399,000.00 (three hundred ninety-nine thousand dollars).

Note from the picture indicated above that the four companies previously mentioned received more than three hundred and sixty million dollars in the period indicated.

Thus, it is not credible that Márcia's shares suffered an overvaluation of 90225% (ninety thousand, two hundred twenty-five percent) on those shares on a period of less than twenty years, providing all the capital injected into the Brazilian companies. This would be a unique case in international financial markets, especially when it comes to a business absolutely unknown, like Valence, and that does not operate on the Stock Exchange, being impossible for an enterprise that has a fiscal domicile in a P.O. Box, as always happens with **paper companies.**

Furthermore, Banco Santos S.A. had **offshore** companies in its official structure. These companies are called Valence Services, and Valence Insurance, therefore, not being the case of mere coincidence, the corporate name of the company for which Márcia is said to be the controller.

Meanwhile, Ruy Ramazini, as stated in his own police interrogation, in addition to being the attorney for Maremar, and Atalanta, was a partner of Alpha

# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

> *Negócios e Participações Ltda.., which received more than US $27 million, through foreign investments between 2001 and 2004. The directors of Banco Santos received their annual bonuses amounting to hundreds of thousands or even millions of Brazilian reals through the latter company."*

Therefore, as the report from the Central Bank of Brazil's Investigation Committee proved, there is a close link between the companies that are hereby defending themselves, as well as the former controller, his wife and relatives, and the companies incorporated abroad, many in tax havens. And also the ploys that were used to misappropriate the Bank's reserves, with remittance of amounts abroad and subsequent transfer into the country, for already known purposes.

These sums were used for the construction of the extraordinary mansion at Rua Gália, for which approximately BR$ 147 million were spent, and also for the purchase of the artwork so enjoyed and sought - to be incorporated to the Union - by the Federal Judiciary.

In this regard, I turn my attention to the brilliant sentence dictated on that Court by the Honorable Judge of the 6th Federal Court, specialized in Money Laundering Crimes.

After the necessary basis were established, the Magistrate has no doubts in informing that the property at Rua Gália, 120, was purchased with money laundering funds, resulting from the embezzlement of reserves from Banco Santos S.A.

The sentence stated:

> *"This property is registered in the name of Atalanta, and Hyles, owned by Márcia Cid Ferreira, and Edna Ferreira de Souza e Silva, as well as offshore companies, among them, Blueshell and Principle Enterprises Inc. (former*

[Illegible signature or initials]

19



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

*Valence Enterprises), included on this defendant's tax statement, and Waiela Corporation. These Brazilian companies, including the offshore ones, have been maintained for a single purpose: to provide for the concealment of amounts resulting from crimes committed by former administrators of Banco Santos, S.A...., and to allow the circulation of illegal funds, returning them for the construction of the property at Rua Gália, 120, and also to pay for expenses in Brazil, and sometimes, so that Márcia Cid Ferreira could capitalize companies linked to Banco Santos, in the form of donations. Almost always, the inflow of foreign funds took place on the "foreign investment line in the country", given that tax evasion took place through money diverted from Banco Santos SA. and that, once abroad, would purchase shared capital of the previously described offshores.* (Page 3364).

In the same sentence, there is reference indicating that the property occupies twelve properties, and that its construction began in 2001, with demolition of the previous building after the acquisition of the lots next to it. Note that the construction ended around 2004, in a period in which the bank was conducting business activities, and exactly when the aforementioned fraud was perpetrated.

Such a criminal sentence resulted in the seizure of assets from Atalanta, Hyles, and Cid Collection, in favor of the Union, acknowledging, with a strong basis, its connection with the assets improperly withdrawn from the bankrupt entity's reserves.

There is hardly any disagreement about the allocation of the aforementioned assets due to the fact that, according to article 91, II, of the Penal Code, and Law 9613/98, the allocation to the Union may only occur if there are affected creditors.

[Illegible signature or initials]

20

# JUDICIARY

## São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3535
[handwritten]

Therefore, reading the laws mentioned would be sufficient. However, such assets, in most cases, were declared incorporated into the Federal Union's assets through the criminal sentence dictated by the Federal Court, which included in its determination, their immediate transfer, with destination from the house at Rua Gália, 120, to the museum.

However, the preliminary injunction accepted by the Superior Court of Justice in a jurisdictional case, temporarily revoked, this determination.

The link between the companies that are defending themselves herein, and Banco Santos, as well as the patrimonial promiscuity, are also demonstrated by the copious documentation that was attached to the initial petition, notably, the electronic correspondence, which has already been mentioned. An example is the message from Edemar Cid Ferreira, addressed to the bank's directors, advising the companies that held artwork ownership to sell them for BR$ 1.00 to Cid Ferreira Collection. In the same document, it is stated that all artwork that had no origin, should pass to the control of Márcia Cid Ferreira.

There is no reason to hold the allegation that the property at Rua Gália, 120 is a family asset since it is under the legal entity's name, and there is no justification for its protection, when it has already been determined that funds diverted from the bankrupt company were used for its construction, remembering that funds near BR$ 147,000,000.00 were used.

The production of expert evidence is completely unnecessary and useless in regard to the allegation stating that the dividends paid by the controlling shareholder of the bankrupt entity were used for the Bank's own capitalization. As it is known, the only assets of the controlling company, Procid Participações, is the bank itself, now bankrupt, and with uncovered liabilities of over BR $ 2.5

[Illegible signature or initials]



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

billion, in addition to being liable to the estate, in the amount of BR$ 100 million , according to data obtained from the balance shown for the bankruptcy petition.

The criminal sentence confirms this assertion, when on pages 3126/3129, "Fraudulent Accounting" chapter, states:

> "*These practices, among others listed below, have demonstrated the consistent rendering of ideologically phony data to the monetary authorities in order to give appearance of regularity and transparency of* **Banco Santos's** *conduct*, *in addition, omitting to the investors the true economic and financial situation.* "

The facts recounted herein, leave no doubt that the bankrupt entity has abused several companies, with the illegal purpose of frustrating actions from creditors. In the monetary authority's arena, as well as in the criminal framework, these facts have been thoroughly demonstrated by documentary evidence and witnesses, being completely legitimate to conclude herein that most of the operations carried out by the Bank were aimed at transferring resources to non-financial companies outside the scope of banking supervision and independent auditors. This mechanism facilitated handling resources out of the country to the bankrupt entity, returning them as legitimate, a true money laundering activity.

Finally, the Honorable Judge of the 6th Federal Criminal Court, on page 3405, sentenced the bankrupt individual, Edemar Cid Ferreira, to a penalty of 21 years of confinement, and subjected him to a penalty based on conducts described in the Criminal Code and the laws on crimes against the financial system and money laundering. There was also a penalty of four years of confinement imposed upon Márcia de Maria Costa Cid Ferreira, for breaking the Money Laundering Act, regarding



# JUDICIARY

### São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3537
[handwritten]

the concealment of the origin and possession of assets directly resulting from crimes described in the law of crimes against the financial system ( pg. 12788).

In view of the aforementioned, I grant, in part, the petition submitted with the purpose of determining the extension of the bankruptcy of BANCO SANTOS S/A to the companies mentioned herein, which are also declared bankrupt.

The legal representatives of ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A., or the nominees of its companies, Blueschell Inc., and Principle Enterprise Inc., are Márcia de Maria Costa Cid Ferreira and Edna Ferreira de Souza e Silva.

The legal representatives of CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., or the nominees of its partner, Wailea Corporation, are Márcia de Maria Costa Cid Ferreira, Rodrigo Rodrigues de Cid Ferreira, and Eduardo Costa Cid Ferreira.

The legal representative of MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, and nominee of its partner, Principle Enterprises Inc., is Márcia de Maria Costa Cid Ferreira.

The legal representative of HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA., and nominee of its partner, Bokara Corporation, are Edna Ferreira de Souza e Silva, and Rodrigo Rodrigues Cid Ferreira.

[Illegible signature or initials]

23

# JUDICIARY



São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3538
[handwritten]

The legal representative of FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIRAS, is Joaquim Gomes de Almeida, who represents its partners, Chory Investments Corp., Ângela Marcondes Barros de Almeida, and MB Molduras do Brasil Indústria e Comércio Ltda.

I establish the legal term at 60 days prior to the extrajudicial intervention of Banco Santos S/A.

 I further determine the following:

1) the term of 15 days for credit reviews, starting from the date of publication of the notice indicated in point 6, being exempted the ones that are correctly registered in the records eventually presented and included in the publication,

2) suspension of foreclosures against the bankrupt entities, with the legal exceptions,

3) prohibition of liens or encumbrances of assets against the bankrupt entities;

4) Annotation next to JUCESP, so to record the word "bankrupt" in the records, as well as the inability to carry out business activities,

5) I appoint Mr. **Vânio César Pickler Aguiar**, a business administrator, as the Judicial Administrator. The conditions for continuing business activities are not verified. The collection and seizure order is to be issued to definitely restrain the one issued before;

6) Subpoena of the Public Ministry, communication by letter to the Public Treasury, and publication of the notice, as provided in the sole paragraph of article 99 of Law 11101/2005;

7) Summons to the representatives of the bankrupt entities, in person and through publication, to provide, within 5 days, the nominal relationship to the creditors, in conformance with article 99, III, of the Special Law, and to provide their statements, in accordance with article 104 of the aforementioned law, on **August 22nd, 2007 at 2:00 pm**, under penalty of perjury;

[Illegible signature or initials]

24



# JUDICIARY

São Paulo

2nd Chamber of Bankruptcy and Judicial Reorganization

3539
[handwritten]

8) I grant the issuance of notice and the customary to the Tax Authority, with the purpose of obtaining the perfect collection of assets from the now bankrupt companies, providing an appropriate procedure for each one of them with a copy of this sentence, and

9) I determine the delivery of a copy of this decision to the Honorable Reporting Judge with Jurisdiction.

Let it be published, registered, and notified.

São Paulo, July 4th, 2007

[Illegible signature]

**Caio Marcelo Mendes de Oliveira**

**Law Judge**



3543
[handwritten]

# JUDICIARY
São Paulo
District of São Paulo
Central Civil Court
2nd Chamber of Bankruptcy and Judicial Reorganization
2nd Office of Bankruptcy and Judicial Reorganization
Pça João Mendes Júnior, no number – São Paulo – SP – Telephone: 2171-6507

### JUDICIAL ADMINISTRATOR AGREEMENT

On July 10th, 2007, in this city and District of the Capital State of São Paulo, in the courtroom of the Hon. Law Judge, Dr. Caio Marcelo Mendes de Oliveira, incumbent upon the 2nd Chamber of Bankruptcy and Judicial Reorganization, appeared, together with myself - a clerk identified below -, Mr. Vânio Cesar Pickler de Aguiar, with offices at Rua Dona Elisa Pereira de Barros, 715, São Paulo, Telephone: 3818-9048, to whom the Honorable Judge granted the commitment to faithfully and truthfully carry out the duties of Judicial Administrator of the **Bankruptcy Records of ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A., CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA, and FINSEC S.A. COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCIERAS, process 05.065208-7/86** pursuant to the sentence pronounced on 07/04/2007.

Accepting the commitment, he promised to faithfully comply with the duties under penalty of perjury, and in accordance with article 33 of Law 11.101/2005.

I have certified, read and found the herein record duly signed and in compliance. I, [Illegible signature], Alesçandra Almeida Santos Nunes, Clerk Director, typed, conferred, and subscribed.

**[Illegible signature]**
**Caio Marcelo de Oliveira Mendes**
**Law Judge**

**[Illegible signature]**
**Vânio Cesar Pickler de Aguiar**
**Duly Sworn**

JUDICIARY
SÃO PAULO
2nd Chamber of Bankruptcy and Judicial Reorganization
2nd Office of Bankruptcy and Judicial Reorganization
Praça João Mendes, no number – 16th floor, room 1618/1624 - downtown - São Paulo /SP – Postal
Code 01501-900 - Telephone: 21716506/21716501 - Fax 21716424

**CERTIFICATE OF STATUS OF THE JUDICIAL PROCESS**

**ALESÇANDRA A SANTOS NUNES, Clerk Director** of the 2nd Chamber of Bankruptcy and Judicial Reorganization of the District of São Paulo/SP, pursuant to the law, etc.

**CERTIFIES**, at the request of the interested party who, while searching in the registry, verified:

Case No. **583.00.2005.065208-6/000080-000**                              Order: **22/2005**

**Action:** Bankruptcy

**Distribution Date**: 12/26/2005

**Petitioners:**
ATALANTA PARTICIPAÇÕES E PROPRIEDADES S/A., TAX ID NO. 04.791.780/0001-96. CID COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., TAX ID NO. 05.615.235/0001-01, FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIRAS, TAX ID NO. 03.732.804/0001-73.
HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA, TAX ID NO. 74.002.353/0001-67.
MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, TAX ID NO. 66052606/0001-52.

**Purpose**

Extension of the bankruptcy effects of Banco Santos to the businesses mentioned in the "Petitioners" section.

**Procedural Situation**
12/01/2005 – Registered on 12/01/2005 with basis in the Main Proceeding 583.00.2005. 065208- 3/000000-00
07/04/2007 – Final subject of the sentence: "Findings… In light of the exposed, I partly grant the petition presented to determine the extension of the bankruptcy of Banco Santos S/A to the companies mentioned in the preamble herein, which are also declared bankrupt. The legal representatives of ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A. or nominees of its partners, Blueschell Inc. and Principle Enterprise Inc., are Márcia de Maria Costa Cid Ferreira and Edna Ferreira de Souza e Silva. The legal representatives of CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., or the nominees of its partner, Wailea Corporation, are Márcia de Maria Costa Cid

Authentication stamp from Brazil's Notary Public Association # 1064AO706501

Stamp from the Notary Public's Office, dated April 26th, 2010.

Ferreira, Rodrigo Rodrigues de Cid Ferreira, and Eduardo Costa Cid Ferreira. The legal representative of MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, and nominee of its partner, Principle Enterprises Inc., is Márcia de Maria Costa Cid Ferreira. The legal representative of HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA., and nominee of its partner, Bokara Corporation, are Edna Ferreira de Souza e Silva, and Rodrigo Rodrigues Cid Ferreira. The legal representative of FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIRAS, is Joaquim Gomes de Almeida, who represents its partners, Chory Investments Corp., Ângela Marcondes Barros de Almeida, and MB Molduras do Brasil Indústria e Comércio Ltda. I establish the legal term at 60 days prior to the extrajudicial intervention in Banco Santos S/A. I further determine the following: 1) a term of 15 days for the credit reviews, starting from the date of publication of the notice provided in point 6, being exempted the ones that are set forth correctly in the record presented and included in the publication, 2) suspension of foreclosure against the bankrupt entities, with the legal exceptions, 3) prohibition of liens or encumbrances of assets against the bankrupt entities; 4) Annotation next to JUCESP, so to record the word "bankrupt" in the records, as well as the inability to carry out business activities; 5) I appoint Mr. **Vânio Cesar Pickler Aguiar**, a business administrator, as the Judicial Administrator. The conditions for continuing business activities are not verified. The collection and seizure order is to be issued to definitely restrain the one issued before; 6) Subpoena of the Public Ministry, communication by letter to the Public Treasury, and publication of the notice, as provided in the sole paragraph of article 99 of Law 11101/2005; 7) Summons to the representatives of the bankrupt entities, in person and through publication, to provide, within 5 days, the nominal relation of the creditors, in conformance with article 99, III, of the Special Law, and to provide their statements, in accordance with article 104 of the aforementioned law, on **August 22nd, 2007 at 2:00 pm**, under penalty of perjury; 8) I grant the issuance of notice and the customary to the Tax Authority, with the purpose of obtaining the perfect collection of assets from the now bankrupt companies, providing an appropriate procedure for each one of them with a copy of this sentence, and 9) I determine the delivery of a copy of this decision to the Honorable Reporting Judge with Jurisdiction. Let it be published, registered, and notified.

São Paulo/SP, July 12th, 2007. I, [illegible signature] (ALESÇANDRA A SANTOS NUNES), Clerk Director, registration No. 315930, typed, verified, signed, and attest.

**[Illegible signature]**
**ALESÇANDRA A SANTOS NUNES**
CLERK DIRECTOR
REG. 315930-2

Stamp from the
Notary Public's
Office, dated April
26th, 2010.

Authentication stamp
from Brazil's Notary Public
Association #
1064AO7O65O2

*Stamp: T. 4806108 L.46.*
*Patricia Soares Lacerda Neme*
*Sworn Translator*
*JUCESP No. 1531*





# PODER JUDICIÁRIO

### São Paulo

2ª Vara de Falências e Recuperações Judiciais

Processo nº 583.00.2005.065208-6/86

Vistos.

Trata-se de requerimento formulado conjuntamente pela administração da massa falida do BANCO SANTOS S.A. e pelo MINISTÉRIO PÚBLICO DO ESTADO DE SÃO PAULO, visando estender os efeitos da referida falência a diversas pessoas e sociedades empresárias, sob o fundamento de que, durante a existência legal daquela instituição financeira, teriam ocorrido atos fraudulentos que implicaram no desvio de seu patrimônio para as sociedades agora indicadas.

Inicialmente o requerimento foi apresentado pelo Ministério Público, mas foi subscrito, num segundo momento, pelo administrador da massa falida, que restringiu o pleito de extensão somente para as pessoas de EDEMAR CID FERREIRA, ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A., CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA., MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA., HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA. e FINSEC S.A. COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIROS.

E, assim, foi deferido o despacho inicial.

Segundo o que se resume do requerimento inicialmente apresentado, a extensão da falência, na hipótese, deveria atingir a pessoa física do principal sócio do Banco Santos, Edemar Cid Ferreira, com base no artigo 81



# PODER JUDICIÁRIO



São Paulo

2ª Vara de Falências e Recuperações Judiciais

da atual Lei de Falências. Ele seria sócio ilimitadamente responsável, de sorte que, decretada a quebra, como conseqüência, a dele também se seguiria, inclusive com base no artigo 106 das Leis das SA's.

Fundamentou-se, na ocasião, que o administrador da falida teria cometido crime consistente na omissão de lançamento que deveria constar da escrituração, de acordo com o artigo 188, VII, do Dec. Lei 7661/45 e 10 da Lei 7492/86.

Teria também realizado, através da sociedade Alpha Negócios e Participações, pagamentos próximos da casa dos cem milhões de reais, a diretores do Banco, com alteração das suas demonstrações financeiras, não se lançando despesas relevantes no respectivo balanço.

No mesmo diapasão, teria se valido o falido do procedimento de se transferir o registro de empregados do Banco para outras empresas, sem que fossem computadas, falseando o balanço, o mesmo ocorrendo com despesas de segurança, limpeza do prédio e publicidade, transferidas para a responsabilidade da sociedade Procid Invest, *"passando ao mercado a impressão de que seu resultado final era bom"*.

A inicial ainda faz referência e se fundamenta em atitudes do falido, que implicaram em: a) fraude à Central de Risco do Banco Central; b) operações com falsas opções flexíveis de índices Bovespa, sem recolhimento do compulsório e da CPMF; c) capitalização insuficiente do Banco, mesmo ante a determinação para provisionamento de créditos duvidosos arrolados no seu ativo; d) atuação do administrador no interesse pessoal, com doações de recursos do Banco para outras empresas do grupo; e) utilização de funcionários do Banco para interesses também pessoais; f) informações inidôneas a empresa de auditoria (fl. 47); g) uso da sociedade PDR para pagar dívidas da Atalanta Participações e Empreendimentos Ltda., h) uso das sociedades Creditar, Delta, Ômega e Quality para desvio de dinheiro do Banco.





# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Ainda segundo a inicial, teria havido promiscuidade patrimonial da sociedade falida com as demais mencionadas, tendo sede social comum, confusão de atividades profissionais, uso da mesma estrutura operacional e administradores e mandatários comuns, além de sócios idênticos, tudo a causar confusão para aqueles que negociavam com o falido.

Para a inicial, as únicas empresas geradoras de recursos eram o próprio Banco e a E-Financial, que lhe prestava serviços. As demais empresas, notadamente Atalanta, Hyles, Cid Collection, Maremar e Finsec, não tinham atividade operacional e eram controladas por outras no exterior, com o objetivo de lavagem de dinheiro extraído do próprio Banco, servindo-lhe para a perpetração de fraudes, existindo domínio do administrador do Banco sobre elas.

Fundam-se, ainda, os Reqtes., em operações que afirmam terem sido danosas para o falido, realizadas pela PDR Corretora de Mercadorias, que captava papéis de cooperativas e produtores rurais, que serviram para o pagamento de despesas da Atalanta Participações, notadamente para a construção de valioso imóvel residencial na Rua Gália, 120, e também para desvio de bens para o exterior. O ex-sócio controlador Edemar é que seria o proprietário do imóvel e lá efetivamente reside, tendo ainda o domínio sobre coleções de obras de arte e outros bens, em nome da sociedade Cid Collection.

Com estas considerações, formularam requerimento para a determinação da extensão falimentar, nomeação de administrador, com declaração formal ou não de falência e de que Edemar Cid Ferreira seja reconhecido, incidentalmente, como verdadeiro proprietário dos bens das sociedades Atalanta, Hyles, Cid Collection, Maremar e Finsec.

Pediram, ainda, a apreensão de livros, arrecadação provisória de bens, proibição da alienação de direitos relativos à sociedade E-Financial Tecnologia e Serviços Ltda. e suspensão de contrato de aluguel.

3





# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Em decisão liminar irrecorrida (fls. 1623/1626), deferiu este Juízo arrecadação provisória de bens destas sociedades, o que foi consubstanciado com os autos que estão entranhados ao procedimento.

Foram apresentadas defesas escritas.

Edemar Cid Ferreira afirma não se aplicar à hipótese a norma do artigo 81 da Lei de Falências, não podendo ser considerado sócio ilimitadamente responsável, existindo ação de responsabilidade em curso, proposta na forma da Lei 6.024/74. Pediu a extinção do procedimento.

A Atalanta, Cid Collection e a Maremar (fl. 1850) reclamam, em preliminar, da falta de legitimidade ativa do Ministério Público, do fato de terem sido intimadas e não citadas para apresentar defesa e, no mais, dizem ser incabível a extensão de falência, segundo a legislação, e que o processo deveria ser tratado como ação autônoma, preservado o direito de defesa, atribuindo-se a ele valor da causa. Prosseguem, afirmando ser indevida a substituição processual operada e, no mérito, afirmam terem se utilizado os postulantes de prova ilícita, com violação de sigilo protegido pela legislação, notadamente por acesso indevido a e-mails existentes nos sistemas do falido, que deveriam ser desentranhados dos autos e destruídos. Inexistiriam fundamentos ou provas para a desconsideração da personalidade jurídica das contestantes, notadamente de fraude ou desvio de recursos ou de funções. Afirmam que os dividendos que o falido pagou à sua acionista controladora foram, quase na totalidade, utilizados para a capitalização do próprio Banco, o que poderia ser demonstrado por perícia contábil.

A seguir, tecem considerações sobre as suas constituições iniciais, afirmando que Edemar Cid Ferreira, sócio da Valence Enterprises Inc., doou à sua mulher a sua participação, antes mesmo da constituição do falido, para segregar bens dela do risco da atividade bancária (fl. 1878). Admitem que Edemar geria as empresas, em nome da mulher, sendo seu administrador de



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



fato, sendo normal que se comportasse como dono da residência da Rua Gália, 120.

Para a contestação, as atividades culturais e publicitárias de Edemar constituíram-se em bons negócios para o falido. Enfim, o patrimônio de Márcia foi totalmente segregado do risco empresarial. Negam atos fraudulentos e que a sociedade PDR teria pago despesas da Atalanta ou, ainda, a remessa de recursos para o exterior. Negam, ainda, terem recebido dinheiro do Banco Santos. Pelo contrário, receberam aportes do exterior, em regulares contratos de câmbio. Sustentam, em síntese, a licitude de suas operações e dizem que a alienação de obras foi realizada pelo preço de aquisição (fl. 1886).

Prosseguem, ainda, afirmando ser normal a colaboração de funcionários de uma instituição com assuntos pessoais de seus superiores. Por fim, impugnam o pedido de arrecadação de bens, sustentando que a casa da Rua Gália, 120, é impenhorável, nos termos da Lei 8.009/90, pedindo o julgamento de rejeição do pedido de extensão da falência, com condenação em verbas de sucumbência.

A contestação da Hyles reporta-se às demais, afirmando que o seu patrimônio remonta há 19 anos, anterior à constituição do Banco Santos. A sociedade pertence à Wailea Corporation, sediada nas Ilhas Virgens Britânicas, que, por sua vez, pertence à Principal Enterprises, cujas ações são de Márcia Cid Ferreira. É condômina a Hyles, de 26,45% do imóvel da Rua Gália, 120.

Na sua defesa, a Finsec S.A. afirma que não está demonstrada a sua insolvência, única forma possível de falência, autorizando somente o artigo 50 do Código Civil, no caso de abuso, que os efeitos de certas e determinadas relações sejam estendidos aos bens particulares dos administradores da pessoa jurídica. Diz que Edemar Cid Ferreira foi seu controlador indireto até fevereiro de 2005, mas agora quem a controla é a massa falida da Alsace Lorraine. Com a decretação da falência, o controle passou à sua massa falida. Diz que sua



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



atividade empresarial é de securitização e é lícita, regulada pelo Bacen. O falido lhe cedia créditos, mediante pagamento em dinheiro. Seu capital veio de aportes da controladora Chory, em remessas regulares de recursos remetidos do exterior. Nega as imputações que lhe foram feitas ou qualquer fraude na formação de seu capital social ou, ainda, confusão patrimonial com o Banco Santos, pedindo a rejeição da pretensão.

A administração da massa falida e o Ministério Público apresentaram petição às fls. 2614 e 2615, excluindo da extensão as sociedades ali mencionadas, passando a figurar ambos como Reqtes. do pedido de extensão.

Sobre as defesas apresentadas manifestaram-se a massa falida (fls. 2211 e seguintes) e o órgão Ministerial (fls. 2697 e seguintes).

Os autos estão instruídos com cópia de sentença criminal proferida na Justiça Federal (fls. 2487 e seguintes) e outros documentos, cientificados os interessados.

É o relatório.

Passo a decidir.

Afasto preliminares articuladas nas defesas apresentadas.

A questão da legitimação ativa do Ministério Público, para o pleito de extensão da falência, está solucionada desde a manifestação deste Juízo sobre petição conjunta que o mencionado órgão firmou juntamente com a administração da massa falida, passando então o pedido – que fora deferido inicialmente somente para o administrador judicial – a ser processado de forma conjunta.

Ao ver deste Juízo, o importante é que, inquestionavelmente, tem a administração da massa, nos termos da legislação vigente, legitimidade para o



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



pedido de extensão falimentar, pois lhe cumpre tomar as providências necessárias para compor, da maneira mais ampla possível, o respectivo ativo. Sendo assim, nada impede a apresentação conjunta (massa falida e Ministério Público) do pedido, inexistindo motivo para o reclamo das sociedades que agora se defendem.

Também ficam afastadas as reclamações pertinentes à falta de citação, pois, o que é relevante, é que as referidas sociedades tiveram oportunidade para apresentação de defesas, ficando plenamente satisfeito o requisito constitucional.

O pleito para a extensão pode e deve ser traduzido como simples pedido de arrecadação para a incorporação de bens à massa falida. É simples incidente e não se processa como ação autônoma.

De qualquer sorte, as referidas sociedades vieram a Juízo, após intimadas sobre os pedidos formulados, e apresentaram alentadas defesas escritas, não sofrendo, por conseguinte, qualquer prejuízo, podendo ser invocada aqui a disposição do art. 214, § 1º, do Código de Processo Civil, com conseqüente suprimento da falta de citação que, como mencionado, era desnecessária.

Pelos mesmos motivos, por se tratar de simples incidente arrecadatório, absolutamente desnecessária a formalidade do valor da causa.

Reclamam ainda as sociedades, que agora se defendem, da utilização, na petição inicial, de prova que consideram ilícita, com violação de sigilo protegido pela legislação. Referem-se aos diversos e-mails anexados à petição inicial, extraídos do sistema do falido.

Nada mais inexato, no entanto.

É que, com a decretação da liquidação extrajudicial, autêntica falência administrativa, pelos graves motivos elencados pela autoridade



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



competente, evidentemente toda a documentação do Banco passou ao domínio público.

Cabia, portanto, quer ao liquidante nomeado pelo Bacen, quer à administração da massa falida, providenciar a arrecadação dessa documentação. Aliás, os artigos 22, II, "f" e 108, ambos da Lei 11.101/2005, determinam que o administrador judicial arrecade os bens e documentos do devedor.

Na hipótese questionada, a diligência do Ministério Público foi autorizada por este Juízo, quando já não tinha o falido a disponibilidade daquela documentação. Ela era, repita-se, de domínio público, de interesse da massa e de credores, principalmente.

Dizer que a juntada desta documentação atentaria contra o sigilo preservado constitucionalmente não prestigia a verdade, porque não poderiam os agentes da sociedade falida utilizar o seu estabelecimento comercial para fins particulares, mas só os inerentes à própria atividade bancária, autorizada pelo Estado. A par disso, o que se observa é que a referida documentação não foi impugnada quanto ao seu conteúdo.

Verifico, agora, a tese articulada pela defesa de Edemar Cid Ferreira, contra o pedido de extensão da falência à sua pessoa natural.

Neste tópico, observo que foram muito bem fundamentados os pleitos do Ministério Público, endossados pela administração da massa falida.

Não há negar, as sociedades ligadas direta ou indiretamente a essa pessoa, não fosse pelo aspecto formal, têm inegável característica unipessoal. As declarações prestadas pelos diversos administradores ouvidos por este Juízo, na oportunidade do art. 104 da Lei 11.101/2005, mostraram, efetivamente, que era mesmo o Sr. Edemar o responsável direto pela administração do banco, imprimindo a ela um cunho eminentemente pessoal.



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Além disso, esta situação ficou bem evidenciada pelo substancioso inquérito instaurado pelo Banco Central do Brasil, em atenção à legislação vigente, estando ele umbilicalmente vinculado a diversas operações financeiras irregulares envolvendo o Banco e as sociedades a ele coligadas.

No entanto, a mim me parece que, salvo por colocar a pecha de falido a quem provavelmente a mereceria, o deferimento da pretensão, no aspecto formal e prático, não se afigura adequado.

É que a regra do art. 81 da Lei 11.101/2005, quer pela sua letra, quer pelos entendimentos doutrinários trazidos à colação, só se aplica aos sócios ilimitadamente responsáveis e o Banco Santos era uma sociedade anônima. Além disso, já existe ação civil pública, proposta na forma da Lei 6.024/74, em que figura a mencionada pessoa como réu e, portanto, poderá ter o seu patrimônio atingido para atender ao prejuízo da administração nefasta já mencionada.

Por estes motivos, desnecessária a extensão de falência para Edemar Cid Ferreira.

Mas, para as demais sociedades, é inegável a necessidade de que a arrecadação de bens do Banco Santos seja a elas estendida.

A vinculação entre elas e o Banco, com o propósito de ocultar o patrimônio, está muito bem demonstrada, quer pela copiosa documentação entranhada ao pleito inicial, quer pelos elementos coligidos no inquérito administrativo do Banco Central do Brasil, quer agora com o acolhimento de denúncia criminal contra diversos administradores do Banco Santos, de acordo com sentença copiada a fls. 2747 e seguintes.

A extensão da falência se justifica porque todas as sociedades mencionadas não apresentam qualquer finalidade econômica e serviram para a prática de abuso de direito, para proteção de um patrimônio apartado, que



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



frustrou a ação de credores. Existia centralização dos negócios e interesses do Banco Santos exatamente na sua diretoria. As sociedades são ligadas, de uma forma ou de outra, e todas elas são, finalmente, dominadas por Edemar Cid Ferreira ou sua mulher.

Tinham o mesmo controle e a sua estrutura dava ensejo a inegável confusão patrimonial.

Sabe-se que estas sociedades receberam recursos que ingressaram no país, a título de investimento de suas controladoras no exterior, de valores muito relevantes.

O documento de fl. 2265 e seguintes mostra para a Atalanta a quantia de US$ 51,7 milhões; para a Cid Collection, US$ 2,6 milhões; para a Finsec, US$98,9 milhões e para a Maremar, US$ 283,7 milhões. E na sentença criminal: *"do retorno ao país de parte do capital desviado"*, consignando as mesmas importâncias (fl. 2776).

O próprio Edemar Cid Ferreira admitiu ter realizado operação para frustrar a atuação de credores.

Efetivamente, em sua defesa, afirmou:

*"Edemar Cid Ferreira também era sócio da Principle (ex-Valence), mas doou à Márcia Cid Ferreira sua participação em 1998, quando ninguém, nem mesmo o Banco Central, nem mesmo o ilustre Doutor Promotor, imaginava que se pudesse vaticinar o triste fim do Banco Santos, que então, começava sua ascensão. Assim procedeu porque queria dotar sua mulher de um patrimônio totalmente dissociado do dele, já separado por força do regime de bens do casamento."*

As causas da falência do Banco Santos foram bem delineadas no substancioso inquérito instaurado pelo Banco Central do Brasil.



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Segundo aquela peça, *"a principal causa da queda da instituição foi a realização sistemática e deliberada de vultosas operações prejudiciais ao Banco, que tinham como contra-partes intermediárias, interessadas ou destinatárias de recursos, empresas que, segundo provas indiciárias reunidas (Capítulo 3.1), seriam controladas, pertencentes, ligadas, formal ou informalmente, ou usadas por ex-administradores do Banco Santos ou por seu controlador. A realização de diversas modalidades de operações desta natureza resultou no comprometimento da situação econômico-financeira, na incapacidade de capitalização, na situação líquida ajustada negativa e na deterioração da liquidez"*.

E prosseguia o referido relatório, fazendo referência à operação mais escabrosa realizada pela administração do falido:

*"Realização de operações estruturadas com Cédulas de Produto Rural – CPR, denominadas "aluguel de CPRs", por meio das quais produtores rurais emitiam os títulos e, mediante "contratos de gaveta", os alugavam para interpostas empresas, ligadas formal ou informalmente, aos ex-administradores do Banco Santos ou ao seu controlador, recebendo, em geral, uma pequena parcela do valor de face, relativa ao aluguel. Tais empresas ligadas, por sua vez, mediante endosso, vendiam títulos ao Banco Santos por seu suposto valor integral. Em suma, o Banco entregava recursos financeiros para as empresas ligadas e, em contrapartida, recebia ativos insubsistentes em nome de terceiros (capítulo 3.2)"*.

Além desta gravíssima ocorrência, que retirou dos cofres do Banco a quantia de R$ 461.884.362,25, atualizada para o ano de 2005, como se vê de fl. 2.715 dos autos falimentares, outros casos graves ocorreram com operação de aluguel de *"export note"*, com concessões de créditos a empresas ligadas aos ex-administradores do Banco ou seu controlador, com empréstimos dissimulados para clientes, por meio de operações de compra de opções flexíveis sem



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



garantias e sem emissão de títulos necessários para cobrança (capítulo 3.6 das Conclusões de Inquérito), afora outros casos danosos ao Banco.

Na sentença proferida pela Justiça Federal, constou que *"as investigações demonstraram que várias das empresas que recebem tais créditos em suas contas correntes pertencem ou operam com doleiros ou empresas de factoring"* (fl. 17 da sentença criminal).

E, na Comissão de Inquérito do Banco Central: *"Registre-se, também, que no capítulo 4.2 existem diversos pagamentos a inúmeras empresas sem capacidade econômica, de onde se conclui que recursos desviados do Banco Santos, foram remetidos ao exterior por outros meios que não o sistema oficial de câmbio brasileiro, retornando ao país, pelas vias oficiais, sempre que havia necessidade"* (fl. 23.036, das conclusões da Comissão de Inquérito).

Não há dúvida, ademais, da fundação do Banco Of Europe Limited e da sua parceira Alsace Lorraine, em 1996, com sede na Ilha de Antígüa, conhecido paraíso fiscal. Segundo a sentença criminal, este banco foi criado para ser uma filial clandestina do Banco Santos no exterior e serviu para receber valores desviados do próprio Banco, havendo prova testemunhal, colhida por ex-funcionários, naqueles autos, de que ele efetivamente pertencia ao falido (fls. 12.227, da sentença criminal). Nestas operações internacionais, clientes do Banco Santos, que tinham reservas no exterior, tomavam empréstimos no Brasil, em reais, e davam como garantia (denominada internamente pelo Banco Santos como *"M-Fora"* ou *"Pledge-Collateral Agreement"*) aquelas reservas, recebendo, em contrapartida, *"participations"* ou notas promissórias que a Alsace Lorraine, entre outras, emitia e que ficavam custodiadas no Banco of Europe. Enfim, com estas operações, liberavam-se reais do Banco Santos para os clientes no Brasil e a Alsace ficava com o valor em dólares no exterior. Na sentença criminal se faz referência a três operações deste tipo, notadamente nos

12



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



casos da Odebrecht S.A., Biossintética Farmacêutica Ltda. e Antilhas Embalagens Editora e Gráfica S.A.

Já nos autos da Comissão de Inquérito, se consignava a perda de clientes da Alsace (leia-se Banco Santos), da ordem de US$ 225 milhões.

No capítulo 4.2 da Comissão de Inquérito do Banco Central (fl. 22.980 e seguintes), é detalhada a engenharia utilizada para o destino dos recursos desviados do Banco Santos.

Da mesma sentença criminal, constou o item do retorno ao país de parte do capital desviado, com referência aos contratos de câmbio liquidados, conforme relação de fl. 27/29 daquela sentença, que arrematou:

> "Dessa forma, parte dos valores desviados do Banco reingressaram no País para manter o fluxo financeiro e lastrear, através de operações simuladas, o balanço da instituição, realizar pagamentos de **officers** e diretores, pagar despesas estranhas ao objeto social da instituição financeira, como as relacionadas a própria manutenção da mansão de seu presidente, e realizar investimentos em imóveis e objetos de arte e decoração, completando-se, assim, na fase de integração de capitais, o ciclo de lavagem de valores oriundos da gestão financeira da instituição financeira ..." (fls. 02/46)" – fl. 2778.

E a vinculação das sociedades empresárias que apresentaram defesa aqui nestes incidentes, ao Banco Santos, é notória.

No relatório de encerramento da referida Comissão de Inquérito (art. 43 da Lei 6.024/74), constam os nomes das inúmeras sociedades daqui e do exterior, vinculadas ao Banco, ao seu controlador ou familiares, formal ou informalmente. Dentre elas há referência expressa à Finsec e Cia. Securitizadora

13



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Ltda., sociedades controladas pelas offshores Chory e Bluecrown, ambas constantes da Tabela 1 de fl. 2.658 (dos autos da falência).

Foi colocada na direção da Finsec pessoa de poucas luzes, que afirmou, ao depor (fls. 2.683/2.684), ter uma empresa junto com o Dr. Edemar. Tal depoimento comprova a vinculação desta sociedade ao controlador do Banco, que ali colocou pessoa que poderia manipular. Ainda segundo mencionado depoimento, Joaquim Gomes de Almeida aceitou proposta feita por Álvaro Zuccheli Cabral, diretor do falido, para subscrever documentos em nome da Finsec.

No depoimento de Andréa Sano Alencar à Polícia Federal, mencionou-se a constituição da Finsec e da Creditar por escritórios terceirizados, a pedido do departamento jurídico do Banco.

A conclusão da Comissão de Inquérito foi a de que a Finsec foi utilizada em operações de securitização, como compradora de dívidas pertencentes ao Banco Santos.

Nas declarações prestadas, perante este Juízo, por um dos principais diretores do Banco (Clive José Botelho):

> *"... era voz corrente no Banco que a FINSEC era do controlador, não se compra um crédito problemático, por um valor que ele não valeria, se não fosse do próprio controlador e tanto é que a própria companhia que auditava os balanços sabia que era uma forma indiretamente dos acionistas de capitalizar uma compra do crédito ruim (fl. 5.325, autos da falência)".*

Note-se que ela teve a sua abertura em 30.3.2000, controlada em 5.4.2000 pela Chory Investments Corp., com sede nas Ilhas Virgens Britânicas. Recebeu recursos originários de operações de câmbio, utilizando-os para

14



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



compra de créditos do Banco (fl. 264 da Comissão de Inquérito, Processo 583.00.2005.091647-5).

Ressalte-se, ainda, que esta sociedade Finsec, nas demandas que sofre perante esta Vara, não é encontrada, não tendo estabelecimento conhecido, embora, quando lhe convém, apresente-se em Juízo, devidamente representada, como no caso deste incidente.

Sobre a Maremar, no depoimento de Ruy Ramazini (fl. 2.686 dos autos da falência), seu administrador, confirmou que se tratava de sociedade pertencente à família do controlador do Banco Santos. Sua função era a de trazer do exterior grande volume de recursos que, depois de passarem por diversas operações de questionável lógica econômica, serviram para capitalizar o Banco. Os recursos da Maremar eram enviados pela offshore, sediada no Panamá, a Principle Enterprises (ex-Valence). No mesmo depoimento mencionado, consta:

> *"que na qualidade de procurador desta empresa, o depoente subscrevia, em conjunto com a Dra. Vera Lúcia Rodrigues da Silva, instrumentos jurídicos necessárias ao aumento de capital, com recursos provenientes do exterior, para depois formalizar os empréstimos à Sra. Márcia de Maria Costa Cid Ferreira".*

Quem detém o controle formal da Principle Enterprises é a Sra. Márcia de Maria Costa Cid Ferreira.

Nos arquivos eletrônicos do Banco Santos, consta carta subscrita pela Principle, de 26.11.2001, endereça ao Swiss Bank Corporation, visando a transferência de US$ 70.000,00 de sua conta para crédito na conta de Edemar Cid Ferreira, mantida naquele banco (fl. 15.596 da Comissão de Inquérito).

Márcia Cid Ferreira é sócia da Hyles, Atalanta e Cid Collection. A Atalanta é controlada pela Blueshell, com sede nas Ilhas Virgens Britânicas, e a



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Hyles, é controlada pela Wailea, assim como a Cid Collection, certo que o representante, no Brasil, da Wailea, é Rodrigo Cid Ferreira, filho do ex-controlador do Banco Santos.

É do relatório da Comissão de Inquérito do Banco Central (fl. 2692) que estas sociedades receberam, direta ou indiretamente, valores do exterior, provenientes de atividades econômicas inexplicadas, para benefício de Edemar Cid Ferreira. E prossegue o relatório: *"a Hyles foi representada pela secretária do Sr. Edmar, Vera Lúcia Rodrigues da Silva, e pela irmã dele, Edna Ferreira de Souza; a Atalanta foi representada por Vera Lúcia e por Ruy Ramazini. No depoimento que este último prestou, perante a Comissão de Inquérito, admitiu ter sido procurador das duas empresas, a convite de Vera Lúcia, a mencionada secretária".*

São exatamente estas duas sociedades as proprietárias do famoso imóvel da Rua Gália, 120, mansão em que reside o ex-controlador do Banco Santos.

Consta, ainda, à fl. 2.693 que, no imóvel da Rua Gália, 120, atuam em sua administração vinte pessoas, dentre elas um gerente contratado pela Atalanta e, ainda, que *"a empresa foi especialmente constituída para a construção e administração do imóvel da Rua Gália, 120, residência do Sr. Edmar, com recursos oriundos do exterior".*

No depoimento de Edna Ferreira, ela informa que participa da Atalanta, de forma minoritária, a pedido de sua cunhada, esposa de Edemar, desconhecendo as atividades da sociedade.

Também a Cid Ferreira Collection, proprietária da coleção de obras de arte reunidas pelo controlador do Banco Santos recebeu recursos do exterior, por meio de sua controladora Wailea Corporation, cujo responsável, no Brasil, como dito, é o filho do ex-controlador do Banco.

16



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Consta da sentença criminal, em sua fl. 37, fazendo referência aos autos do inquérito do Banco Central, que as sociedades Maremar, Atalanta e Cid Collection, receberam, em operações de câmbio, respectivamente, as quantias de U$$ 306.410.243,21, U$$ 51.748.000,00 e U$$ 2.560.000,00. E, adiante, mencionou:

> *"Familiares de Edmar Cid Ferreira, a saber, mãe, esposa, filhos, irmã e sobrinho, integram, com um número praticamente desprezível de cotas, os quadros sociais de sociedades comerciais nacionais, cujos sócios majoritários são sempre empresas **off shore** sediadas em paraísos fiscais. Os procuradores dessas empresas no Brasil são os familiares de Edemar Cid Ferreira.*
>
> *As empresas nacionais não possuem objetos sociais efetivos, assim como as empresas estrangeiras. As primeiras declaram como domicílios fiscais saletas vizinhas em prédios comerciais. As últimas se valem de um mesmo endereço em seu país de origem, muitas vezes utilizando como tal a caixa postal dos escritórios responsáveis pela sua constituição.*
>
> *Em determinado momento, as desconhecidas empresas estrangeiras descobrem que aplicar nas desconhecidas empresas nacionais pode ser um bom negócio e injetam nos "empreendimentos" brasileiros milhões de dólares ao longo dos anos.*
>
> *O quadro acima contraria a lógica mais elementar. Trata-se, na verdade, da materialização da última fase do processo de lavagem de capitais, conhecida como integração, quando o produto de um crime antecedente reingressa na economia formal. Estamos diante de uma antiga e bem*





# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais

conhecida estratégia destinada a conferir aparência de legitimidade a capitais de origem criminosa. Nessa estratégia, empresas nacionais recebem investimentos de seus sócios estrangeiros que, na verdade, são os próprios sócios nacionais protegidos pelo anonimato garantido a empresas **off shores** sediadas em paraísos fiscais.

Nos autos 2006.61.81004274-8, Márcia de Maria Costa Cid Ferreira, ao contrário do que afirmara quando ouvida em inquérito policial, alega que é a sócia controladora da Principle Enterprises, sucessora de Valence Enterprises, embora sem apresentar documentos que efetivamente comprovem tal assertiva.

Na declaração de rendas relativa ao exercício de 1986, Márcia declarou possuir 133 (cento e trinta e três) ações da Valence Enterprises Inc., com valor unitário de U$$ 3.000,00 (três mil dólares), totalizando, portanto, U$$ 399.000,00 (trezentos e noventa e nove mil dólares).

Observa-se pela tabela indicada anteriormente que as quatro empresas indicadas acima receberam mais de trezentos e sessenta milhões de dólares nos períodos indicados.

Assim, não é crível que as ações de Márcia sofressem uma supervalorização de 90.225% (noventa mil, duzentos e vinte e cinco por cento) ao longo desses menos de vinte anos, propiciando todo o capital injetado nas empresas brasileiras. Tratar-se-ia de caso único no mercado financeiro internacional, ainda mais quando se trata a Valence de empresa absolutamente desconhecida, além de não operar em Bolsa de Valores, empreitada



# PODER JUDICIÁRIO

### São Paulo

##### 2ª Vara de Falências e Recuperações Judiciais



*impossível para um empreendimento que tem domicílio fiscal numa caixa postal, como sempre ocorre com as **paper companies**.*

*Ademais, o Banco Santos S.A. possuía em sua estrutura oficial empresas **off shore** denominadas Valence Services e Valence Insurance, não se tratando, pois, de mera coincidência, a razão social da empresa da qual Márcia se diz controladora.*

*Por seu turno, Ruy Ramazini, conforme afirmado em seu próprio interrogatório policial, além de procurador das empresas Maremar e Atalanta, foi sócio da Alpha Negócios e Participações Ltda., que recebeu mais de U$$ 27 milhões, a título de investimentos estrangeiros entre 2001 e 2004. Os diretores do Banco Santos recebiam seus bônus anuais, nos montantes de centenas de milhares ou mesmo milhões de reais, através desta última empresa".*

Assim, como se vê, apenas o relatório da Comissão de Inquérito instaurada pelo Banco Central do Brasil, já informa a estreita vinculação das sociedades que apresentaram defesa neste incidente, com o ex-controlador, sua mulher e parentes e sociedades estabelecidas no exterior, muitas em paraísos fiscais. E também os estratagemas que foram usados para desfalcar os cofres do Banco, com remessa de valores para o exterior e sua posterior internação no país, para os objetivos conhecidos.

São estas importâncias que foram utilizadas para a construção da extraordinária mansão da Rua Gália, onde foram gastos cerca de R$ 147 milhões e para a compra de obras de arte tão festejadas e pretendidas – para incorporação à União – pela Justiça Federal.

19



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



A tal respeito, volto minha atenção para a brilhante sentença proferida naquela sede, pelo nobre Juízo da 6ª Vara Federal, Especializada em Crimes de Lavagem de Dinheiro.

Após a necessária fundamentação, não teve dúvidas o Magistrado ao informar que o imóvel da Rua Gália, 120, foi adquirido com valores provenientes da lavagem de dinheiro, decorrente de desfalques nos cofres do Banco Santos S.A.

Constou daquela r. sentença:

*"este imóvel está registrado em nome da Atalanta e da Hyles, de propriedade de Márcia Cid Ferreira e Edna Ferreira de Souza e Silva, além de offshores estrangeiras, dentre a elas a Blueshell e a Principle Enterprises Inc. (ex-Valence Enterprises), declarada no imposto de renda desta acusada e a Waiela Corporation. Essas empresas brasileiras, inclusive as offshores, foram fomentadas com um único objetivo, de propiciar a ocultação dos valores decorrentes dos crimes perpetrados pelos ex-administradores do Banco Santos S.A. ... e para permitir a circulação de valores ilegais, revertendo-se para a construção do imóvel da Rua Gália, 120, bem ainda para pagamento de despesas no Brasil e, por vezes, para que Márcia Cid Ferreira capitalizasse empresas ligadas ao Banco Santos, sob forma de doação. Quase sempre o ingresso das divisas se deu sobre a "rubrica investimento estrangeiro do país", sendo certo que a evasão de divisas se deu por meio do dinheiro desviado do Banco Santos S.A. e que, já no exterior, passava a compor o capital social das offshores descritas anteriormente".* (fl. 3364).

É da mesma sentença a referência de que a residência do imóvel ocupa doze propriedades e que a sua construção teve início em 2001, com



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



demolição do anterior prédio, após aquisição dos lotes a ele contíguos. Note-se que a construção terminou por volta de 2004, realizada toda ela já em período em que o Banco estava em plena atividade e exatamente no período em que foram perpetradas as fraudes já mencionadas.

A r. sentença criminal terminou por seqüestrar a favor da União os bens da Atalanta, Hyles e Cid Collection, reconhecendo, com forte fundamentação, a sua vinculação com o patrimônio indevidamente retirado dos cofres do falido.

Apenas se vai discordar da destinação dada aos referidos bens, pois, de acordo com o artigo 91, II, do Código Penal e Lei 9.613/98, a destinação à União só ocorreria se não houvessem credores prejudicados.

Para tanto, basta a leitura dos referidos dispositivos legais. Não obstante, tais bens, em sua maioria, foram declarados incorporados ao patrimônio da União Federal, na sentença criminal proferida pela Justiça Federal, que determinou, inclusive, a sua imediata alienação, com destinação da casa da Rua Gália, 120, para museu.

Medida liminar, porém, deferida pelo E. Superior Tribunal de Justiça, em conflito de competência, suspendeu, por ora, estas determinações.

A vinculação das sociedades que agora se defendem ao Banco Santos e a promiscuidade patrimonial são, ademais, demonstradas pela copiosa documentação que acompanhou a petição inicial, notadamente a correspondência eletrônica a ela anexada, a que já se fez referência. Exemplo disto é a mensagem de Edemar Cid Ferreira, dirigida aos diretores do Banco, recomendando às empresas que detinham a propriedade de obras de arte, para vendê-las, pelo valor de R$ 1,00, para a Cid Ferreira Collection. No mesmo documento, afirma-se que todas as obras de arte, que não tivessem origem, deveriam passar ao domínio de Márcia Cid Ferreira.



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



Nenhum motivo para albergar a alegação de que o imóvel da Rua Gália, 120, seja bem de família, uma vez que ele está em nome de pessoas jurídicas e não se justificaria a sua proteção, quando já verificado que, na sua construção, foram utilizados recursos desviados da sociedade falida, lembrando-se que, nela, foram despendidos valores da ordem de R$ 147.000.000,00.

Completamente desnecessária e inútil a produção de prova pericial, em virtude da alegação de que os dividendos pagos pela acionista controladora do falido foram utilizados para a capitalização do próprio Banco. Como se sabe, o único patrimônio da controladora Procid Participações é o próprio Banco, agora falido, que possui passivo, a descoberto, acima de R$ 2,5 bilhões, além de ser devedora da mesma massa, pela quantia de R$ 100 milhões, conforme dados retirados do balanço apresentado quando do requerimento de falência.

Corrobora tal afirmativa a sentença criminal, quando às fls. 3.126/3.129, no capítulo "Da Contabilidade Fraudada", conclui:

> *"Estas práticas, dentre outras a seguir elencadas, demonstram o ardil consistente em prestação de dados ideologicamente falsos à autoridade monetária com vistas a conferir aparência de regularidade e transparência na condução do **Banco Santos**, omitindo-se, ainda, dos investidores a verdadeira situação econômico-financeira".*

Os fatos aqui narrados não deixam dúvidas de que o falido fez uso abusivo de várias pessoas jurídicas, com objetivo ilícito de frustrar a ação dos credores. Tanto na área da autoridade monetária, quanto na esfera criminal, esses fatos foram exaustivamente demonstrados por provas documentais e testemunhais, sendo aqui totalmente legítimo concluir que grande parte das operações realizadas pelo Banco tinham por objetivo transferir recursos para empresas não financeiras, fora do alcance da supervisão bancária e dos

22



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



auditores independentes. Este mecanismo proporcionava ao falido manobrar os recursos para fora do país, retornando-os como legítimos, em uma verdadeira lavagem de dinheiro.

Por fim, o nobre julgador da 6ª Vara Federal Criminal, à fl. 3.405, condenou o falido, Edemar Cid Ferreira, à pena de 21 anos de reclusão, como incurso em condutas tipificadas no Código Penal e nas leis de crimes contra o sistema financeiro e de lavagem de dinheiro. Também foi aplicada pena de 4 anos de reclusão à Márcia de Maria Costa Cid Ferreira, por violação à Lei de Lavagem de Dinheiro, face a ocultação da origem e da propriedade dos valores provenientes diretamente dos crimes tipificados na lei de crimes contra o sistema financeiro (fl. 12.788).

Em face do exposto, defiro, em parte, os requerimentos apresentados, para o fim de determinar a extensão da falência do BANCO SANTOS S/A às sociedades mencionadas no preâmbulo desta, que também são declaradas falidas.

São representantes legais de ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A. ou procuradoras de suas sócias Blueschell Inc. e Principle Enterprise Inc., Márcia de Maria Costa Cid Ferreira e Edna Ferreira de Souza e Silva.

São representantes legais de CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA. ou procuradores de sua sócia Wailea Corporation, Márcia de Maria Costa Cid Ferreira, Rodrigo Rodrigues de Cid Ferreira e Eduardo Costa Cid Ferreira.

É representante legal de MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA. e procuradora de sua sócia Principle Enterprises Inc., Márcia de Maria Costa Cid Ferreira.



23




# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais

Da HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA. são representantes legais e procuradores de sua sócia Bokara Corporation, Edna Ferreira de Souza e Silva e Rodrigo Rodrigues Cid Ferreira.

É representante legal de FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIRAS, Joaquim Gomes de Almeida, que representa suas sócias Chory Investments Corp., Ângela Marcondes Barros de Almeida e MB Molduras do Brasil Indústria e Comércio Ltda.

Fixo o termo legal em 60 dias anteriores à intervenção extrajudicial no Banco Santos S/A.

Determino ainda o seguinte:

1) o prazo de 15 dias para as habilitações de crédito, a contar da publicação do edital previsto no item 6, ficando dispensados os que constarem corretamente do rol eventualmente apresentado e constante da publicação;

2) suspensão de ações e execuções contra as falidas, com as ressalvas legais;

3) proibição de atos de disposição ou oneração de bens das falidas;

4) anotação junto a JUCESP, para que conste a expressão "falido" nos registros e a inabilitação para atividade empresarial;

5) nomeio como administrador judicial o administrador de empresas **Vânio Cesar Pickler Aguiar,** não se verificando condições para continuidade do negócio, devendo ser expedido mandado de lacração e arrecadação, convertida em definitiva a liminar antes concedida;

6) intimação do Ministério Público, comunicação por carta às Fazendas Públicas e publicação do edital, na forma do parágrafo único do artigo



# PODER JUDICIÁRIO

São Paulo

2ª Vara de Falências e Recuperações Judiciais



99 da Lei 11.101/2005;

7) Intimem-se os representantes das falidas, pessoalmente e por edital, para apresentação, em 5 dias, da relação nominal dos credores, observado o disposto no artigo 99, III, da Lei Especial, e para prestar declarações, na forma do artigo 104 da lei mencionada, no **dia 22 de agosto de 2.007, às 14:00 horas**, tudo sob pena de desobediência;

8) Defiro a expedição de ofício à Receita Federal e os de praxe, visando a perfeita arrecadação de bens das sociedades ora falidas, formando-se, com cópia desta sentença, um procedimento próprio para cada uma delas, e

9) Determino remessa de cópia desta decisão ao Exmo. Sr. Relator do Conflito de Competência.

P.R.I.

São Paulo, 04 de julho de 2007.

**Caio Marcelo Mendes de Oliveira**
**Juiz de Direito**

25





**PODER JUDICIÁRIO**
**SÃO PAULO**
**Comarca de São Paulo**
**Foro Central**
**2ª Vara de Falências e Recuperações Judiciais**
**2º Ofício de Falências e Recuperações Judiciais**
**Praça João Mendes Júnior, s/nº - São Paulo - SP – Telefone: 2171-6507**

## COMPROMISSO DE ADMINISTRADOR(A) JUDICIAL

Em 10 de julho de 2007, nesta cidade e Comarca da Capital do Estado de São Paulo, na sala de audiências do MM Juiz de Direito Titular da 2ª Vara de Falência e Recuperações Judiciais, Dr. Caio Marcelo Mendes de Oliveira, comigo escrevente identificado no final, compareceu o Sr. Vanio Cesar Pickler de Aguiar, com escritório à Rua Dona Elisa Pereira de Barros, 715, São Paulo telefone 3818-9048, a quem o MM Juiz deferiu o compromisso de bem e fielmente desempenhar as funções de administrador judicial, nos autos da Falência de ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A, CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA, MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA, HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA E FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIRAS, **processo 05.065208-7/86 conforme** decisão proferida em 04/07/2007.

Prestado assim o compromisso, prometeu cumpri-lo com fidelidade, sob as penas e na forma do artigo 33 da Lei 11.101/2005.

Para constar, lavrei este termo que, lido e achado conforme, vai devidamente assinado. Eu_____ Alesçandra Almeida Santos Nunes, Escrivã-Diretora, digitei, conferi e subscrevi.

Caio Marcelo Mendes de Oliveira
Juiz de Direito

Vanio Cesar Pickler de Aguiar
COMPROMISSADO

# PODER JUDICIÁRIO
## SÃO PAULO
### 2ª Vara de Falências e Recuperações Judiciais
### 2º. Ofício de Falências e Recuperações Judiciais
Praça João Mendes, s/nº - 16º andar, sala 1618/1624 - centro - São Paulo/SP - CEP: 01501-900 - Telefone: 21716506/21716507 - Fax: 21716424

# CERTIDÃO DE OBJETO E PÉ

**ALESÇANDRA A SANTOS NUNES**, Escrivã Diretora do 2º. Ofício de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, na forma da Lei, etc

**CERTIFICA**, atendendo a pedido de pessoa interessada que pesquisando em Cartório verificou constar :

Processo nº **583.00.2005.065208-6/000086-000**                    Ordem : **22/2005**

**Ação**: Falência

**Data da distribuição :** 26/12/2005

**Requeridos:**
ATALANTA PARTICIPAÇÕES E PROPRIEDADES S/A CNPJ/MF 04.791.780/0001-96.
CID COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA CNPJ/MF 05.615.235/0001-01..
FINSEC S/A COMPANHIA SECURITIZADORA DE CRÉDITOS FINANCEIROS CNPJ/MF 03.732.804/0001-73.
HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA CNPJ/MF 74.002.353/0001-67.
MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA CNPJ/MF 66052606/0001-52..

**Objeto                            da                            ação**
Extensão dos efeitos da falência do Banco Santos às empresas mencionadas no campo "requeridos".

**Situação Processual**
01/12/2005 - Entrados em 01/12/2005 com origem no Processo Principal 583.00.2005.065208-3/000000-000
04/07/2007 - Tópico final da sentença: "Vistos. ... Em face do exposto, defiro, em parte, os requerimentos apresentados, para o fim de determinar a extensão da falência do BANCO SANTOS S/A às sociedades mencionadas no preâmbulo desta, que também são declaradas falidas. São representantes legais de ATALANTA PARTICIPAÇÕES E PROPRIEDADES S.A. ou procuradoras de suas sócias Blueschell Inc. e Principle Enterprise Inc., Márcia de Maria Costa Cid Ferreira e Edna Ferreira de Souza e Silva. São representantes legais de CID FERREIRA COLLECTION EMPREENDIMENTOS ARTÍSTICOS LTDA. ou procuradores de sua sócia Wailea Corporation, Márcia de Maria Costa Cid Ferreira, Rodrigo Rodrigues de Cid Ferreira e Eduardo Costa Cid Ferreira. É representante legal de MAREMAR EMPREENDIMENTOS E PARTICIPAÇÕES LTDA. e procuradora de sua sócia Principle Enterprises Inc., Márcia de Maria Costa Cid Ferreira. Da HYLES PARTICIPAÇÕES E EMPREENDIMENTOS LTDA. são representantes legais e procuradores de sua sócia Bokara Corporation, Edna Ferreira de Souza e Silva e Rodrigo Rodrigues Cid Ferreira. É representante legal de FINSEC S/A COMPANHIA

FEDTJ: ISENTO

Página 1 de 2

SECURITIZADORA DE CRÉDITOS FINANCEIRAS, Joaquim Gomes de Almeida, que representa suas sócias Chory Investments Corp., Ângela Marcondes Barros de Almeida e MB Molduras do Brasil Indústria e Comércio Ltda. Fixo o termo legal em 60 dias anteriores à intervenção extrajudicial no Banco Santos S/A. Determino ainda o seguinte: 1) o prazo de 15 dias para as habilitações de crédito, a contar da publicação do edital previsto no item 6, ficando dispensados os que constarem corretamente do rol eventualmente apresentado e constante da publicação; 2) suspensão de ações e execuções contra as falidas, com as ressalvas legais; 3) proibição de atos de disposição ou oneração de bens das falidas; 4) anotação junto a JUCESP, para que conste a expressão "falido" nos registros e a inabilitação para atividade empresarial; 5) nomeio como **administrador judicial** o administrador de empresas **Vânio Cesar Pickler Aguiar**, não se verificando condições para continuidade do negócio, devendo ser expedido mandado de lacração e arrecadação, convertida em definitiva a liminar antes concedida; 6) intimação do Ministério Público, comunicação por carta às Fazendas Públicas e publicação do edital, na forma do parágrafo único do artigo 99 da Lei 11.101/2005; 7) Intimem-se os representantes das falidas, pessoalmente e por edital, para apresentação, em 5 dias, da relação nominal dos credores, observado o disposto no artigo 99, III, da Lei Especial, e para prestar declarações, na forma do artigo 104 da lei mencionada, no dia 22 de agosto de 2.007, às 14:00 horas, tudo sob pena de desobediência; 8) Defiro a expedição de ofício à Receita Federal e os de praxe, visando a perfeita arrecadação de bens das sociedades ora falidas, formando-se, com cópia desta sentença, um procedimento próprio para cada uma delas, e 9) Determino remessa de cópia desta decisão ao Exmo. Sr. Relator do Conflito de Competência. P.R.I."

São Paulo/SP, 12 de julho de 2007. Eu, _____ (ALESÇANDRA A SANTOS NUNES), Escrivã Diretora, matrícula 315930, digitei, conferi, subscrevi e dou fé.

**ALESÇANDRA A SANTOS NUNES**
ESCRIVÃ DIRETORA
MATR. 315930



1.1806/08 L.46.
*PATRICIA SOARES LACERDA NEME*
*TRADUTORA PÚBLICA*
*JURAMENTADA*
*JUCESP Nº 1531*

**FEDTJ: ISENTO**

Página 2 de 2



**COURT OF JUSTICE OF THE STATE OF SÃO PAULO**
DISTRICT OF SÃO PAULO
CENTRAL CIVIL COURT
2nd CHAMBER OF BANKRUPTCY AND JUDICIAL REORGANIZATION
Praça João Mendes, no number, rooms 1618/1624 - Downtown - Postal Code 01501-900 - Telephone: (11) 2171-6424, São Paulo - SP
E-mail: sp2falencias@tj.sp.gov.br

## CERTIFICATE OF STATUS OF THE JUDICIAL PROCESS

**ALESÇANDRA ALMEIDA SANTOS NUNES,** Notary Public Officer of the 2nd Chamber of Bankruptcy and Judicial Reorganization of the Central Civil Court, pursuant to the law,

**CERTIFIES** that, upon doing a search at the Notary Public Office directed by her, she verified:

**PROCESS NUMBER**: 000.05.065208-7 **- SUBJECT TYPE: Bankruptcy**

**DISTRIBUTION DATE**: 06/17/2005    **JURISDICTIONAL AMOUNT**: BR$ 1,000,000.00

**RESPONDENT(S)**:

BANCO SANTOS S/A - INSOLVENT ESTATE, Rua Hungria, 1100, Tax ID No. 58.257.619/001-66

**PURPOSE OF THE ACTION**:

Voluntary bankruptcy required pursuant to article 21, paragraph "b" of Law No. 6024 from 03/13/1974.

CERTIFIES that, in judgment dated 09/20/2005, the bankruptcy of Banco Santos S/A was decreed, appointing Mr. Vanio Cesar Pickler de Aguiar, with address at Rua Dona Elisa Pereira de Barros, No. 715, São Paulo - SP, as the Judicial Administrator. It further and finally certifies that the records are in the stage of assessment of liabilities and collection of assets, existing a separate incident of allocation: incident No. 000.05.065208-7/447.

**NOTHING FURTHER.** The foregoing is true and I attest. São Paulo, October 19th, 2010

*[Signed by: Alescandra Almeida Santos Nunes]*
**ALESÇANDRA ALMEIDA SANTOS NUNES**
**HEAD OF DIVISION**

To the State: Exempt

This document is a copy of the original signed electronically by ALESCANDRA ALMEIDA SANTOS NUNES. To obtain the original, visit the website www.tj.sp.gov.br, report or process number 0065208/58.2005.8.26.0000 and code 2S0000001WLGJ.



**TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO**
COMARCA DE SÃO PAULO
FORO CENTRAL CÍVEL
2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS
Praça João Mendes s/nº, Salas 1618/1624, Centro - CEP 01501-900, Fone: (11) 2171-6424, São Paulo-SP - E-mail: sp2falencias@tj.sp.gov.br

## CERTIDÃO DE OBJETO E PÉ

**ALESCANDRA ALMEIDA SANTOS NUNES**, Escrivã do Cartório da 2ª Vara de Falências e Recuperações Judiciais do Foro Central Cível, na forma da lei,

**CERTIFICA** que, pesquisando em Cartório, a seu cargo, verificou constar:

**PROCESSO Nº:** 000.05.065208-7 - **CLASSE - ASSUNTO: Falência**

**DATA DA DISTRIBUIÇÃO:** 17/06/2005   **VALOR DA CAUSA:** R$ 1.000.000,00

**REQUERIDO(S):**
BANCO SANTOS S/A - MASSA FALIDA, Rua Hungria, 1100, CNPJ 58.257.619/0001-66

**OBJETO DA AÇÃO:**
Autofalência requerida com base no artigo 21, alínea "b" da Lei 6.024 de 13/03/1974 .

CERTIFICA que, por sentença datada de 20/09/2005, foi decretada a falência do Banco Santos S/A, nomeado administrador judicial o Sr. Vanio Cesar Pickler de Aguiar, com endereço à rua Dona Elisa Pereira de Barros, nº 715- São Paulo – SP. Certifica mais e finalmente que os autos encontra-se em fase de apuração do passivo e realização do ativo, existindo em apartado o incidente de rateio nº 000.05.065208-7/447.

**NADA MAIS**. O referido é verdade e dá fé, São Paulo, 19 de outubro de 2010.

ALESCANDRA ALMEIDA SANTOS NUNES
DIRETORA DE DIVISÃO

Ao Estado:ISENTO

Este documento é cópia do original assinado digitalmente por ALESCANDRA ALMEIDA SANTOS NUNES. Para conferir o original, acesse o site www.tj.sp.gov.br, informe o processo 0065208-58.2005.8.26.0000 e o código 250000001WLGJ.



**L**a

Academy of Languages

516 North Charles Street, Suite 412
Baltimore, MD 21201
410 705-1762
443 524 9229 – FAX

## C E R T I F I C A T I O N

I hereby certify that the translator of this _JUDICIAL PROCESS CERTIFICATE_

is competent to translate from _PORTUGUESE_ into

English and the reverse, and that this translation, no. **190202**

is, to the best of my knowledge and belief, a true and accurate ren-

dition into _ENGLISH_ of the attached document

in the _PORTUGUESE_ language.

Jonathan Brinksman
Office Manager

Sworn and subscribed before me, on this _3RD._ day of the month
of _DECEMBER_, 2010.

_____, Notary Public
Arthur J. Miller



ARTHUR J. MILLER
Notary Public
Baltimore City, MD
My Comm. Exps. March 1, 2011



516 North Charles Street, Suite 412
Baltimore, MD 21201
410 705-1762
443 524 9229 – FAX

Academy of Languages

## C E R T I F I C A T I O N

BANCO SANTOS S.A.

I hereby certify that the translator of this BANKRUPTCY EXTENSION ORDER

is competent to translate from _PORTUGUESE_ into

English and the reverse, and that this translation, no. **19020.1**

is, to the best of my knowledge and belief, a true and accurate ren-

dition into _ENGLISH_ of the attached document

in the _PORTUGUESE_ language.

Jonathan Brinksman
Office Manager

Sworn and subscribed before me, on this _2ND_ day of the month

of _DECEMBER_, 2010.

_____, Notary Public
Arthur J. Miller



ARTHUR J. MILLER
Notary Public
Baltimore City, MD
My Comm. Exps. March 1, 2011

SEAL



**Academy of Languages**

516 North Charles Street, Suite 412
Baltimore, MD 21201
410 705-1762
443 524 9229 – FAX

## C E R T I F I C A T I O N

I hereby certify that the translator of this BANCO SANTOS, S.A. BANKRUPTCY ORDER
is competent to translate from PORTUGUESE into
English and the reverse, and that this translation, no. 1 9 0 2 0 0
is, to the best of my knowledge and belief, a true and accurate ren-
dition into ENGLISH of the attached document
in the PORTUGUESE language.


Jonathan Brinksman
Office Manager


Sworn and subscribed before me, on this 2ND. day of the month
of DECEMBER, 2010.

Arthur J. Miller , Notary Public
Arthur J. Miller



ARTHUR J. MILLER
Notary Public
Baltimore City, MD
My Comm. Exps. March 1, 2011

SEAL