1                UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF FLORIDA
2

3    IN RE:                          CASE NO. 10-47543-LMI

4    BANCO SANTOS, S.A.,

5          Debtor.
     _____/
6

7

8                 D.E. 55, D.E. 74 and D.E. 75

9                 Tuesday, February 17, 2015

10

11        The above-entitled cause came on for hearing before

12   the  Honorable  LAUREL M. ISICOFF,  one  of the Judges in

13   the   UNITED  STATES  BANKRUPTCY  COURT,  in  and  for the

14   SOUTHERN DISTRICT OF FLORIDA, at  301 North Miami Avenue,

15   Miami, Miami-Dade County,  Florida  on February 17, 2015,

16   commencing  at  or  about  1:00 p.m.,  and  the following

17   proceedings were had.

18

19

20

21

22

23                      Reported By:

24                   Karen B. Patlak

25

1                    APPEARANCES:

2

3               ASTIGARRAGA DAVIS, by
            GREGORY S. GROSSMAN, Esquire
            ARNOLDO B. LACAYO, Esquire

4       On behalf of the foreign representative,
                    Vanio Aguiar

5

6              BERGER SINGERMAN, LLP, by
            CHRISTOPHER A. JARVINEN, Esquire

7                       and
             CAHILL PARTNERS, LLP, by

8       JOHN R. CAHILL, Esquire (via telephone)
        On behalf of Edward Tyler Nahem Fine Art, LLC

9               and Edward Tyler Nahem

10

11                  ALSO PRESENT:

12

              ANDRE MARQUEZ (via telephone)

13

14                  - - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We are here this afternoon on the

2    Banco Santos matter.  I understand I have telephone

3    appearances, so I'm going to actually start with them.

4    So, Mr. Cahill, are you on the phone?

5          MR. CAHILL:  Yes, Your Honor.  This is

6    John Cahill of Cahill Partners in New York on behalf of

7    the movant, Edward Tyler Nahem, LLC and Ed Tyler Nahem.

8          THE COURT:  Okay.  And, Mr. Cahill, I'm going

9    to ask that each time you speak, that you identify your

10   name again for the record.  Okay?

11         MR. CAHILL:  Yes, Your Honor.

12         THE COURT:  All right.  The other person

13   that's on the phone is Andre Marquez.  Are you there,

14   Mr. Marquez?

15         MR. MARQUEZ:  Yes, I am, but I'm on a

16   listen-only line.

17         THE COURT:  Okay.  All right.  And from the

18   courtroom?

19         MR. JARVINEN:  Your Honor, good afternoon.

20   Christopher Jarvinen, that's J-A-R-V-I-N-E-N, from

21   Berger Singerman, LLP on behalf of the movants,

22   Edward Tyler Nahem Fine Art, LLC and Mr. Edward Tyler

23   Nahem.

24         MR. GROSSMAN:  Good afternoon, Your Honor.

25   I'm Greg Grossman, along with my law partner -- Grossman

1  is G-R-O-S-S-M-A-N -- along with my law partner,

2  Arnie Lacayo, L-A-C-A-Y-O, on behalf of the foreign

3  representative, Vanio Aguiar, A-G-U-I-A-R.

4           THE COURT:  All right.  Thank you all very

5  much, and thank you for coming back at one o'clock today,

6  although there was quite a group out here at 9:30 who

7  claim that they were here for Banco Santos.  So -- they

8  haven't come back.  So I think they thought they were

9  here for Banco Santos, but they were here for something

10 else.

11          Be that as it may, I've reviewed everything.

12 I have a lot of questions, but I will allow you to go

13 forward, Mr. Jarvinen, with your presentation to

14 highlight anything that you want to highlight, address,

15 any arguments that Mr. Grossman raised, and then I will

16 get to my questions.  Okay?

17          MR. JARVINEN:  I would like to thank you,

18 Your Honor, and also thank you for making time for us

19 today here.

20          As the Court noted, we are here today on the

21 movant's motion for relief from the automatic stay to

22 authorize the gallery to commence a declaratory judgment

23 action in state court in New York.  On the line today is

24 Mr. Cahill.  Mr. Cahill is the arts counsel for the

25 gallery.  Mr. Cahill has represented the gallery for over

1    a decade and possesses personal knowledge with all issues

2    before the Court as it relates to the Cahill declaration.

3    In particular, Mr. Cahill represented the gallery in the

4    purchase of the works of art in January of 2006.

5    Mr. Cahill was -- led the effort to respond to the

6    U.S. Customs' subpoena in 2008.  Mr. Cahill also led the

7    two litigations that were commenced in New York state

8    court against Mr. Barral and Barral Fine Art, the seller

9    of the works of art to the gallery.  Mr. Cahill also

10   coordinated on behalf of the gallery with non-U.S.

11   counsel and, in particular, the Swedish -- what I will

12   refer to as the Swedish lawsuit that was commenced by

13   Banco Santos, the judicial administrator, against the

14   gallery in 2013.

15            Your Honor, we are asking you to consider

16   approval of the lift stay motion filed at ECF Number 55.

17   The goal of the lift stay motion is simple, to permit the

18   gallery to commence a declaratory judgment action in New

19   York state court seeking a ruling by that Court which

20   declares that the gallery, which is located in New York,

21   was a good faith purchaser in New York during

22   January 2006 of four paintings, which I will refer to as

23   the works of art from Barral Fine Art, an art dealer

24   located in New York, pursuant to a purchase and sale

25   agreement, which is governed by New York law.  That's it.

1   Nothing more.

2           We are not asking the Court to make any

3   substantive ruling regarding title to the works of art.

4   The gallery wishes simply to have its day in court in New

5   York to obtain a Court order that holds once and for all

6   that the gallery was a good faith purchaser of the works

7   of art.

8           I think it's important before I summarize or

9   distill for the Court why cause exists to lift the stay,

10  I would like to provide a little bit of background on the

11  timeline.  The gallery divides the timeline, the

12  background here into two periods, the period from late

13  2005, early 2006 when it negotiated and purchased the

14  four paintings from Barral Fine Art, and the second

15  period is from a period two years later when the gallery

16  was first apprised of a competing claim to the works of

17  art.  The first period, the period in which the gallery

18  had no knowledge of any potential competing claim to the

19  works of art, began more than nine years ago and it's

20  important to consider that, because Mr. Nahem and the

21  gallery have suffered since 2008 or seven years with

22  respect to a cloud of title on the works of art.  But in

23  the first period the gallery purchased the works of art

24  from Barral in New York and subsequently during 2006 sold

25  three of the works of art and then placed the fourth on

1  consignment at Sotheby's U.K.  The fourth did not sell

2  at public auction in 2007 and was being held by

3  Sotheby's U.K. for a future auction, when Sotheby's U.K.

4  was notified by British law enforcement authorities to

5  hold the painting.

6              In brief, that first period ended with the

7  gallery selling three works of art and putting the fourth

8  on consignment.  The second period began in 2008, more

9  than two years after the gallery purchased the works of

10  art, when the gallery learned for the first time about a

11  competing claim to at least one of the works of art, the

12  art that was being -- the painting that was being held at

13  Sotheby's UK.

14              THE COURT:  The Jaune Avec Trous or whatever?

15              MR. JARVINEN:  I wish my -- my French is so

16  poor, it's embarrassing whenever I say it.  But it's --

17  yes, it's the --

18              THE COURT:  Something.

19              MR. JARVINEN:  -- Jaune Avec Trous.

20              So what did the gallery do?  The gallery did

21  what any respectable gallery would do.  Mr. Nahem

22  contacted the three clients who had purchased the works

23  of art, informed them of the circumstances and inquired

24  whether or not they wished to enter into a rescission

25  agreement.  Two of the clients -- two of the customers of

1   the gallery did so.  And so the gallery entered into

2   rescission agreements, gave back the cash that was used

3   to purchase the paintings and took back the paintings.

4                    THE COURT:  Well, with two of them, correct?

5   Isn't --

6                    MR. JARVINEN:  That's -- that's --

7                    THE COURT:  -- one still --

8                    MR. JARVINEN:  -- in private hands.

9                    THE COURT:  -- wandering somewhere?

10                   MR. JARVINEN:  One is in private hands.

11                   At the time of the rescission agreement

12  covering two of the paintings, one was overseas, Sea

13  Strip.  And so the gallery voluntarily when it imported

14  Sea Strip back into the United States in 2008, handed it

15  over to the U.S. Customs Service, maintaining its right

16  to title, but still handing it over in January of 2009.

17                   What else did the gallery do upon learning in

18  2008 that there was a competing claim to the title to the

19  works of art?  The gallery investigated.  What the

20  gallery learned from Sotheby's UK is that they were

21  acting at the behest of British law enforcement

22  authorities that were, in turn, requested to do so from

23  Brazilian law enforcement authorities.

24                   So the gallery did what any respectable

25  gallery would do, it went to investigate.  It went to

1   Brazil.  It had to go to Brazil and it filed an action

2   seeking a preliminary injunction, the equivalent of a

3   preliminary injunction, which would do essentially two

4   things; one, give it access to sealed documents that were

5   filed in support of, at that time, a sealed order that

6   claimed that there were works of art that were subject

7   to return to Brazil.  All of that was under seal.  It

8   went to seek a preliminary injunction to access those

9   records and it sought to have a preliminary injunction,

10  which would prevent enforcement of this sealed Brazilian

11  order as it related to the painting that was on

12  consignment at Sotheby's U.K.  It was unsuccessful in

13  obtaining that preliminary injunction.  It took no

14  further action in Brazil.  That action took place in 2008

15  before the trial court and then the Appellate Court --

16  they appealed the adverse decision to the Appellate Court

17  and the Appellate Court ruled against the gallery in

18  2009.  It took no further action in Brazil.

19          So Mr. Cahill on behalf of the gallery also

20  sued Barral Fine Art, the seller of the art in 2008,

21  obtained a default judgment against Barral Fine Art.  And

22  then upon learning that Barral Fine Art was essentially

23  judgment proof, commenced a second lawsuit in 2010

24  against Alberto Barral seeking to obtain rights -- fraud,

25  breach of contract and fraud against Alberto Barral.  The

1  gallery obtained the default judgment, but was

2  unsuccessful in its action against Alberto Barral,

3  personally.  And that opinion, the 19-page opinion of the

4  state court, is attached to the Cahill declaration and

5  was E-filed in the New York state court.

6          It's now 2015 and it's now been almost seven

7  years since Mr. Nahem and the gallery have learned for

8  the first time about a competing claim to the title.

9  They -- they want their day in court.  They believe, and

10 I think rightly so, that since the transaction took place

11 in New York, and from a seller and buyer both located in

12 New York under a purchase and sale agreement governed by

13 New York law, and given the extent to which New York has

14 developed art law, that New York is the proper forum, the

15 state court in New York, because Mr. -- the gallery was a

16 bona fide purchaser of this artwork.

17         So that turns me to the legal standard for

18 this Court with respect to a motion to lift stay.  I

19 don't believe ---

20         THE COURT:  I'm very familiar with the legal

21 standard --

22         MR. JARVINEN:  No, no.

23         THE COURT:  -- Mr. Jarvinen.

24         MR. JARVINEN:  Yes, Your Honor.  I was going

25 to say I don't believe I need to spend much time on this,

1   because I believe that there is -- I believe that there

2   is not a disagreement amongst the parties with respect to

3   the legal standard.

4           So I would like to go into the reason why

5   and distill for the Court -- not go into all the reasons

6   that are in the motion to lift stay, not into the

7   objection and the reply, but really just distill for the

8   Court the primary reasons why we have established a prima

9   facie case for lifting the stay to allow the state court

10  proceeding to commence and why we believe that the

11  judicial administrator has not carried his ultimate

12  burden to show lack of cause.

13          THE COURT:  Well, let me ask you something,

14  Mr. Jarvinen.  Since this has all been done on competing

15  affidavits, why don't you believe that the legal

16  administrator has met his burden?

17          MR. JARVINEN:  I believe that the legal

18  administrator has not met his burden because with respect

19  to the first prong, that Banco Santos will not suffer any

20  prejudice if this Court grants the lift stay motion.

21  Very simple, the automatic stay is designed to protect a

22  debtor against lawsuits, essentially lawsuits of any

23  kind.  The fact that Banco Santos affirmatively sued the

24  gallery in Sweden in 2013 to seek return of one of the

25  works of art, which Banco Santos believed was in Sweden,

1    is exactly what they would pursue in this Court or in

2    another court against the gallery.  In essence, they

3    don't need the protection of the automatic stay.  There

4    is no prejudice to them to being named a defendant in a

5    declaratory judgment action that seeks to quiet title to

6    the works of art.  And that goes into the second prong,

7    Your Honor, which is balance of the hardships.  It also

8    weighs in favor of lifting the stay to allow the state

9    court proceeding, the declaratory judgment action to

10   proceed because by filing extensive papers in Sweden it

11   is clear that the judicial administrator is ready,

12   willing and able to proceed with a declaratory judgment

13   action as a defendant in the United States.

14           THE COURT:  Well, equally of import is that

15   your client was ready, willing and able to proceed with

16   the questioning on the Brazilian criminal court actions

17   when it proceeded in 2008.  So what weight should I put

18   on that Swedish action?  I don't think there is a dispute

19   and, of course, I'm going to ask Mr. Grossman this, as

20   well.  But it doesn't seem to be a dispute that everybody

21   agrees that this issue needs to be resolved.  What I

22   think is really going on here is who gets to pick the

23   playground, and I know why you want it to be in New York.

24   I mean, that's obvious.

25           What -- if there is no dispute that the

1   litigation needs to be resolved somewhere, is that really

2   what I should be deciding -- and I'm going to ask

3   Mr. Grossman the same thing -- or is this really just

4   about which forum should hear it, this Court or actually

5   the District Court, since I'm going to assume that as

6   much as you gentlemen enjoy my company, that I'm not

7   going to be the one making this decision; number two,

8   New York court where, of course, you would argue strongly

9   that New York law should apply and that statute of

10  limitations that you have mentioned in your papers should

11  be invoked; or, three, the Brazilian court which is where

12  it all started in the first place and where everybody

13  appears to have very competent counsel?  Isn't that

14  really what's going on here?

15              MR. JARVINEN:  I wish that that was really

16  what was going on here, but reading the objection, I see

17  that there is a -- well, let me go back a step.  The

18  gallery only went to Brazil to seek to investigate and

19  have a preliminary injunction put in place while it had

20  the opportunity to investigate.  It never commenced an

21  action to quiet title to the -- at that time, remember,

22  the precautionary measure action in Brazil concerned only

23  one painting.

24              THE COURT:  I understand.

25              MR. JARVINEN:  All right.  So it never sought

1    the protection of the Brazilian courts to argue that I

2    should get a preliminary injunction to quiet title.  It

3    just went there to obtain a preliminary injunction so it

4    could investigate and prevent enforcement of this order

5    that it had never seen, which was under seal.

6                The gallery never dealt with in the -- in the

7    transaction involving these four works of art, it never

8    dealt with anything connected to Banco Santos.  It dealt

9    with Mr. Barral.  It dealt with Barral Fine Art in New

10   York.  And so to answer your questions, we believe the

11   proper forum here is New York state court, because New

12   York has a vested right in protecting its citizens,

13   protecting its business people with respect to being a

14   bona fide purchaser particularly in the case when that

15   business person, that gallery took the necessary steps,

16   the reasonable steps in order -- in advance of purchasing

17   and extending -- purchasing it with a great deal of

18   money, $1.48 million, these four works of art.

19                THE COURT:  I understand that, Mr. Jarvinen,

20   but let me ask you this question:  Part of your

21   argument -- putting aside that I think this is really

22   more about venue than anything else, your argument

23   centers on what this is really about, which is litigation

24   between your client and Mr. Barral and Barral Fine Art,

25   and what weight should I -- in making a determination

1    regarding relative prejudice to the parties, should be on

2    the fact that this is regarding an estate, a bankruptcy

3    estate and the rights that are being asserted statutorily

4    on behalf of all the creditors of that estate.  In other

5    words, your argument seems to -- I don't want to say

6    ignore, but seems to make short shrift of the fact of who

7    the -- who the other side is in this case, and why

8    shouldn't I put some greater weight on that than you are

9    arguing?

10           MR. JARVINEN:  Well, I think to answer your

11   question the first thing is we do believe that the

12   judicial administrator, for example, is the proper party.

13   The actions of the judicial administrator in Sweden and

14   with respect to other actions that the judicial

15   administrator has taken, such as meeting in New York,

16   having Mr. Grossman's law firm -- a representative of

17   Mr. Grossman's law firm meeting in New York to work with

18   U.S. Customs Service, et cetera, et cetera, is that we

19   have the proper defendant in a quiet title action.  But,

20   ultimately, it's about protecting the gallery as a good

21   faith purchaser.

22           This gallery had no -- absolutely no

23   interaction with the Brazilian liquidation.  It never

24   went to Brazil.  It never spoke with representatives of

25   Walia or Ms. Ferreira or anything.  It has no connection

1   whatsoever.  It was a New York gallery undertaking a New

2   York transaction, and this Court has -- in order -- and,

3   remember, the only thing before this Court is a lift stay

4   motion.  The Brazilian liquidation has not commenced an

5   action here or anywhere else, except for Sweden, except

6   my client.  But the key point for the Court is the

7   gallery -- all of the actions took place in New York.

8   There is no connection between the gallery and this

9   estate and there should be protection that is afforded in

10  this instance to allow the state court proceeding to

11  proceed.

12          THE COURT:  But, Mr. Jarvinen, isn't it the

13  case in many bankruptcies, whether they are foreign

14  bankruptcies with a Chapter 15 ancillary proceeding or

15  otherwise, whether it's California and Maine, that the

16  issue is how the relative rights of the parties in terms

17  of where their rights are litigated are always something

18  that the Bankruptcy Court has to face in these types of

19  arguments?

20          MR. JARVINEN:  I agree with you, it does have

21  to face and it has to weigh.

22          My argument in support of weighing this, in

23  favor of lifting the stay and allowing the declaratory

24  judgment action to go forward in New York is simply to

25  say that here it's a situation where the gallery is not a

1    creditor of this estate, hasn't filed a claim in Brazil.

2    It has no connection to this estate.  The only connection

3    it has with this estate are actions that took place years

4    after it purchased this artwork, and so that should be

5    taken into consideration when allowing -- when the Court

6    is balancing the prejudice of lifting the stay to allow a

7    lawsuit to take place in a different forum.

8                THE COURT:  Okay.  What else?

9                MR. JARVINEN:  Your Honor, with respect to

10   the second prong, the balance of the hardships, the

11   objection indicated that it would be easier to travel

12   between Brazil and Miami than between Brazil and New

13   York.

14               THE COURT:  I don't want to hear about the

15   flights.

16               MR. JARVINEN:  Okay.  It also implied that

17   because this Court found cause to impose the stay in the

18   recognition order over four years ago, including, at that

19   time, balancing the hardships of the creditor, that I

20   took from that paragraph, end of story.  But I think the

21   response there is just because the Court naturally

22   imposed the stay in January of 2011 in the recognition

23   order, that that does not prevent a party from filing a

24   motion requesting the Court to lift the stay, as I have

25   done.

1          With respect to the third prong, some

2    probability of success on the merits, Mr. Nahem and the

3    gallery believe that they have shown in Paragraph 78 to

4    83 of the lift stay motion, Paragraphs 24 to 31 of the

5    reply and the declarations filed in support thereof that

6    we have more than surpassed what would be -- what courts

7    have held to be just a slight or some support for the

8    belief that there is probability of success that a New

9    York court could enter an order, a declaratory judgment

10   order quieting title to the four works of art.

11          THE COURT:  Well, let me ask you something.

12   Doesn't that presuppose that the New York court or

13   whatever court adjudicated the matter would have to find

14   that New York law applies to the dispute between the

15   liquidating -- the estate of Banco Santos and your

16   client?

17          MR. JARVINEN:  Correct, Your Honor, it would.

18          THE COURT:  Okay.  And in making that

19   determination, the Court would apply the law of New York,

20   unless the case is removed, to determine conflicts.  And

21   what is the law of conflicts in New York?

22          MR. JARVINEN:  It's the most significant

23   interest.  It is the greatest interest.  It's not much

24   different from other states and forums.

25          THE COURT:  Okay.  So you have a New York

1    court.  And I understand your argument, it was ultimately

2    a purchase between two purchasers, but it continues to

3    ignore that the defendant in your case is the liquidator

4    of a Brazilian bankruptcy estate.

5              MR. JARVINEN:  Your Honor, as -- and

6    Mr. Cahill can comment on this, because Mr. Cahill would

7    be litigating this matter.  He is very familiar with New

8    York's long-arm statute --

9              THE COURT:  Uh-huh.

10             MR. JARVINEN:  -- and what would be in

11   support of the fact that a New York court would have not

12   only jurisdiction over the judicial administrator, but

13   could also enter an order which would be enforceable.  If

14   it's agreeable with the Court, may I have Mr. Cahill

15   respond to your question?

16             THE COURT:  I think you misunderstood my

17   question, and I apologize if I wasn't clear,

18   Mr. Jarvinen.  I'm not -- I didn't ask about whether the

19   New York court could assert jurisdiction over the

20   administrator, but what law the New York court would

21   apply to the dispute?  Your papers seem to assume that

22   the New York court, whether it's the state court or if

23   the case was removed, the Federal Court, would

24   automatically apply New York law.

25             MR. JARVINEN:  Correct, Your Honor.  That is

1    the position of the gallery that we would -- we would

2    assert that New York law applies.  As you saw in the

3    complaint that was attached to the motion, yes, it would

4    be -- our belief fundamentally is that this is just a

5    bona fide purchaser argument and that there is a statute

6    of limitations, as well, issue and that is a New York law

7    issue -- those are New York law issues.

8              THE COURT:  Right.  Okay.  All right.  What

9    else?

10             MR. CAHILL:  Your Honor, this is John Cahill.

11   If I just may add to that that New York courts because,

12   rightly or wrongly, they perceive that New York is the

13   center of the art world and the art market, have stated,

14   including the Court of Appeals, our highest Court, that

15   New York law should apply to art market transactions

16   on -- you know, to the benefit of, you know, foreign

17   parties.

18             There are many cases in which New York law

19   has been applied where foreign law would be more

20   beneficial to an art gallery or another party, and the

21   Court has held that New York law should apply, because

22   New York has a strong public policy interest in applying

23   New York law to transactions that occur in New York,

24   because New York is an important art market and, again,

25   as the Court of Appeals has said, is the center of the

1    art world at least today.

2              THE COURT:  Okay.  Thank you, Mr. Cahill.

3              All right.  Anything else?

4              MR. JARVINEN:  No, Your Honor.  My goal is to

5    keep it brief and to answer any questions that you may

6    have.

7              THE COURT:  My questions aren't as organized

8    as they normally are.  Normally, I write little plaintiff

9    and defendant or movant and respondent, but I didn't have

10   time to do that.  So I'm going to have to read my

11   questions, so give me a moment.

12             What does -- why last week when you-all were

13   here -- and, again, I will ask Mr. Grossman this

14   question, too.  It was made clear to me by both of you

15   that my ruling on this motion has something to do with

16   the motion to quash.  Why?

17             MR. JARVINEN:  I believe, I would put it a

18   little differently.  When the Court raised last week

19   that -- it suggested a hearing on the 24th or 26th of

20   this month with the motion to quash hearing scheduled for

21   the 25th in New York and the objection deadline on the

22   18th, counsel for Banco Santos raised that with the

23   Court, my comments at that time were just designed for

24   scheduling purposes so that we just followed the schedule

25   and that was it, meaning the fact that this hearing is

1   before that hearing.  There was no magic in it.  It was

2   just -- I was thinking in my head about what -- the

3   challenge that this Court had scheduling it before the

4   24th and -- I mean, before the 25th, and the fact that

5   when I used to practice before the Bankruptcy Courts in

6   New York, if there was a problem with the hearing,

7   counsel would just call the clerk and just seek a change

8   in that hearing.  There was nothing else other than that,

9   Your Honor.

10          THE COURT:  Okay.  So as far as you are

11   concerned whether or not I grant stay relief has nothing

12   to do with the motion to quash?

13          MR. JARVINEN:  No, it's just the way in which

14   this was scheduled, Your Honor.

15          THE COURT:  Okay.

16          MR. JARVINEN:  You scheduled yours before the

17   bankruptcy judge in New York scheduled the motion to

18   quash.

19          THE COURT:  All right.  There seems to be a

20   conflation in the argument.  One is the issue of good

21   title.  But good title for purposes of bona fide purchase

22   would be different than the issue of fraudulent

23   conveyance.  And you have alluded or -- not even just

24   alluded, you pretty much stated in your papers that if

25   the trustee or the liquidator wanted to bring an action

1    for fraudulent conveyance, then they need to bring that

2    as a counterclaim.  Not necessarily.  One could have good

3    title, as it were, but nonetheless be subject to a

4    fraudulent conveyance action, isn't that true, subject to

5    the statute of limitations?

6                    MR. JARVINEN:  Yes, Your Honor.  I have

7    nothing else to add other than, yes, that is correct.

8    However, it's our belief that the -- particularly with

9    respect to the statute of limitations, that they are out

10   of time and they sat on whatever rights they may have had

11   since 2008 and they are out of time.  And it's pretty

12   clear under New York law that that would be the case.

13                    THE COURT:  What about Brazilian law?

14                    MR. JARVINEN:  I do not know, Your Honor.

15                    THE COURT:  Okay.  I'm sorry, I have to read

16   through my questions.  It appears that it is the

17   impression of the Banco Santos side that you are seeking

18   to sue Dr. Aguiar in his individual capacity.  Why?

19                    MR. JARVINEN:  Your Honor, we weren't -- if

20   there was any -- as we wrote in our reply, we tried to

21   correct the record.  Normally when one sues, such as in

22   a -- say in a liquidation, you sue the legal

23   representative of the entity, but not in their individual

24   capacity.  We are not seeking to sue the judicial

25   administrator in his legal capacity at all and we hope

1    that we have made that clear.

2            THE COURT:  All right.  In going over the

3    documents and the affidavits and some of the exhibits

4    that you-all attached, what is the import -- and I'm

5    going to ask Mr. Grossman the same question -- of the

6    three of the four pieces were sequestered by a criminal

7    court in Brazil?  Isn't it the efficacy of that

8    sequestration order that's still at issue and, if not,

9    what happened to that order?  Did that order expire?

10           MR. JARVINEN:  I do not know what happened to

11   that order.  I don't know if it's expired.  I know

12   nothing in all seriousness about that order, Judge.

13           THE COURT:  Okay.  If that order is still in

14   place, and I understand that I would -- Mr. Marquez would

15   be the better person to ask this and perhaps we will

16   revisit this question and I will ask Mr. Grossman, if

17   that sequestration order is still in place, then is

18   anything that the New York court did or didn't do or that

19   I did or didn't do or one of my colleagues across the

20   street did or didn't do be irrelevant to the efficacy of

21   that sequestration order?

22           MR. JARVINEN:  Your Honor, the gallery

23   believes that the order sitting out there on its own is

24   meaningless unless there was an intent to enforce and

25   they knew, the judicial administrator, Banco Santos, knew

1   ever since the precautionary measure action was commenced

2   in 2008 about the fact that the gallery believes it is a

3   good faith purchaser of this artwork and the gallery

4   believes that New York -- they will obtain an order of

5   the New York court if this Court grants the order to lift

6   stay, which not only quiets title, but one of the issues

7   there will be that they didn't act on whatever rights

8   they may have had and that has now expired.

9              THE COURT:  Okay.  All right.

10             MR. CAHILL:  Your Honor, this is John Cahill,

11  just briefly.  That was also the -- there was also a

12  claim made in Sweden to quiet title by the judicial

13  administrator --

14             THE COURT:  Okay.  Thank you.

15             MR. CAHILL:  -- which they need to have title

16  quieted somewhere and we are just saying it should be in

17  New York.

18             THE COURT:  Okay.  Thank you.  All right.

19  Let me hear from Mr. Grossman.

20             MR. GROSSMAN:  Thank you, Your Honor.  Again,

21  Greg Grossman, G-R-O-S-S-M-A-N, on behalf of the -- one

22  representative.

23             I know Your Honor set aside a large amount of

24  time.  I don't think we will need it.

25             I think Your Honor has what this is about.

1    This is about which playground.  The lawsuit that they

2    hope to bring is declaratory relief.  A lot of talk about

3    quiet title.  This isn't a quiet title action.  Quiet

4    title is an in rem proceeding where you have possession

5    of the item.  You either have possession of real property

6    you are acquiring title or you have possession of

7    personal property and you are seeking to quiet title.

8    Quiet title is anybody who might have an interest in the

9    property.  There is only one defendant here, the estate

10   of Banco Santos through its judicial administrator.  This

11   is not a quiet title.  This is a dec action or a

12   purported dec action.

13          If you look on Page 55 of their original

14   filing, which is their proposed complaint, the actual

15   claims for relief tell you what they want.  Mr. Jarvinen

16   says all they want is a determination that they are a

17   good faith purchaser.  But then in the colloquy with Your

18   Honor that's not what they are asking for only.  They are

19   asking for declaratory relief that Banco Santos estate

20   has no cause of action against them, that the cause of

21   action is barred by the statute of limitations, et

22   cetera, et cetera, et cetera.

23          This is not a small lawsuit on a very narrow

24   issue.  This has got a whole lot of corollaries that are

25   requested.  This is on Page 55 -- Page 13 of the proposed

1   complaint.  We could find no case, and no case was cited

2   by the movants, in which a Court has granted relief from

3   the automatic stay to allow it to sue a bankruptcy

4   trustee, even a domestic bankruptcy trustee, for a

5   declaration that the bankruptcy trustee has no cause of

6   action.

7            We did find a case from Judge Fitzgerald in

8   which somebody filed a lawsuit asking for declaratory

9   relief as an adversary proceeding in a Chapter 11.  They

10  filed an adversary proceeding and they asked for a

11  declaration that the Pennsylvania Uniform Fraudulent

12  Transfer Act applied and that it was barred by statute of

13  limitations.  She dismissed the claim on a motion to

14  dismiss saying that she can't -- it's an advisory opinion

15  to do such a thing.  It's the only case we found.  I have

16  the citation, I apologize.  It is In re: -- you can't

17  make this up -- Busy Beaver Building Centers, Inc. at

18  127 B.R. 343.  I don't think it's particularly

19  controversial.  We all know implicitly when you hear

20  declaratory relief, you have to analyze how concrete is

21  it, has it been developed, et cetera, et cetera.  So I

22  don't think that is a surprise.

23            More importantly, Judge, is think of the

24  precedent they are asking you to set.  Think of every

25  Chapter 11 case where somebody suggests that the former

1    director or officer of a corporation committed

2    wrongdoing.  That director or officer -- and if the case

3    is in Delaware and the former officer lives in Iowa, they

4    go to a Delaware court and file a motion for relief from

5    stay.  I get to sue in Iowa state court against a

6    Delaware bankruptcy trustee of the estate to declare that

7    I didn't do anything wrong and a Delaware judge is going

8    to grant that relief.  If that were the case, they would

9    have been able to cite a case that stands for that

10   proposition.  We couldn't find any.  By saying it in a

11   very stark way I think we understand the problem here.

12   It is essentially they want to file what we would call

13   outside of the bankruptcy world the SLAPP suit, you know,

14   sue first, that way in case there is a litigation against

15   me, I'm the plaintiff and I'm controlling it.

16            THE COURT:  But they are not suing first

17   because your client sued in Switzerland.

18            MR. GROSSMAN:  In Sweden for one -- right.

19   The lawsuit in Sweden was asking for -- was asking for

20   the grabbing of that artwork and the ex -- you know, the

21   patriation or repatriation of that to Brazil.  It turned

22   out to be the artwork wasn't there and the case was

23   dismissed and withdrawn, because you can't grab something

24   that's not in the country.  So, yes, the judicial

25   administrator went and tried to marshal the assets of the

1    estates or those that he felt he had the ability to

2    marshal.  He was unsuccessful, because you can't grab

3    what is not there.

4              THE COURT:  So let me ask you something.  So

5    the gallery is just supposed to sit around and wait until

6    the administrator does something with respect to these

7    four pieces of artwork?

8              MR. GROSSMAN:  The gallery is free to do

9    whatever they think is best.  The fact that they consider

10   there to be a cloud, I think the cloud, as Your Honor

11   pointed out, I think the cloud is caused because there's

12   a Brazilian criminal sequestration order out there.  To

13   our knowledge it has not been withdrawn, it has not been

14   modified and it has not been reversed.  It's still out

15   there.

16             If that is their concern, there is nothing

17   that a state court judge in New York can do, and,

18   frankly, there is nothing that Your Honor can do.  They

19   would have to go to the criminal court down there or they

20   could go to any court down there and perhaps bring it all

21   together.  I am not a Brazilian lawyer.  I don't know

22   what procedure they would have to lift that

23   sequestration.

24             My understanding is that in their -- what

25   they call their preliminary injunction lawsuit in Brazil,

1    they asked for an injunction of that sequestration and,

2    they were rebuffed by that court, suggesting that they go

3    to the criminal court and ask the criminal court for

4    relief.  That sort of seems what we would do here in the

5    states.  If there was a forfeiture and somebody had it or

6    if there was an order of forfeiture out there and you

7    thought it was affecting, you would go to the judge who

8    issued the order of forfeiture and say, dear judge, you

9    need to lift the forfeiture.  I didn't do anything wrong.

10   I would like to have a proceeding.  I would like you to

11   give me relief from the order so I can have all of that.

12   I don't think a New York state court judge could do that.

13   Now, maybe they are comfortable that they don't need that

14   in order to move the artwork again.  Maybe that's a

15   decision that they have made.

16            The other thing that I thought was

17   interesting was the notion that this has nothing to do

18   with the motion to quash in New York.  Because as we read

19   the motion to quash in New York, they want you to grant

20   stay relief so they can file a lawsuit in New York state

21   court, tell the bankruptcy judge in New York where the

22   subpoena was issued for the documents, quash it because

23   we have a lawsuit pending in New York state court and all

24   of these documents are going to be produced in that

25   lawsuit.  The timing here, we serve a subpoena, we ask

1    for documents, we get them, this motion to lift stay and

2    then we get a motion to quash filed all around -- in

3    fact, I think filed on the same day.  So to say that

4    these are not connected, I think is a little bit -- is a

5    little bit disingenuous.

6              I'm not going to argue the scope of the 2004.

7    That is for Judge Gerber in the Southern District to

8    handle.  It's not one of these, you know, we have four

9    pieces of artwork and we have a set of bad guys, and

10   that's why we have asked for the documents about the

11   pieces of artwork and the bad guys.  So, in any event,

12   that's not for the Court here to do today.

13             There's nothing that stops them from filing

14   their adversary proceeding here.  I think we have looked

15   at that before.  They do not need your permission to file

16   a lawsuit in your own courtroom.  That's not going to

17   help them on the sequestration, I don't think.  But they

18   have a forum, it's here.  When we filed our Chapter 15

19   petition here on behalf of the estate, you know, we've

20   consented at least to the motion under 1334 that there

21   would be bankruptcy related jurisdiction in that respect.

22             THE COURT:  But that consent, putting

23   wellness aside, because who the heck knows what's going

24   to happen there, but as Mr. Jarvinen points out in his

25   papers, there is no jurisdiction for me to adjudicate a

1    fraudulent conveyance or any claims that the

2    liquidating -- the administrator would assert against the

3    artwork.  So what possible purpose would be served by

4    bringing an action in this court?  I can't adjudicate the

5    relative rights of the party and the artwork either.

6                    MR. GROSSMAN:  Let me try and unpack that.  I

7    certainly agree we could not file a Uniform Fraudulent

8    Transfer Act claim under -- because the statute under

9    Chapter 15 is very clear, we couldn't bring a

10   counterclaim under American avoidance actions.  We all

11   understand that.

12                   If we brought an avoidance action under

13   Brazilian law, the issue would be since they are not a

14   creditor, they didn't file a claim, they may be able to

15   contest and refuse to consent to having Your Honor hear

16   and determine it.  If they affirmatively consented, then

17   you could try it -- even now under regular American law,

18   you could file -- you could hear and determine a lawsuit

19   against somebody who received a fraudulent transfer, even

20   though they are no long a creditor and didn't file a

21   claim, if they agree.  If they don't agree, then you may

22   shift the case from a pretrial and have to send it up to

23   the District Court for trial, et cetera, et cetera, or

24   if they are going to say you can't or ---

25                   THE COURT:  Yeah, but -- but maybe --

1          MR. GROSSMAN:  There's another piece of this

2    missing.

3          THE COURT:  -- maybe I haven't stated this

4    correctly.  If there is no jurisdiction under Chapter 15

5    to adjudicate a bankruptcy fraudulent conveyance, then

6    taking it to the District Court doesn't confer bankruptcy

7    jurisdiction.  There is either jurisdiction under 1334

8    or there is not.  There would have to be separate

9    jurisdiction unrelated to the bankruptcy in the

10   Chapter 15 to bring the claims that the administrator was

11   seeking to bring against the gallery.

12         MR. GROSSMAN:  The first thing is there would

13   be jurisdiction under 1334.

14         THE COURT:  How?

15         MR. GROSSMAN:  The last part of 1334 says

16   that Chapter 15 and all related matters and other matters

17   concerning the 15.  So there is 1334 jurisdiction.  It's

18   not a question of jurisdiction.  It will be a question of

19   core versus noncore and what is not under Stern v.

20   Marshall, and whether you can issue the final order, but

21   there is jurisdiction.

22         In Condor, which is the case out of

23   Mississippi that ended up at the Fifth Circuit, the

24   original trial judge there said you cannot bring the

25   fraudulent transfer action under Nevis law, you cannot

1    bring that thing here because of the provision in

2    Chapter 15 that says you couldn't sue under 544 or 548.

3    The Fifth Circuit reversed and said you can bring it

4    under Nevis law if that's not precluded.  So what did

5    they do?  They brought an adversary proceeding under

6    Nevis law as an adjunct to the Chapter 15.

7                    THE COURT:  Okay.

8                    MR. GROSSMAN:  That person may or may not

9    have consented to the jurisdiction of the Bankruptcy

10   Court to hear and determine it as a final order, but

11   there is still jurisdiction.  That's our view of it.

12                   You did make another point, Judge, which I

13   think is apt here and we pointed this out to

14   Mr. Jarvinen, and I apologize it wasn't in our papers.

15   It was one of the discussions we had in the hallway.

16   We consider, if Your Honor was to grant this relief,

17   this is a monumental waste of estate resources.  There's

18   simply no way that a Brazilian bankruptcy estate

19   represented by a Brazilian judicial administrator is

20   going to allow a state court judge in New York to

21   adjudicate the rights with an art gallery in New York.

22   So he's going to remove.  But the removal is two grounds

23   for jurisdiction, the bankruptcy, we just heard through

24   1334, but there is diversity here.  We are a non-U.S,

25   whatever we are, an entity, a trust, an estate, whatever

1   would consider it and they are a New York corporation.

2   That is -- the basis for diversity is not to get

3   hometowned by the judge who's in the home court.  So we

4   would be already removing it.  There's no remand on

5   diversity, because otherwise the whole purpose of the

6   rule goes away, which is not to have a judge with

7   lifetime tenure, et cetera, et cetera, here and determine

8   your case.

9              That's irrespective of whether or not there

10  would also be a personal jurisdiction dispute, and all we

11  have heard today about whether the estate would be

12  subject to personal jurisdiction is that my law partner

13  went and visited Customs in New York where the artwork

14  that was repatriated is kept to meet with Customs.

15  That's what we've heard.  And the issue with the

16  2004 Examination to obtain documents from a New York art

17  gallery.

18             Again, we also have the forum of

19  nonconvenience.  And in complete transparency, Judge, if

20  they were to file the same lawsuit here in this court, we

21  would have to have a serious conversation with our client

22  about this doesn't belong here either.  This ought to be

23  in Brazil on a forum of nonconvenience basis.  I don't

24  know how that will play out.  I'm not presupposing that

25  we would win that or lose that.  But I'm telling the

1   Court that is a distinct possibility.

2            There's a notion here that a specialized

3   court, and I think Mr. Cahill tried to basically tell you

4   that New York state courts are now specialized courts

5   dealing with art, because New York considers itself the

6   center of the art world.  But that prong is where we were

7   talking about the tax court, the patent court, the court

8   of international trade.  That doesn't really carry here.

9   Well, even if you were to try to take that to its

10  extreme, they said -- I don't think they are ensured any

11  guarantee that their lawsuit is going to be assigned to

12  the same judge who handled their other lawsuit.

13            THE COURT:  Well, that's clear, because this

14  would be in the New York Supreme Court and they have more

15  than one judge in the New York Supreme Court, I think.

16            MR. GROSSMAN:  And being very practical, my

17  client is not going to feel comfortable.  If there's some

18  reason they want to be in front of that judge, probably

19  because that judge already adjudicated against them on

20  the notion that they were defrauded, so they want that

21  judge.  We all know the rule of litigation.  If the other

22  side wants it real bad, it's not good for you.

23            The other thing, Judge, is that they haven't

24  told you that litigating here is inconvenient.  They

25  haven't said anything about whether it's convenient or

1    inconvenient for us to litigate here if they wanted to

2    bring their adversary proceeding here.  So there is no

3    record evidence that says that there is anything about

4    Miami that's a problem for them. I will tell you it's a

5    well-known art gallery.  They go to Art Basel and all of

6    that.

7                 The statement made that the artwork had no

8    connection to Banco Santos, if you look at Footnote

9    Number 6 on Page 8 of their filings ---

10                THE COURT:  Which -- of which?

11                MR. GROSSMAN:  Page 8 of their original

12   motion, the footnote says that one of these pieces of

13   artwork was originally sold by this gallery to Walia.

14   Walia is the entity owned by the principal of Banco

15   Santos and the wife.

16                THE COURT:  So that means that -- I mean, not

17   that it's not that important for this as far as I know.

18   But that means that this gallery owned this piece, sold

19   it to Mrs. Ferreira, who then sold it to Barral, who then

20   sold it back to the gallery.

21                MR. GROSSMAN:  Judge, one of the reasons for

22   the 2004 is to say, listen, all of this may just be

23   coincidence, maybe happenstance.  It may be, as they put

24   it, they only found out in 2008 that Ms. Ferreira was

25   behind Walia, but, you know, that's what discovery is

1    for.  That's one of the reasons for the 2004 request.

2              THE COURT:  So how -- you know, I appreciate

3    all of this.  But you have a gallery that bought four

4    pieces of art, three of which were sold, two of which

5    have been bought back, one of which has been given to

6    Customs -- and I think I'm following this correctly --

7    one of which is still in the U.K., but there has been no

8    suggestion that this gallery did anything wrong.  It's

9    just a question of whether who has superior title to the

10   artwork.  So how long do you drag this out?  Mr. Jarvinen

11   argues that they have been under this shadow for nine

12   years.  How much longer?

13             MR. GROSSMAN:  It depends on what their

14   shadow -- what their shadow -- which shadow they are

15   identifying.  If they are identifying the shadow of the

16   criminal court in Brazil, then only that court, I think,

17   can answer that question.  If they are saying that they

18   are okay with that shadow, that their problem with the

19   shadow is that Banco Santos would like to know what

20   happened with the artwork, that's why a Rule 2004

21   Examination request was made, to give us their files

22   about this artwork.

23             THE COURT:  But what does it matter if what

24   you are trying to do is just get the artwork or its value

25   back or whatever Brazilian law allows you to do?

1          MR. GROSSMAN:  I'm not sure I follow the

2    question, Your Honor.

3          THE COURT:  Well, I mean -- I'm just trying

4    to understand.  It seems to me that the only issue is

5    whether -- who has superior title, the gallery or the --

6    the gallery and then its purchasers or the estate?  But

7    isn't that just a question of whether the estate has

8    superior title, not that Ms. Ferreira and the gallery are

9    in cahoots.  If that were the case, you would have done

10   something a long time ago.

11         MR. GROSSMAN:  Well, there's -- there's two

12   points to that; one is, I'm not sure it can -- it may

13   turn out to be just a title dispute with no knowledge

14   based requirements, but I think these things are usually

15   inextricably linked to knowledge at the time of events.

16         THE COURT:  Right.  But how -- I mean, isn't

17   there a statute of limitation issue?  Putting aside the

18   New York law, an innocent purchaser, et cetera, et

19   cetera, isn't there a statute of limitation under

20   Brazilian law?

21         MR. GROSSMAN:  I think there must be, I would

22   assume.  I don't know what -- when it accrues and I don't

23   know when it ends.

24         THE COURT:  Well, don't you think you ought

25   to find that out before you and Mr. Jarvinen, your client

1  and Mr. Jarvinen's client continue to chew on each other?

2          MR. GROSSMAN:   Judge, I didn't -- I didn't --

3  I've only asked for documents regarding the artwork.

4  They responded with the declaratory relief action.   If

5  they think that that's the appropriate way to proceed, we

6  are really fighting about where is the correct playground

7  for that proceeding.   But I did not ask for that relief.

8  And I understand -- I understand completely the

9  practicality of we need to have a resolution once and for

10 all.   I get that.   But at that point -- and if that's

11 proper, then we really ought to talk about where that

12 action would be proper.   It would seem to me that the

13 most proper place for that is in Brazil.   That's the

14 person who you say has created the cloud.   So go to where

15 that person who has created the cloud lives and ask for

16 that court to adjudicate that there is no cloud or that

17 the cloud has been lifted or that time has past if that's

18 permissible.   If you are unwilling to go there, then your

19 other choices are to come here where you don't need

20 permission or go to New York state court, which is what

21 they are trying to do, but only if they can get stay

22 relief and we think that's the least appropriate place if

23 we are going to have that battle.

24          With respect to the information, what we know

25 is that documents were provided to Customs.   Our

1    investigation, at least on our side, is we don't have

2    those documents.  They are with Customs.  Now, there is a

3    strangeness here.  The guy who was working at Customs,

4    left Customs and works for our co-counsel in the BVI, but

5    he doesn't have the documents.  You don't walk out --

6    when you leave the government, you don't walk out with

7    all of your files.

8              THE COURT:  Some people do, but ---

9              MR. GROSSMAN:  Some people do, but probably

10   not properly.

11             In any event, Judge, that's from our

12   perspective.  We want the documents to see what's there.

13   If there is a cause of action, then there's a cause of

14   action.  If there's not, then there's not.

15             I will point out, Judge, we talked about

16   statute of limitations, and I want to be clear here.

17   Even under U.S. law under a fraudulent transfer, an

18   actual intent to delay, hinder or defraud has got a one

19   year from the time in which you know, in which you become

20   aware that the transfer has occurred.  Now, I'm not

21   suggesting that we wouldn't have known one year.  We have

22   known a long time from the debate here.  But the idea

23   that there is some outer limit in Florida -- for

24   instance, where the statute of repose, we know after

25   12 years it's dead and buried and never coming back.  I

1   don't know what the statute of repose is in Brazil.  I

2   don't know if they have such a concept or not.  So it may

3   be that the cause of action hasn't even yet accrued,

4   whatever that cause of action is.

5           Again, I'm shadowboxing here, because I don't

6   have the documents.  So if I have the documents, it may

7   give rise to a cause of action that I hadn't thought of,

8   and that cause of action may not be time barred, because

9   it may be something completely different.  It may also be

10  because the documents have never been produced to us,

11  despite demand, that that creates a tolling.  There's a

12  lot of things that happen here.  And I think -- I

13  understand they want to get to someplace where they have

14  final resolution.  My point is their best place to do

15  that is the place where the estate is located in Brazil.

16  Their second best place is where the estate has decided

17  to come in the United States, which is right here.

18          Thank you.

19          THE COURT:  No, no, don't go anywhere.

20          MR. GROSSMAN:  Oh, sure.

21          THE COURT:  All right.  In your papers you

22  argue in your forum nonconvenience that there are these

23  other entities involved now in the Banco Santos

24  bankruptcy that would not -- and my question to you is:

25  What possible relevance do those entities have to who is

1   subject to the jurisdiction of what court?  I mean, what

2   difference does it make what other entities have now been

3   brought into the Banco Santos bankruptcy?

4            MR. GROSSMAN:  I think the issue was -- I

5   agree with Your Honor on the second point, which is the

6   fact that there's an entity out there that may be brought

7   into the -- into -- basically adjudicated in a

8   substantive consolidation of a nondebtor entity type

9   animal.  That isn't even a change of jurisdictional hook

10  for a New York state court or perhaps for this Court,

11  unless additional recognition has.  But it may trigger

12  additional statute of limitations or additional causes of

13  action that only exist when there is a bankruptcy of an

14  entity.  There are certain causes of action.  I think

15  it's -- we have it here, too.  There are certain causes

16  of action that only allow it on the filing of a

17  bankruptcy or the making of the entity into a bankrupt.

18  That's the point of that and I think one of them is this

19  Walia.

20            THE COURT:  Okay.

21            MR. GROSSMAN:  I do have to note, Judge, that

22  I love the fact that one of the pieces of artwork is a

23  Twombly.  I just think that that's ---

24            THE COURT:  Right.  I did notice that,

25  although I'm too ignorant to know what significance it

1   has other than the happy coincidence of sharing the name

2   with the Supreme Court case, although I think it's

3   spelled differently.  Okay.

4            Thank you, Mr. Grossman.  I have no more

5   questions.

6            MR. CAHILL:  Your Honor, this is John Cahill.

7   I have just three quick facts I would like to give to the

8   Court if I ---

9            THE COURT:  Okay.  All right.  I'm going to

10  stop you for a moment.  Mr. Cahill, I will allow you to

11  respond, but just so that you know, in the future I would

12  rather that you wait until I invite you to make a

13  comment.

14           MR. CAHILL:  Okay.

15           THE COURT:  But that will just be for the

16  future.  So Mr. Jarvinen is at the lectern, but I will

17  allow you to precede him in your remarks.  So, go ahead.

18           MR. CAHILL:  I didn't want to respond, Your

19  Honor, I just wanted to just give a few quick facts, the

20  first of which is that when the gallery did go to Brazil

21  to the criminal court to try and get records, including

22  the order which has been described, it was unable to get

23  any records from Brazil because the records were sealed.

24           The second is that Mr. Grossman said that the

25  action of Sweden was to grab the asset, and I'm looking

1    at the petition that was filed by the judicial

2    administrator, which is Exhibit M, as in Mary, to our

3    moving papers, and the first relief is that the Court

4    established that Banco Santos has better right than

5    Edward Tyler Nahem to the painting Switch by Robert

6    Rothenberg.  So it's exactly the same relief that we are

7    seeking here in the U.S. and that they sought in Sweden,

8    which is to establish who has the better right to title

9    of the painting.

10             The last fact is that Mr. Taylor, who was the

11   Customs agent, did ask if he could walk out of the

12   government with his files -- this is Exhibit M to our

13   moving papers, which his affidavit are part of it anyway,

14   and at meeting of which Mr. Grossman (unintelligible) in

15   New York, he asked the U.S. attorney if he could have his

16   files and they said, yes, you can have all of your files,

17   except anything that we had gone to the grand jury

18   process.  So that should include things he got through

19   the Customs subpoena.  Those are just my three facts.

20             THE COURT:  Okay.  Thank you.

21             All right.  Mr. Jarvinen?

22             MR. JARVINEN:  Your Honor, before I respond

23   to a number of -- on an individual level some of the

24   arguments made by Mr. Grossman, what I had heard through

25   Mr. Grossman's presentation is a lot of issues that will

1   arise in the underlying lawsuit.

2           The gallery, since 2008 has waited and has

3   made the decision it wishes to wait no longer to quiet

4   title to these four works of art.  It just wants an end

5   to this nightmare from the last seven years.

6           THE COURT:  So why didn't it do something in

7   2008?

8           MR JARVINEN:  It's doing it now.  I can't

9   answer why it didn't do, what it did, or -- it tried to

10  investigate in Brazil.  It didn't work.  It didn't get

11  its preliminary injunction.  But what we are asking for

12  now is an opportunity to end this, to bring it to a

13  conclusion and that's the key thing here, is that the

14  judicial administrator, Banco Santos, wants us to wait.

15  It wants to choose when to sue us.  It wants one-sided

16  discovery, despite an extensive pleading filed in Sweden

17  in the Swedish lawsuit showing that it already is aware

18  of many facts, it wants to take a 2004 Examination

19  against my client here.  Again, that's not before this

20  Court.  But what we are saying is, wait, you get to sue

21  us when you want, you get to take discovery of us when

22  you want.  But, you know what, we think you have

23  sufficient facts that you have gathered from either

24  Mr. Taylor or otherwise, or else your pleadings could not

25  have been as extensive as they were in Sweden, and it's

1    about time to bring this to finality.

2              So, regardless of what Court rules, whether

3    it rules in our favor or rules against us, it's time to

4    allow us this opportunity to bring this lawsuit.  We are

5    not asking for money.  We are just asking for the ability

6    for a court to quiet title against the representative of

7    the estate who claimed in a Swedish lawsuit that it is

8    the representative of the estate in order to take

9    possession of one of the paintings.  So that's really at

10   a 30,000 foot level what we are asking, just lift the

11   stay, allow us to proceed with the lawsuit.

12             If there isn't a statute of limitation issue,

13   if there's a tolling issue on the judicial

14   administrator's side, I get that.  That's going to be the

15   fight and the fight is going to happen.  But the question

16   is:  For the purposes of today for the lift stay motion,

17   we believe that the first two prongs, which is, you know,

18   prejudice to the estate and balancing the harms, the fact

19   that they brought the Swedish lawsuit shows that they

20   don't need the automatic stay.  And the fact that they

21   brought the Swedish lawsuit shows that they are able to

22   defend in an action because they were the plaintiff in

23   the Swedish lawsuit.

24             I find it remarkable, Your Honor, that their

25   papers are completely silent in contesting any of the

1    legal issues that we raised with New York.  If you look

2    at the objection, they don't make any argument against

3    the legal argument that we made that a New York court has

4    jurisdiction, that they will be able to show or at least

5    the gallery will be able to show that it was a bona fide

6    purchaser and that the statute of limitation -- the

7    applicable statute of limitations will prevent them from

8    the -- Banco Santos from being successful.  And I think

9    that's important to keep in mind here.  The papers are --

10   there is no response to those arguments.  So I believe

11   that the -- the movants have established the third prong,

12   which is some basis, even if slight, that they have a

13   chance -- the gallery has a chance to be successful.

14           I would like to just respond to a few of the

15   arguments that Banco Santos has made, which is they say

16   that there's no case going either way and they cite a

17   Chapter 11 case, Busy Bee.  I don't recall that in the

18   objection.  I can't comment on it now.  What I can

19   comment on is that this is a Chapter 15.  It's not a

20   Chapter 11 case.  So the Court's jurisdiction is

21   different in a 15 than in an 11, and that is why the

22   United States District Court for the Southern District of

23   New York in In re: Fairfield Sentry at 458 B.R. 665

24   overturned a Bankruptcy Court's order refusing to remand

25   fraudulent transfer cases which the Chapter -- the

1  foreign representative had removed to Bankruptcy Court

2  from being remanded back to state court.  So there is

3  precedent within a relatively young statute of Chapter 15

4  of the authority to remand back if there is a removal.

5            So -- but, again, the 1334 issue for the most

6  part, other than their argument, which is citing

7  Chapter 11 cases, that this Court has broad authority, is

8  that we have to look at subject matter jurisdiction

9  differently in a 15 than an 11.  Instead of broad

10 universal jurisdiction, it is limited to property, which

11 is in the territorial jurisdiction of the United States.

12 That is why we in our lift stay motion ask the Court to

13 enter an order lifting the stay, to the extent it is

14 applicable ---

15            THE COURT:  Well, but in your argument you

16 can -- yes, there is no stay in effect as to the artwork

17 that is not in the territory of the United States, but

18 that's different than saying the Court doesn't have

19 jurisdiction over the dispute.

20            MR. JARVINEN:  Right.  All I am saying, Your

21 Honor, is that I was giving you an example of where there

22 was a removal and a remand dispute --

23            THE COURT:  Uh-huh.

24            MR. JARVINEN:  -- and that there is authority

25 for remanding.

1          What Mr. Grossman basically said is if this

2    Court grants the lift stay motion and we go to state

3    court, they are going to immediately remove.  And under

4    the rules of removal, they would remove it to the

5    Bankruptcy Court in New York, because that's where the

6    removal would go.  It would go from the state court in

7    New York to the District Court, and the District Court

8    would do the -- you know --

9          THE COURT:  The order of reference.

10          MR. JARVINEN:  Right -- would put in the

11    Bankruptcy Court and then we would have a fight there as

12    to -- over whether or not it should be remanded, and 1452

13    does give in bankruptcy cases the power to remand.  What

14    I'm just saying is that is a fight for a different day,

15    but there is not an absolute exclusion on that.  And,

16    frankly, it's not relevant for the purposes of this

17    motion to lift stay, because we have responded, I think,

18    appropriately to the fact that there is a conceptual

19    difference between what takes place in Chapter 11 and

20    what takes place in a 15, and you have authority to enter

21    an order to lift the stay to allow the state court

22    proceeding to continue.  And I just have a few more

23    points.

24          THE COURT:  You can make as many as you want.

25          MR. JARVINEN:  All right, Your Honor.  He --

1  Mr. Grossman says he believes that a New York state court

2  cannot do as the plaintiffs request.  As I indicated

3  before, their objection is silent.  They never attack the

4  specific New York law, jurisdiction, final order, statute

5  of limitations that we put forth in our papers.  I'm

6  aware that these issues are going to be heavily contested

7  in the lawsuit and that's the proper place.  It isn't for

8  today.  I believe we have sustained the burden to show a

9  prima facie argument that we have at least some slight

10  probability of success related to a quiet title action in

11  New York.

12           THE COURT:  But how can I make that

13  determination until somebody, and I think it's incumbent

14  upon both sides to figure out what is the continuing

15  status of the sequestration order in Brazil.  Because if

16  there is no understanding by whatever court is going to

17  ultimately decide this, what is the ongoing efficacy of

18  that sequestration order?  Nothing any court can do

19  anywhere else in the world is going to make a difference,

20  because ultimately it has to be what the effect of that

21  order is on this entire dispute.

22           Now, it could be -- and Mr. Marquez is

23  probably quietly sitting in his chair holding his hands

24  going, I know, I know, I know, I know.  But it seems to

25  me that that's where everybody has to start.

1          I know and respect both you and Mr. Grossman

2    very, very well, and -- but I really think that both of

3    you need to have a better understanding of that and, in

4    the case of Mr. Grossman, understanding what the statute

5    of limitation is for any cause of action that he seeks to

6    bring under any law with respect to this artwork at this

7    point many, many, many years after the Banco Santos

8    bankruptcy has commenced.

9          MR. JARVINEN:  Our position, which I've

10   articulated before, Your Honor, is that because the

11   gallery is a good faith purchaser under New York law, it

12   had no dealings with the estate whatsoever in the

13   purchase of these four works of art, that a New York

14   state judge can enter an order that shows that this was

15   under New York law a proper purchase and that title,

16   whatever title, whatever would be the effect of that

17   order is cut off.  Period.  We don't have to prove that

18   today, but we have to give you an indicia and I thought

19   that we did so, particularly in our reply, that we

20   believe that the statute of limitations will cut off any

21   effect of that order.

22          THE COURT:  Okay.  But you're arguing -- and

23   I know you are familiar with the law, as is Mr. Grossman,

24   because we talked about it last year at ABI, okay, and

25   that is the flip side, where a New York judge -- whatever

```
 1    his name is, the District Court judge that hates

 2    bankruptcy -- held that there is no extraterritorial

 3    effect to any United States bankruptcy laws on the

 4    relative rights of parties outside of the country.

 5              So what you are arguing is the same thing

 6    would apply with respect to Brazilian criminal law, is

 7    that there is no extraterritorial effect on that

 8    Brazilian criminal sequestration, vis-a-vis a dispute in

 9    the United States on artwork that was subject of that

10    sequestration order.  That's what you are arguing to me

11    and I don't -- which is not -- you are right, that's not

12    a decision that I have to make.  But in terms of trying

13    to determine success on the merits, isn't that something

14    that I should have at least a general idea of what the

15    law says?

16              MR. JARVINEN:  I think that we have put in

17    our papers what we believe we need to do, and that is

18    that a New York state judge could enter an order, which

19    has effect.

20              THE COURT:  I totally --

21              MR. JARVINEN:  Right.

22              THE COURT:  -- understand your argument.  I'm

23    disagreeing with you that that piece doesn't have to at

24    least be addressed.  So that's my question, is that

25    that's all -- you haven't -- you may -- the answer may be
```

1   very easy, but that to me is the piece that is missing

2   from your argument.  But go ahead and make the rest of

3   your points.

4              MR. JARVINEN:  Thank you, Your Honor.

5              Again, the comment about New York state court

6   having expertise.  As we cited in our papers, the

7   Georgia case, In re: Reigns (phonetic), 2014 Westlaw

8   6461784 at 6, where the Court granted a motion to lift

9   stay in part to let the Georgia state court interpret its

10  own laws, finding that Georgia has relative expertise and

11  that was sufficient to justify lifting of the stay.

12             THE COURT:  Uh-huh.

13             MR. JARVINEN:  Mr. Grossman indicates that

14  the gallery doesn't state why it doesn't want to commence

15  the quiet title action in this court.  I think we dealt

16  with that in our reply where we said that the statute

17  doesn't require us to give a justification.  I think it's

18  quite evident to the Court the reasons why, at least what

19  we stated, why we believe that the New York state court

20  is the proper forum for the quiet title action.

21             Again, I end where I began, Your Honor, which

22  is very simply that right now it is one way.  The

23  judicial administrator gets to take discovery under

24  Rule 2004 when it wishes to, rather than the -- what we

25  believe are the proper balance of obligations and rights

1    to discovery in a lawsuit.  The judicial administrator

2    chooses to sue us when it wishes to and enough is enough.

3    We ask that you lift the stay to allow us to proceed in

4    state court.  And all of the arguments that Mr. Grossman

5    has brought up will be dealt with in that state court

6    lawsuit.

7              Thank you, Your Honor.

8              THE COURT:  Well, I'm not going to rule

9    today, because I'm going to ask each of you to find out

10   the following:  I want to know what the status of the

11   sequestration order and if that requires Mr. Marquez and

12   whoever your Brazilian co-counsel is, Mr. Grossman -- I

13   believe that he has been in this court before, so I know

14   you have got one.  All right -- I want to know the status

15   of the sequestration order, and I want to know what the

16   statute of limitation under Brazilian law for the legal

17   administrator to bring any causes of action under the

18   sequestration order or otherwise.  Because I'm going to

19   tell you right now, I'm inclined to grant -- I'm going to

20   grant the motion for relief from stay.  The question is

21   what I'm going to grant the motion to do.  Is the motion

22   for relief from stay going to be granted solely for the

23   purpose of going down to Brazil?  That may be what my

24   ruling is.  Okay?  Or it may be to go up to New York and

25   you-all can chew on each other's ankles and use up the

1   whole $1.4 million in arguing about these fascinating

2   issues of jurisdictional law and never getting to the

3   merits of the case.  I mean the bottom line is this:

4   This has to go -- this has to come to a head somewhere.

5   Okay.  I am not inclined today to say where.

6            I just truly believe that as brilliant as all

7   of you are, that you should have had some idea what the

8   impact of what this sequestration order is, because it

9   could be that that is the only place where this can go

10  forward.

11           With respect to the 2004 request, I'm going

12  to let Judge Gerber rule on that.  He's a very smart man

13  and he can decide whether he wants to wait and see where

14  this litigation goes or -- I don't know.  But that's

15  Judge Gerber's decision to make.

16           Having said that, this was a contested

17  matter.  So -- but there's only so much that I can do.

18  So I'm going to rule on the motion for relief from stay,

19  but I want to have something from all of you regarding

20  the sequestration order status and whatever statute of

21  limitations are Brazilian.  Is that -- am I speaking

22  English?

23           MR. JARVINEN:  Yes, Your Honor.

24           THE COURT:  So ---

25           MR. JARVINEN:  Just one clarification.

1          THE COURT:  Well, I'm going to ask you that

2     now.  So, Mr. Jarvinen, any questions on my request?

3               MR. JARVINEN:  Yes, I do.  Just one, Your

4     Honor.

5               As I read -- the second question is:  What is

6     the statute of limitations under Brazilian law for the

7     foreign administrator to commence an action against the

8     gallery, and I just wanted to request clarification on

9     "action."  Is it just a -- like a replevin turnover?  I

10    just ---

11              THE COURT:  I want to know in general, not

12    specifically, because I don't want it argued here.  I

13    want to know if your position is -- I know what New York

14    law is.  You've made it very clear, and it's also why

15    I've said -- not pejoratively, but knowledgeably -- that

16    that's why you want to be in New York state court,

17    because that's the law you want to argue.

18              It could be that you are now going to come in

19    and say, and, Judge, even under Brazilian law after nine

20    years, the legal administrator can't bring the lawsuit

21    anymore.  It's too late.  I don't know.  And I just want

22    to have a general idea of the applicable statute of

23    limitations, in general.  And I don't know Brazilian law.

24    Okay.  And I know you and Mr. Grossman know what

25    Brazilian law you know much better than I do.  But I want

1    to know, again just under the standard of stay relief

2    substantial likelihood of success on the merits, if you

3    believe you would have an argument under Brazilian law

4    that the legal administrator could not bring the action.

5    Because I -- maybe I am completely out of line, but this

6    is what concerns me and that's why I want to know the

7    answer.  All right.

8                    So any other questions?

9                    MR. JARVINEN:  Yes, Your Honor.  Do you wish

10   it -- do you wish it in declaration form from each of our

11   respective Brazilian counsel, or do you wish us to put it

12   just in a pleading for your consideration?  I just want

13   to understand how you wish this presented.

14                   THE COURT:  Let me ask Mr. Grossman.  If you

15   both agree, I don't care, because I know and trust you

16   both well enough that I'm not concerned that anything you

17   tell me is not going to be accurate.  So, Mr. Grossman?

18                   MR. GROSSMAN:  Judge, I am completely

19   agnostic as to the form.  I believe under 44.1, which was

20   the new one that allows you to basically look at anything

21   to determine foreign law.

22                   THE COURT:  Uh-huh.

23                   MR. GROSSMAN:  And I don't think it matters

24   what format we put it in.  If they want it as a

25   declaration or if they want it just as a memorandum of

1   points and authority, we would probably prefer a

2   memorandum of points and authority so we don't have to

3   spend the energy of going to the apostille or whatever it

4   is that we might otherwise do.  But I'm okay with either

5   way.

6           THE COURT:  Okay.  So why don't we just do it

7   that way.  As I said, I know you both well enough that

8   I'm completely comfortable with whatever you give me.  It

9   doesn't have to be under oath.

10          MR. GROSSMAN:  I have a question for Your

11  Honor.

12          THE COURT:  Yes, sir.

13          MR. JARVINEN:  The (unintelligible) ---

14          THE COURT:  I was going to ask you that next.

15          MR. JARVINEN:  Yes, Your Honor.

16          MR. GROSSMAN:  And with respect to your first

17  prong on the status of the sequestration order, I would

18  prefer that Your Honor issue an order from today's

19  hearing that directs that this issue be answered for the

20  Court, because that way we have a piece of paper from

21  this Court that we can wave around in front of whoever we

22  might wave it around for, to say she is expecting an

23  answer to this.  Because if what they are saying is that

24  the order is under seal, we may need to file a petition,

25  meaning our Brazilian counsel may have to go to criminal

1    court and say the bankruptcy judge who has the 15, which

2    was authorized by the Bankruptcy Court, wants an answer

3    to this question and here is her order.  It may not be

4    our ability as just the -- even the judicial

5    administrator can tell the criminal court to unseal it,

6    describe it, give us anything about it, but your order

7    will carry a lot more weight down there.  I don't think

8    they should object to that.  I want to give you the

9    answer.  I want to stop some obstacles to that.

10              THE COURT:  I think what I -- my first

11   concern is, one, has it expired?

12              MR. GROSSMAN:  No, no, I understand.

13              THE COURT:  Right.  That would be the easiest

14   answer.  But if it has expired, then it doesn't really

15   matter what ---

16              MR. GROSSMAN:  Well, what I wanted was the

17   force of an order, because it allows us to then say, you

18   know, the court -- the ancillary jurisdiction of the

19   bankruptcy estate in the United States has directed us to

20   take steps to find out the answers to their question.  Is

21   the order still in force?  Can we share a copy of the

22   order?  I think those are the two main parts to it.

23              THE COURT:  Okay.

24              MR. GROSSMAN:  I'm just being practical here.

25   Having that piece of paper allows us perhaps to petition

1   the criminal court.  If they won't talk to us

2   voluntarily, then perhaps having that order will move

3   somebody in the criminal court to allow that to happen.

4           THE COURT:  All right.  And I assume,

5   Mr. Jarvinen, that you don't disagree, that that would be

6   a good idea.

7           MR. JARVINEN:  It's a good idea.

8           THE COURT:  Okay.  Then I'm more than happy

9   to do an order.  I think I would be more comfortable if

10  you would prepare the order, share it with Mr. Jarvinen.

11  If you have anything to add and then -- and I'm, you

12  know, willing to enter that order tomorrow if the two of

13  you can get the form of the order agreed to.  I just

14  really think frankly everybody needs to know what the --

15  the status of that sequestration order.  And then I guess

16  the -- I will look to your local counsel in your

17  memorandum to state whether -- well, first of all, if the

18  order is not in effect anymore, that's one thing.  And if

19  the order still is in effect, whether that does require

20  something being done in the Brazilian courts either

21  instead of or in addition to anything being done in the

22  United States.  Again, because I agree this needs to be

23  taken care of.  We can't wait any longer.  One way or the

24  other, either there's no cause of action anymore and your

25  folks can finally rest in peace or whatever it is that

Page 62

1    they want to do, or the trustee has a cause of action,

2    they need to do something now.  So I will -- I will look

3    for that order in the next couple of days.

4                    MR. GROSSMAN:  That's fine.

5                    THE COURT:  And then we will take it from

6    there.  In terms of a deadline, I will move as

7    expeditiously as you-all can provide me with the

8    information.  But I'm not going to create an artificial

9    deadline.  What I will tell you is if in 14 days you

10   don't have anything, maybe -- I don't know.  You tell me.

11   Do you want to file a status that you don't have

12   anything?

13                   MR. GROSSMAN:  I would think that we will put

14   in the order some period of time by which we will tell

15   the Court what efforts we've made to obtain it.  If we

16   have it, then we will provide it.  If we haven't found

17   it, we will tell you why -- what our obstacles are to

18   getting it and what we hope to do to obtain it.

19                   MR. JARVINEN:  And we will work

20   collaboratively from this point, Your Honor.

21                   THE COURT:  Well, I have no doubt.  I know

22   you both very well.  I'm very comfortable with that.

23   And, as I said, I am going to grant stay relief.  The

24   question is what is it going to look like.  So -- and

25   even if it's stay relief to file in the District Court

1  here, I don't know.  I just -- I mean, something has to

2  happen.  This can't go on.

3           I mean, I -- frankly, everybody has waited a

4  little bit too long.  The administrator has waited.  The

5  gallery has waited.  But now we are here and now I'm

6  going to help the process along and we are going to get

7  to the next step one way or the other.  Okay?

8           MR. GROSSMAN:  Judge, you mentioned

9  something -- and I sort of missed what's the adjective of

10  sheepishly -- you said that the -- this is a contested

11  matter.  If the contested matter still remains pending,

12  it's a contested matter.

13           THE COURT:  Well, it's still contested.

14           MR. GROSSMAN:  It's still contested.

15           THE COURT:  I haven't ruled.

16           MR. GROSSMAN:  You haven't ruled.  Very good.

17  Thank you, Your Honor.

18           THE COURT:  All right.  Thank you both very

19  much.  I thank all of you.  And, Mr. Cahill, thank you

20  and, Mr. Marquez, thank you for quietly -- I'm sure your

21  fist is halfway down your throat, but thank you very much

22  for participating, as well.

23           All right.  Gentlemen, I will look for

24  something from you tomorrow or the next day and then

25  after that within a certain time period.  Okay?

1          MR. GROSSMAN:  I'm sorry, Judge.  Did you

2    want the -- we cited the notion that you can't remand on

3    diversity case.  I have the citation.  I did not know if

4    you wanted it or not.

5          THE COURT:  I don't care, because I'm not the

6    one that will be ruling on it --

7          MR. GROSSMAN:  Understood.

8          THE COURT:  -- right?  In other words,

9    what -- where you-all end up is either going to be in

10   New York or here or in Brazil --

11         MR. GROSSMAN:  Understood.

12         THE COURT:  -- right?  And then what happens

13   from there that will be for another day.

14         MR. GROSSMAN:  Very good.  Thank you,

15   Your Honor.

16         THE COURT:  Thank you.  All right.  Anything

17   else, gentlemen?

18         MR. JARVINEN:  No.

19         THE COURT:  No.  Okay.

20         (Thereupon, the hearing was concluded.)

21

22

23

24

25

Page 65

1                          CERTIFICATION

2

3    STATE OF FLORIDA        :

4    COUNTY OF MIAMI-DADE   :

5

6           I, Karen B. Patlak, Shorthand Reporter and Notary

7    Public in and for the State of Florida at Large, do

8    hereby certify that the foregoing proceedings were taken

9    before me at the date and place as stated in the caption

10   hereto on Page 1; that the foregoing computer-aided

11   transcription is a true record of my stenographic notes

12   taken at said proceedings.

13          WITNESS my hand this 19th day of February,

14   2015.

15

16

17          _____

18                  KAREN B. PATLAK

19            Court Reporter and Notary Public

20         in and for the State of Florida at Large

21              Commission #FF 162365

22                September 23, 2018

23

24

25