1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION

3

4

5

IN RE:                      CASE NO. 10-47543-BKC-LMI
6                          Chapter 15
BANCO SANTOS, S.A.,
7

        Debtor in a foreign
8             proceeding,
_____/
9

10

11

12                STATUS CONFERENCE (94)

13                  May 27, 2015

14

15       The above-entitled cause came on for hearing

16 before the HONORABLE LAUREL MYERSON ISICOFF, one of

17 the Judges in the UNITED STATES BANKRUPTCY COURT,

18 in and for the SOUTHERN DISTRICT OF FLORIDA, at

19 301 North Miami Avenue, Courtroom 8, Miami, Miami-Dade

20 County, Florida, on Wednesday, May 27, 2015,

21 commencing at or about 4:00 p.m., and the following

22 proceedings were had:

23                Reported By:  Margaret Franzen

24

25

Page 2

1                         APPEARANCES:

2

3        ASTIGARRAGA DAVIS MULLINS & GROSSMAN, by
                GREGORY S. GROSSMAN, ESQUIRE
4                ARNOLDO B. LACAYO, ESQUIRE
         on behalf of the Judicial Administrator

5

6

7                    BERGER SINGERMAN, by
             CHRISTOPHER A. JARVINEN, ESQUIRE
8                          and
                    CAHILL PARTNERS, by
9        JOHN R. CAHILL, ESQUIRE (Via Telephone)
                           and
10   ANDRE MORAES MARQUES, ESQUIRE (Via Telephone)
         on behalf of Edward Tyler Nahem Gallery
11             and Edward Tyler Nahem

12

13

                       - - - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Let's go to Banco Santos.  I'm

2    sorry, gentlemen, I didn't think that it was going to

3    take that long for Ecological.

4          So I'll take appearances in

5    Banco Santos, starting with whoever is on the

6    phone, we'll do that.

7          So, Mr. Cahill, are you on the phone?

8          MR. CAHILL:  Yes, Your Honor.  John Cahill

9    from Cahill Partners ---

10         THE COURT:  All right.  Mr. Cahill, I'm

11   having trouble hearing you.  Are you speaking into a

12   handset?

13         Please, those of you from Ecological,

14   please leave the courtroom.

15         All right.  Mr. Cahill, did you spell

16   your name for the record?

17         MR. CAHILL:  It's John, J-o-h-n, Cahill,

18   C-a-h-i-l-l, for Edward Tyler Nahem Gallery.

19         THE COURT:  Okay, and, Mr. Marques, are you

20   on the phone?

21         MR. MARQUES:  Yes, I am.

22         THE COURT:  Okay.  Mr. Wynock, (phonetic)

23   are you on the phone?

24         MR. CAHILL:  I don't think Mr. Wynock was

25   able to make it, Your Honor, so I will be the sole

1  representative of Edward Tyler Nahem Gallery.

2          THE COURT:  Is that Mr. Cahill speaking?

3          MR. CAHILL:  Yes, Your Honor, forgive me.

4          THE COURT:  And Mr. Marques is the

5  principal of your client; is that correct?

6          MR. JARVINEN:  Your Honor, Mr. Marques is

7  the Brazilian counsel for the client.

8          THE COURT:  Ahh, okay, okay.  All right,

9  and in courtroom?

10         Mr. Jarvinen.

11         MR. JARVINEN:  Yes, good afternoon, Your

12 Honor.  Christopher Jarvinen, that's J-a-r-v-i-n-e-n,

13 from Berger Singerman, LLP, on behalf of the Edward

14 Nahem Gallery and Edward Nahem.

15         THE COURT:  All right.  Mr. Grossman.

16         MR. GROSSMAN:  Good afternoon, Your Honor.

17 Greg Grossman, G-r-o-s-s-m-a-n, with my colleague,

18 Arnoldo Lacayo, L-a-c-a-y-o.

19         THE COURT:  All right.  Gentlemen, I just

20 want to remind you that each time you speak, you need

21 to say your name again.  You don't need to spell it

22 again, but you need to say your name again, so the

23 record is clear who is speaking at any given time,

24 and that goes for those of you in the courtroom, as

25 well as those of you who are on the phone.

1          I have reviewed all of the papers that
2     were filed.  Mr. Grossman, is there anything that
3     you want to add to your status report or anything
4     that you want to respond to with respect to the
5     Gallery's report, and then I'll ask Mr. Jarvinen
6     the same thing?
7          MR. GROSSMAN:  Your Honor, Greg Grossman
8     for the foreign representative.
9          We have nothing to add to the papers,
10    and I think we've had now two hearings, one of
11    which was transcribed, and I believe the
12    transcript would be available on Pacer.  The
13    second was more of a scheduling discussion, I
14    don't believe that hearing was transcribed.  I
15    believe nothing substantive occurred there,
16    except the Court inquired of counsel where we
17    were in the process of getting the paperwork in.
18          THE COURT:  I think that's correct.
19          All right.  Mr. Jarvinen, did you have
20    anything you wanted to add to your presentation
21    or address that was raised in the foreign
22    representative's report?
23          MR. JARVINEN:  Your Honor,
24    Christopher Jarvinen.  I do not have anything to
25    raise with respect to the foreign representative's

1    report.

2              I do want to provide an update to the

3    Court of a development that happened yesterday in

4    Brazil.  In both the foreign representative's

5    report and in our supplemental pleading, we refer

6    to this decision of the criminal court dated

7    December 11, 2006.  We call it in the Gallery's

8    supplemental pleading, we call it the -- we

9    define it as the December 2006 decision, and we

10   talk about it principally between the pages of

11   the -- I mean, the paragraphs of 12 to 19.

12             The Gallery had indicated in the

13   supplemental pleading that this December 2006

14   decision superseded the sequestration order, the

15   April order, but that the December 2006 decision

16   was on appeal.

17             Now, remember the date, it's

18   December 2006, order has been on appeal.

19   Yesterday, interestingly enough, the Appellate

20   Court in Brazil overturned the criminal court,

21   the December 2006 decision, and remanded the

22   proceedings back to the criminal court.

23             What's interesting about it is it

24   was -- and the December -- the December 2006

25   decision was declared null and void by the

1    Appellate Court, for reasons I won't go into here

2    unless the Court wishes to ask, and so it sort of

3    is a restart button with respect to the December

4    2006 decision, which among other things, was the

5    decision which sentenced Mr. Ferreira to jail,

6    and as of today, Mr. Ferreira is not in jail and

7    for purposes of our papers, we not only indicated

8    that the sequestration order had been superseded

9    by the December 2006 decision, we noted that it

10   was on appeal, we noted that it hadn't -- the

11   December 2006 decision hadn't been granted

12   res judicata in Brazil, and we noted that it

13   could be overturned, and it has.

14          However, the decision is not available.

15   The Appellate Court issued it yesterday, but --

16   issued its decision yesterday, but didn't issue

17   the written decision.

18          THE COURT:  Right, I understand, but you

19   say it was reversed and remanded.

20          MR. JARVINEN:  It's reversed and remanded,

21   and what's very interesting about the December ---

22          THE COURT:  I know everybody is always so

23   polite looking at each other, but you have to stop

24   being so nice and just look at me because you have to

25   speak into the microphone.

1              MR. JARVINEN:  My pleasure.

2              The December 2006 decision has been on

3      appeal now for --

4              THE COURT:  A thousand years.

5              MR. JARVINEN:  -- nine years, right, and

6      that was a very hefty decision, it was 660 plus

7      pages, and it's now remanded back to the criminal

8      court.

9              And I have no idea what the outcome of

10     that will be, but what we do know, is that that

11     order is overturned on appeal.  That's what I

12     know right now, I don't know anything else other

13     than that.

14             I just wanted to report that.

15             THE COURT:  Okay.  Thank you.

16             All right.  Mr. Grossman, anything you

17     want to add to Mr. Jarvinen's report regarding

18     the 2006 decision, and how -- what impact that

19     has on the sequestration order?

20             Does it make the sequestration order

21     good again, even if Mr. Jarvinen's argument is

22     correct, that the 2000 -- the December 2006

23     decision superseded the sequestration order?

24             MR. GROSSMAN:  Greg Grossman for the

25     foreign representative, Your Honor.  Having not read

1   the decision --

2          THE COURT:  That hasn't been written yet.

3          MR. GROSSMAN:  -- I think all of us are

4   reacting to media reports of what occurred.  So

5   without knowing what the intricacies of the order

6   are, I can't tell -- I can't tell the Court that I

7   have a view on it.

8          Obviously, no surprise from the papers

9   filed by both sides in this case, that we have a

10  diametrically different view of what the legal

11  affect of the preliminary order, of the secondary

12  order, the December 2006 order, and we may or may

13  not have agreement about what the Appellate Court

14  did here when we finally read the decision from

15  our perspective.

16         I don't think it changes much of what

17  Your Honor has been asked to do, which is to

18  decide whether or not you're going to give stay

19  relief.

20         So from our view, our points are

21  relatively straightforward.  If the cloud of the

22  sequestration exists or might exist or will exist

23  in the future, the only person that can lift that

24  cloud is a Brazilian Criminal Court.

25         If the issue with respect to the

1    Banco Santos estate is the issue, then the

2    primary jurisdiction should be where the estate

3    is, which is in Brazil.

4              If, in fact, those two options are not

5    available or the Court is not inclined to simply

6    deny the motion, because, obviously, I don't

7    think you need stay relief to file anything in

8    Brazil because your stay only goes to the border

9    of the country, of this country, our point

10   remains very straightforward, then.

11             If Your Honor is going to pick a

12   jurisdiction in the United States for any cause

13   of action brought by the Gallery, we think that

14   this is the appropriate jurisdiction, as opposed

15   to a state court in New York.

16             THE COURT:  All right.

17             So, Mr. Jarvinen, let me ask you the

18   same question I just asked Mr. Grossman, and

19   perhaps your answer has to be the same, because

20   until you see the order, you're speculating as to

21   what the Appellate Court has done.

22             But if, in fact, you are correct, or

23   that your guess turns out to be correct, that

24   there's a reverse and remand of some nature as

25   opposed to just reverse and dismiss, would that

1    not revive the sequestration order --

2             MR. JARVINEN:  Your Honor ---

3             THE COURT:  -- which was -- was a place

4    holder until final adjudication was made, according

5    to your argument?

6             MR. JARVINEN:  Your Honor,

7    Christopher Jarvinen.

8             I first would like to preface by saying

9    that although Mr. Grossman and I have not agreed

10   on much in this matter to date, I do agree with

11   him in the sense -- I do agree with him in the

12   sense that the decision by the Appellate Court in

13   Brazil does not have a fundamental impact on the

14   Gallery's position, which is, and always has

15   been, that the legal standard which is relevant

16   for the lift stay motion is set forth in the

17   Gallery's lift stay motion, as well as in its

18   reply, and that all that the lift stay motion

19   asks for is the ability to proceed with a

20   declaratory judgment action in New York State

21   Court.

22            With respect to the decision of the

23   Appellate Court in Brazil, to answer your

24   question, until the Appellate Court actually

25   issues a detailed decision, I won't be able to

1    answer the Court in a fair way until we have an

2    opportunity to look at that decision.

3                I do know, not from media reports, but

4    from the Appellate Court itself, that it has

5    reversed and remanded, and that what that means,

6    we'll only know when it eventually decides to

7    issue its decision.

8                THE COURT:  Which will hopefully be less

9    than 662 pages.  Okay.

10               Okay.  All right.  So, Mr. Jarvinen --

11   no, no, come.  Then -- then let's -- let's start

12   off where we ended up on February 17th, okay,

13   which precipitated my requesting that you

14   gentlemen get this information.

15               I appreciate your argument, both the

16   one that you've in shorthand restated here just

17   now, and which you addressed in -- more fully in

18   your status report, but explain to me what

19   possible effect granting you relief would have on

20   the underlying dispute, which is who should get

21   the artwork, maybe not with respect to the one

22   piece of art that is not in the sequestration

23   order, but with respect to the three that are?

24               Do you understand my question?  Did I

25   say it clearly enough?

1           MR. JARVINEN:  I think your question, Your

2    Honor, will also depend on what the Appellate Court

3    writes in its decision.

4           THE COURT:  Well, let's -- because we could

5    just keep doing this forever, you know, and I -- I

6    enjoy spending time with the two of you, but -- or

7    three of you, I don't want anybody to feel slighted,

8    but that's not going to be acceptable.

9           So -- so let's -- let's -- let's --

10   yes, the Appellate Court is going to do

11   something.  Until the Appellate Court issues its

12   written opinion, okay, what you have here with

13   respect to three of the four pieces of art, is an

14   order or orders that appear to state, somewhat

15   unambiguously, if not absolutely unambiguously,

16   that those three pieces of art must be returned

17   to the Brazilian Government.

18           Did I misunderstand anything that those

19   orders provide?

20           MR. JARVINEN:  Well, what I would like to

21   do, Your Honor ---

22           THE COURT:  Well, I want you to answer my

23   question first.

24           MR. JARVINEN:  Well, the answer to your

25   question is I'm not a Brazilian lawyer, and I don't

1    practice in Brazil, I'm not admitted in Brazil.  I am

2    incredibly weary, despite the work that the Gallery

3    has done in putting these papers together, I'm

4    incredibly weary of being -- of answering when I

5    don't know, and what I mean by that is, I have -- I

6    have a sequestration order, which is the equivalent

7    of a preliminary injunction.

8              THE COURT:  Uh-huh.

9              MR. JARVINEN:  It's our position, the

10   Gallery's position, that that preliminary injunction

11   was superseded by an order, which was on appeal,

12   which didn't have res judicata, and have an overturn

13   of that order.  I don't know under Brazilian Civil

14   Procedure, whether or not that infuses the

15   sequestration order with life that it may not have

16   had if the Court on appeal had affirmed the December

17   2006 decision.  I just --

18             THE COURT:  Right.

19             MR. JARVINEN:  -- I think sometimes the

20   correct answer is, I don't know.

21             THE COURT:  Okay, and that's fair.  I mean,

22   that's fair, but perhaps that underscores what my

23   concern is here.

24             Okay.  So if I granted you the relief

25   that you sought, and if you all recall last time,

1   I said I'm going to grant some kind of relief,

2   although Mr. Grossman alludes to the fact that if

3   the relief is to say, go to Brazil and let the

4   Brazilian courts figure out what your legal

5   rights are, you don't need stay relief because

6   the stay doesn't apply extraterritorial, thanks

7   to Judge Rayhoff, right?

8            The -- I grant you stay relief, and you

9   either file something in state court and it gets

10  removed, and Judge Gerber says let Judge Isicoff

11  deal with it, or it gets removed here and

12  Judge Isicoff deals with it, or you seek to have

13  the reference withdrawn and some other judge

14  deals with it, whatever, that ruling is not going

15  to bind the Brazilian Court, and if, in fact, the

16  ultimate result, since you're right, we don't

17  know, of all this, is that there is a live order

18  out there, okay, that says those pieces of

19  artwork have to be returned to the Brazilian

20  Government unless the Gallery can establish that

21  it's a good faith purchaser, what's the point?

22            MR. JARVINEN:  I think the point is we

23  would like to establish that the Gallery was a good

24  faith purchaser where the transaction took place, and

25  by the place where the parties who were involved in

1    that transaction existed.

2         THE COURT:  Okay.  Well, let me ask you

3    this, Mr. Jarvinen, again, I'm just talking about the

4    three pieces of artwork for right now, we'll get to

5    the fourth in a second, because I think it's a little

6    bit different -- well, it's a lot different.  Okay.

7         If I granted the stay relief, and

8    whatever court, whatever court, whatever forum in

9    the United States determined that, would the

10   standard of good faith be one governed by what

11   New York or Florida law or bankruptcy law, to the

12   extent it's different, recognizes as a standard

13   of good faith or would the adjudicating court in

14   the United States be required to apply the

15   Brazilian law that the Brazilian Court would have

16   to consider in determining whether the party is

17   entitled to the good faith defense from the

18   sequestration order/injunction order/conviction

19   order, whatever order is in effect?

20        MR. JARVINEN:  As the Gallery mentioned in

21   its motion to lift stay, we believe New York law

22   would apply.

23        THE COURT:  Why?

24        MR. JARVINEN:  Because the transaction

25   involved parties in New York, all of the events

 1  involving the transaction took place in New York, not

 2  just New York, New York City, is where not only the

 3  Gallery is located, Mr. Barral was located, where the

 4  four works of art were located.  They were, I guess,

 5  stored in a -- in an art storage facility in Queens.

 6  All of the negotiating took place in New York, and

 7  these -- the paintings were exchanged for the

 8  consideration in New York.

 9           THE COURT:  Okay.  So what you're -- what

10  you're telling me is that when you -- when the

11  Brazilian Court would determine whether the Gallery

12  acted in good faith, the Brazilian Court would apply

13  New York law in making the determination that the

14  protections of the Brazilian criminal statute of good

15  faith purchaser were met?

16           MR. JARVINEN:  It's my understanding

17  that -- if I hear the Court correctly, if you were

18  talking about what law a Brazilian court would apply?

19           THE COURT:  Uh-huh.

20           MR. JARVINEN:  I think a Brazilian court

21  would apply only Brazilian law.  I don't think a

22  Brazilian court, based on my conversations with

23  Mr. Marques, that a Brazilian court would ever apply

24  or agree to apply New York law.

25           THE COURT:  Okay.  So I'm going to go back

1    to the question that I asked you.  Assuming that

2    ultimately the Brazilian Court, whenever, determined

3    that the three pieces of artwork were subject to

4    return, only allowing the Gallery to raise a good

5    faith defense to the return, why wouldn't the U.S.

6    court be required to apply whatever law the Brazilian

7    Court would apply to determining good faith for that

8    to be res judicata to the criminal proceeding in

9    Brazil?

10          MR. JARVINEN:  It's my understanding, Your

11   Honor, that the sequestration order only applies to

12   the works of art -- to works of art or whatever

13   assets were assets of the quote, unquote, "estate" at

14   that time in April of 2006.

15          THE COURT:  I thought the sequestration

16   order specifically named three pieces of art.

17          MR. JARVINEN:  Correct, but this is the --

18   you have to conceive this as two sets of events going

19   in tandem with each other without relationship.

20          THE COURT:  I understand.

21          MR. JARVINEN:  And that is, you have -- you

22   have negotiations and sale in New York of four works

23   of art from one New York art dealer to the Gallery,

24   all right.

25          THE COURT:  Uh-huh.

1          MR. JARVINEN:  In another, you have

2    unconnected, unknown by the Gallery at that time,

3    that December 2005/January 2006 timeframe,

4    unconnected, unrelated proceedings in Brazil, where

5    naturally the judicial administrator, the trustee, is

6    trying to find out as much information about what was

7    going on in the scheme that was involving

8    Banco Santos.

9          (Phone rings.)

10         THE COURT:  Okay.  I'm sorry.  Go ahead,

11   Mr. Jarvinen.

12         MR. JARVINEN:  All right.  So simply after

13   you have the closing of the sale in January of 2006,

14   I don't know when Mr. Barral or the -- Barral

15   obtained the works of art, that's not important.  My

16   opinion is, I am a good faith purchaser on the part

17   of the Gallery under New York law.

18         As soon as those works of art were with

19   the Gallery, or ever since Barral obtained them,

20   but at least since the Gallery obtained them, you

21   have four months later, you have a sequestration

22   order that only covers what is believed to be in

23   the estate of Banco Santos at that time, and

24   those works of art were never part of that

25   estate.

1          Our position is that that sequestration
2     order shouldn't even apply with respect to the
3     three works of art that it eventually names, and
4     so, therefore, it's only just and correct that
5     New York law would apply and that a New York --
6     and for better or not, the New York courts have
7     particular expertise with respect to art law just
8     because of the nature of the commerce.
9               THE COURT:  No, I remember, you made that
10    argument last time.
11         Okay.  So what you're saying is that
12    the New York State Court or the Bankruptcy Court
13    or the District Court in either the Southern
14    District of New York or the Southern District of
15    Florida, has to make a threshold determination
16    that the sequestration order does not apply to
17    these three works of art, even if it is still
18    valid?
19              MR. JARVINEN:  I agree.
20              THE COURT:  All right.  Let's go to the
21    other piece of art.  Okay.  Which one was the
22    other -- I call it the other piece of art because I
23    couldn't keep track of which was the other piece of
24    art.
25              MR. JARVINEN:  I believe it's Sea Strip,

1   Your Honor.

2           THE COURT:  Sea Strip is the one in

3   Switzerland?

4           MR. JARVINEN:  Sea Strip is the one ---

5           THE COURT:  Or is that the one that went to

6   the FBI agent that now works for the foreign

7   representative?

8           MR. JARVINEN:  Sea Strip, I believe, and

9   Mr. Cahill can correct me, I don't have my paper in

10  front of me, but I believe Sea Strip was the painting

11  that -- the work of art, that as soon as the Gallery

12  discovered that there could be an issue, reached out

13  to the customer, purchased it back, gave the customer

14  back the money, it was overseas, and brought it back

15  to the United States, voluntarily handed it over to

16  the Customs Service.

17          THE COURT:  Okay.

18          MR. JARVINEN:  It was the gentleman who was

19  working at the Customs Service who later went into

20  employ by the Banco Santos judicial administrator,

21  the foreign representative.

22          THE COURT:  And so that painting now is

23  just being held in Customs?

24          MR. JARVINEN:  Correct, that's our

25  understanding.

1          THE COURT:  So it's in the United States,
2  but it's status is pending?
3          MR. JARVINEN:  Correct.
4          THE COURT:  Okay.
5          MR. JARVINEN:  And that's one of the
6  reasons we brought this motion.
7          THE COURT:  So with respect to that, let me
8  just see -- I wrote down questions.  You know me, I
9  always write down questions to make sure I didn't
10  forget anything.
11          Okay.  I covered those questions.  So
12  it seems to be that there's two disputes between
13  you and the -- your client and the plan
14  administrator, with respect to -- well, it's with
15  respect to all, but I'm going to focus on
16  Sea Strip for right now, and that is the plan
17  administrator believes that there's three
18  potential causes of action that the plan
19  administrator could bring, and the statute of
20  limitations has not run on any of them.
21          And your position, your client's
22  position, is that there's only one cause of
23  action that the plan administrator could possibly
24  bring, and that cause of action the statute of
25  limitations has expired, is that -- is that a

1  correct understanding?

2         MR. JARVINEN:  Correct, Your Honor.

3         THE COURT:  Okay.  So have you looked at

4  the other two statutes that the plan administrator

5  believes might be relevant?

6         MR. JARVINEN:  Yes, Your Honor, just one

7  moment, please.

8         With respect to the claim under

9  Brazilian Bankruptcy Law, Article 130, the

10  position of the Gallery is that, you know, as my

11  grandfather always used to say, paper doesn't

12  refuse ink, and that if -- if the judicial

13  administrator/foreign representative intends to

14  make factual allegations that have no basis, a

15  piece of paper can reflect anything.

16         THE COURT:  Uh-huh.

17         MR. JARVINEN:  And I think as the Gallery

18  is pretty confident, it dealt only with Mr. Barral,

19  there was no conspiracy, there's no underhandedness

20  on the part of the Gallery.  The Gallery is one of

21  the finest galleries not just in the United States,

22  but in the world.  It has a very good reputation.

23         And, you know, I could go into comments

24  as to the fact that, you know, the judicial

25  administrator hasn't put across one iota of

1    evidence, at any point since this proceeding

2    began a year ago, that it has to substantiate any

3    of those allegations.

4               THE COURT:  Okay.  So ---

5               MR. JARVINEN:  Now, with that said ---

6               THE COURT:  I'm sorry.  I just want to stop

7    you because I want to make sure I understand your

8    argument, and that is whether or not these statutes

9    exist and provide these causes of objection, there's

10   absolutely no basis, the trustee -- the plan

11   liquidator or the plan administrator has absolutely

12   no basis upon which it could even suggest that it

13   would have the ability to look to a conspiracy or

14   collusion-type cause of action with respect to your

15   client, is that a fair understanding of your

16   argument?

17              MR. JARVINEN:  Yes, that's a fair

18   understanding of the argument, and also, in

19   particular, Your Honor, with respect to Brazilian

20   Civil Code, Article 1228, pursuant to my

21   communications with Brazilian counsel, you know,

22   their position is that that's not even a good faith

23   argument to make within these circumstances, with

24   that type of -- that type of cause of action, but I

25   don't want to get into hyperbole.

1              I mean, the judicial administrator, the
2    foreign representative, has -- you know, is in
3    the process of taking discovery and that
4    eventually, I'm sure, will be before this Court
5    in terms of comments that the judicial
6    administrator may wish to make, but they'll get
7    the discovery that they need, that I think
8    reaffirms the fact that at least the Gallery's
9    position is that it was just a good faith
10   purchaser.  "There is no there there," to quote a
11   famous author.
12              But with respect to that, with respect
13   to 130, there's no basis in fact.  With respect
14   to the 1228, and I'm referring to the Brazilian
15   bankruptcy law articles, that there's just no
16   basis in fact or it's a cause of action that
17   doesn't apply.
18              And, again, I hate saying this, but I
19   don't -- I'm not a Brazilian attorney, so I wish
20   I were more comfortable in my daily practice,
21   like I think all counsel in this room would be
22   with, you know, 548 or 547 of the U.S. Bankruptcy
23   Code, but we're not, so we're sort of speaking in
24   a way which we're trying to take positions based
25   on our conversations with Brazilian counsel

1   and ---

2              THE COURT:  I understand.

3              MR. JARVINEN:  You know, so I want to be

4   fair to the Court, I want to be fair to my adversary,

5   but I just don't believe, based on my conversations

6   with our Brazilian counsel, that particularly those

7   causes of action have justification.

8              THE COURT:  Okay.  All right.  Thank you.

9              All right.  Mr. Grossman, let me hear

10  from you regarding the matters that Mr. Jarvinen

11  and I have been debating and considering for the

12  last half hour.

13             MR. GROSSMAN:  Thank you, Your Honor.

14             Greg Grossman for the foreign

15  representative.  I think we're -- we're, perhaps,

16  doing cart and horse stances here.  We have

17  discovery that remains outstanding, that's how

18  this started.

19             We issued a 2004 subpoena, and in

20  response we got a motion to lift stay and a

21  motion to quash the subpoena, and the argument

22  made in the motion to quash the subpoena, which

23  was heard by Judge Gerber, was don't let them get

24  any discovery because we're going to get stay

25  relief, we're going to file this lawsuit, and the

1   discovery is going to be more limited in a piece

2   of litigation than it would be under 2004.

3          And now today we're now hearing, that

4   because the trustee -- because the judicial

5   administrator doesn't have all the goods to be

6   able to bring the cause of action, that somehow

7   we should assume that he will never get the

8   goods, which is exactly what 2004 Examinations

9   are all about.

10          We filed with the Court a notice of

11  filing of the transcript before Judge Gerber.  He

12  made the statements that I've heard this Court,

13  and all of our courts here in the Southern

14  District of Florida make, which is that's what

15  2004 is about.  Find out what occurred, so that

16  you can bring causes of action if you have them,

17  so that's my point about cart and horse.

18          In our view, the motion should simply

19  be denied, it's denied without prejudice, there's

20  nothing that says it's with prejudice or anything

21  like that.  We should get on with the discovery.

22  We should get the discovery in hand, we should be

23  able to review it.

24          If, as Mr. Jarvinen says, "there's no

25  there there," then nothing will happen, there

1   won't be a lawsuit filed, et cetera.  If there is

2   something that does, perhaps, rise -- raise the

3   issues, there may be further discovery and there

4   may be a cause of action.

5           We -- we were asked to hypothetically

6   describe potential causes of action, assuming

7   facts that we haven't yet been able to discern,

8   and so it's almost a law school examination

9   question, and in that respect, we did the best we

10  could, saying these are our suspicions.  If our

11  suspicions were confirmed through discovery,

12  these are the potential causes of action that we

13  would have.

14          We obviously have a raging debate under

15  Brazilian law, so here we are now, we're having a

16  debate under Brazilian law about whether causes

17  of action occur, and whether there's facts to

18  support those causes of action, which facts

19  haven't yet been established because we haven't

20  gotten the documents to establish the facts.

21          So we are pretty much -- we are pretty

22  far down, you know, out on a limb, all of us

23  collectively, and I think that we -- going back

24  to first principles, which is, we have a

25  discovery request, that's what we ought to do

1  first.  The motion should simply be denied.

2  There are two places they can file suit if they

3  wish to, they don't need stay relief to do that.

4         If later on after they produce the

5  discovery, they may have a better argument to

6  make before the Court saying, okay, now that

7  we've given everything over to the judicial

8  administrator, it is now time for you to give us

9  stay relief, I can see some wisdom there.

10        I will take up the mantle on the very

11 points Your Honor described.  Think about what is

12 being asked, they want stay relief to go to a

13 state court in New York to determine that they

14 meet a defense.

15        Well, first, they're going to ask a

16 New York State Court to opine whether a Brazilian

17 sequestration order applies, number one; number

18 two, if they determine that it does apply, they

19 are then going to determine that the defense of

20 good faith applies or doesn't apply, and doing

21 all of that without the actual party in interest,

22 which is the Brazilian Government, because they

23 are the ones -- this is not my client.  Our

24 client hasn't filed -- we didn't issue a

25 sequestration order, it wasn't even done at our

1    request.

2              If you think about it, if you analogize

3    what we do here in the States in a forfeiture

4    case, a District Judge, at the request of the

5    United States Government, issues a forfeiture --

6    a preliminary order of forfeiture.

7              Nobody gets to file a lawsuit in Iowa,

8    in state court in Iowa, to get somebody to

9    determine whether or not that was a proper

10   forfeiture order.  You go to the Judge who issued

11   the forfeiture order, and you ask that Judge,

12   Judge, this order doesn't apply to me because the

13   circumstances are such that it doesn't apply.  I

14   didn't have it at the time, I meet the defense of

15   whatever that is.

16             So the idea that anything that happens

17   in a New York State Court, or even a New York

18   District Court or a Bankruptcy Court in Florida

19   or a New York -- or a District Court in Florida,

20   is going to have any effect on the Brazilian

21   Government's rights under their sequestration

22   order.

23             I said this at the last hearing, my

24   perception is that the Gallery doesn't really

25   care about the cloud of the Brazilian Criminal

1   Court, what they care about is the particular

2   potential civil liability, and that's what's

3   driving this, because it's not particularly

4   complicated to realize that no New York State

5   Court order, they're going to bring it down to a

6   Brazilian criminal judge and say, here, we won,

7   please dismiss.  They're worried about civil

8   liability with the Banco Santos estate.

9          If that's what they really care about,

10  we're here, they can file a lawsuit here.  I do

11  think they -- in rethinking this, I don't think

12  they need stay relief, but I do think they

13  probably need your permission because they need

14  to name the judicial administrator in his

15  representative capacity, not a big point.

16         If Your Honor thinks that this is the

17  appropriate place to bring it, either here or in

18  District Court, I don't have any problem with an

19  order that says you're granting them leave to do

20  so, if that's where you see it.

21         On the removal issue, Judge, we raised

22  this point before, this is just a monumental

23  waste of time.  I cannot in good conscious tell a

24  judicial administrator appointed by a Brazilian

25  Bankruptcy Court to go to a New York State Court

Page 32

1   and have the rights of the foreign estate

2   adjudicated by a state court judge in New York.

3          So that means I'm removing that case,

4   and I'm removing it on both bankruptcy

5   jurisdiction, on 1334 as being related to the

6   Chapter 15, and I'm removing it on diversity.  So

7   we're already going to be in the District Court.

8   So any argument that the New York State Courts

9   have particular expertise in art, as a practical

10  matter, it makes no difference.

11         Then the only fight will be on

12  transfer, whether it will be transferred from a

13  New York Federal Court, either Bankruptcy or

14  District Court, and I don't know the answer

15  because I don't know their removal -- their local

16  rules on removal, particularly when you're

17  removing on two separate independent federal

18  grounds.

19         So then we will be talking about

20  transfer, and then it may be transferred from

21  district to district, and referred, I don't know

22  how that will all work out, but ultimately that's

23  my -- the client, the judicial administrator,

24  chose this forum to bring the 15.  This kind of

25  an adversary -- this would be an adversary

1  proceeding adjunct to it.

2          If we were to file a law -- if we

3  decided we were going to file one of those

4  Brazilian causes of action against the Gallery

5  and felt like we couldn't get -- if there was

6  some issue with being able to get jurisdiction

7  over them in Brazil, where would we file that

8  adversary?

9          Right here, as adjunct to our Chapter

10  15, just like we've done other adversaries before

11  this Court, in fact, one in this case, where we

12  sued an American entity, sued them on a variety

13  of causes of action, both U.S. and Brazilian, and

14  we brought it here.  Your Honor adjudicated it

15  until it was resolved consensually.

16          So ultimately, we think that's where

17  we're going to end up, maybe we won't, maybe

18  we'll end up in a District Court or a bankruptcy

19  in New York, it's possible if you give stay

20  relief.

21          From our perspective, we think we

22  should do the discovery first, and I have no

23  problem with the Court ordering us to come back

24  in so that you can keep us -- keep us cats herded

25  to make sure we're moving forward towards a

1   resolution, I have no problem with that.  I think

2   the Court has imminent power under both Rule 16

3   and under your 105 powers to order the judicial

4   administrator, through counsel, to show up and

5   tell you what's going on periodically, and that's

6   what I would think is the most appropriate way

7   forward.

8          Let's find out if there is something

9   there, and if there is something there, then a

10  lawsuit will get filed, and if there's not

11  something there, then there won't be.

12         I raised this point at the first

13  hearing, on this, Judge, because I want the Court

14  to conceptualize, we're not talking about a cause

15  of action that they are proposing to bring that

16  itself has substantive law.

17         They're asking for declaratory relief.

18  So by definition, the only thing that declaratory

19  relief is, it is a procedural tool to get a

20  substantive law issue or controversy decided.  So

21  a typical declaratory relief, as the Court knows,

22  is going to be, you have a debate over what a

23  contract means.  The substantive law is contract

24  law.

25         In that circumstance, you say, what's

1    the choice of law rule going to be?  Well, if
2    you're asking for declaratory relief in what a
3    contract means, then you're going to apply the
4    law of the contract, if the contract specifies.
5            What they're asking for -- if you go
6    back to what they're asking for about declaratory
7    relief, one of them, declare that all causes of
8    action are barred by the statute of limitations.
9    Okay.  The declaratory relief is just a
10   procedural handle, the pot is whatever is the
11   underlying cause of action.
12           So then we're going to be having a
13   discussion about which cause of action we're
14   talking about.  Well, we've identified three
15   Brazilian causes of action.  So now a New York
16   State Court, giving declaratory relief on whether
17   the statute of limitations has run, will be doing
18   the statute of limitations under Brazilian law
19   for three Brazilian causes of action.
20           Well, they certainly don't have
21   expertise in that, not that this Court does
22   either, but the point is, that that's what's
23   really going on here.  The conflict of law rule
24   analysis here is not, you know, the events
25   occurred here, the events occurred there, because

1   this isn't a tort claim, this is a declaratory
2   relief claim.  So then you have to look to the
3   underlying tort, and I can't tell you that there
4   is a good answer there because you're talking
5   about potential statutory torts.
6          In U.S. parlance, we would talk about
7   548 as being a statutory tort, perhaps.  There
8   are courts that disagree with that.  There are
9   courts that say it's not a -- it's just a -- it's
10  just a statutory claim, it's not a tort, so you
11  don't look at substantial relationship.
12         I think Florida has come out and said,
13  a fraudulent transfer action under the state law
14  is considered -- you use the same tort analysis,
15  but I can't say that knowledge or how much
16  knowledge, is it New York amount of knowledge or
17  is it Brazilian amount of knowledge.
18         Yeah, I suspect there was something
19  hinky about the deal because I got it at an
20  eighth of the price of what the artwork really
21  was about, and the person I was dealing with was
22  in the back of -- you know, in the back of the
23  shopping center handing it to me, whispering in
24  hush tones.
25         Okay.  That might not be enough under

1    New York law, it might be enough under Brazilian

2    law, I don't know the answer to that question.

3              THE COURT:  Not that you're suggesting that

4    that's what happened.

5              MR. GROSSMAN:  No, I'm saying the only way

6    to ---

7              THE COURT:  I don't want Mister --

8    Mr. Jarvinen --

9              MR. GROSSMAN:  Of course.

10             THE COURT:  -- to think he had to respond

11   to that.

12             MR. GROSSMAN:  Of course.

13             The only way to test these

14   hypotheticals is to take them to their

15   extremities.  The only way to realize whether or

16   not we're on firm ground, is to test them to

17   their extremities.

18             If, in fact, under Brazilian law, their

19   law said that it was -- enough red flags are

20   raised, that that is imputed actual knowledge,

21   there's nothing crazy about that notion.

22             That might not -- we might not agree

23   with it.  You know, the 11th Circuit in one case

24   might not agree with it, the 2nd Circuit might,

25   the 8th Circuit might have a different view, the

1    fact that Brazil may set the bar differently than

2    where New York is, that happens, but asking -- to

3    say that a New York State Court Judge is the

4    right place for that, seems to me both premature

5    and frankly, belies the notion that it's the best

6    forum.

7            There may not be a best forum here

8    other than, frankly, Brazil, because that's where

9    everything -- that's where the action is, that's

10   where the kinds of causes of action we're talking

11   about are, both sides.  Nobody put in their

12   papers that there is an American cause of action

13   that would be brought.

14           So everybody has agreed -- one thing we

15   have agreement is, that there's at least one

16   Brazilian cause of action that arguably could be

17   brought, on our side we've raised -- we said

18   there's three that potentially could be brought,

19   they're all Brazilian causes of action.

20           We've all agreed that the sequestration

21   order was issued by a Brazilian court.  We all

22   understand that the courts who issue orders are

23   generally the courts who can change those orders,

24   modify them or decide that they don't apply,

25   that's the typical place that you would go when

1    you're unhappy with an order.

2            So from our perspective, Judge, we just

3    think that the motion should be denied without

4    prejudice, we should get on with the discovery,

5    Your Honor could set us down for periodic

6    updates.

7            You know I don't like to come to court

8    empty-handed.  If you set an update, I have to

9    have -- I can tell you what's going on, I'm going

10   to tell you what's going on, and I'm going to,

11   well in advance of that, tell the client they

12   need to -- if they're -- if they're delaying in

13   any way, they need to stop that, they need to get

14   on board because we're going to stand before this

15   Court and we want to tell the Court we've made

16   progress.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.

19           Mr. Jarvinen, other than the back of

20   the truck comment, is there anything that you

21   would like to respond to?

22           MR. JARVINEN:  Yes, I would, Your Honor.

23   Christopher Jarvinen.

24           Mr. Grossman, as always, I respect his

25   ability to talk about what ifs down the road, but

Page 40

1    those are what ifs down the road, in the event

2    that the Court grants the lift stay motion to

3    allow the Gallery to pursue a declaratory action

4    in state court.

5             And I just want to be very clear with

6    the Court, that the standard for the Court to

7    lift the stay, as set forth in the lift stay

8    motion was pretty clear, and I think it's pretty

9    clear, and I believe that the Gallery sustained

10    its burden with respect to it.

11             THE COURT:  And how do you believe that the

12    Gallery has done that, Mr. Jarvinen?

13             MR. JARVINEN:  First, that Banco Santos

14    will suffer no prejudice if this Court lifts the

15    stay, because the purpose of the stay is to give the

16    debtor a breathing spell, and the fact is, is that

17    the judicial administrator, who was appointed ten

18    years ago, okay, commenced that Swedish lawsuit

19    against the Gallery, and by doing so, shows that it

20    doesn't require the benefits of the automatic stay,

21    that's point one.

22             Point two is that the Gallery has shown

23    some probability, some probability, and that's

24    the legal standard, some probability of success

25    on the merits with asserting a declaratory

Page 41

1    judgment action in New York.

2              And the case law is clear, I don't have

3    to present a case in chief in a motion to lift

4    stay, all I need to show or the Gallery needs to

5    show, is some probability of success, which can

6    be a slight showing, and that the Gallery's

7    papers submitted to this Court show that it

8    wasn't frivolous, that it at least has a chance

9    in New York State Court with respect to that.

10             And then the third part is that the

11   balance of the hardships weighs in favor of

12   lifting the automatic stay to allow the Gallery

13   to pursue this cause of action.

14             As the Court rightly noted earlier in

15   the status conference, you have one work of art

16   in what we believe is in a storage facility in

17   Sotheby's London, which has been sitting there

18   because it didn't sell at auction, it was put

19   back in storage, and then it is now, at the

20   request of authorities, being held in storage.

21   You have Sea Strip, which is being held by the

22   Customs Service.  You have a third painting,

23   which is still owned by the Gallery, that the

24   Gallery can't sell because of the cloud on title.

25             It wasn't the judicial administrator

1    who filed this motion, it was the Gallery.  The

2    Gallery has had enough, it just wants its day in

3    court.

4            I realize that Mr. Grossman has brought

5    up all the things that can occur down the road,

6    but we request the Court to give the Gallery the

7    opportunity to have its moment in court in

8    New York and see what happens there.

9            And with respect to some of the

10   statements made by Mr. Grossman, we're never

11   going to ask the New York Court whether or not

12   the Brazilian sequestration order applies, I

13   suppose they will, as a gating function.  We'll

14   come to that.

15           The cart before the horse.

16   Mr. Grossman implies that the sequestration order

17   is in force.  It may not be in force.  The

18   Gallery's position is that it was superseded now

19   by an order that's now on reverse and remand.  It

20   could take ten more years, ten more years before

21   it gets back up to the Appellate Court.

22           We don't want to wait any longer.  The

23   Gallery just wants to have its moment.  If we're

24   taking the risk, we're taking the chance that if

25   you grant the motion to lift stay and we go to

1   New York State Court, that a variety of things

2   could happen.  Give us that opportunity, give us

3   that chance, in order for us to be able to do so,

4   and all of the Brazilian law that may filter in,

5   but the key here with respect to the lift stay

6   motion, is the legal standard as we set forth in

7   the -- in our lift stay motion, and I rest on the

8   belief that we satisfied what we needed to do

9   under the prevailing legal standard for a lift

10  stay in order for us to be able to proceed in

11  New York State Court.

12          Thank you.

13          THE COURT:  Okay.  First of all, I want --

14  I want to thank all of you, including those on the

15  phone, for taking the time to answer the questions

16  that I had, and I want to explain, again, or better,

17  if I didn't explain, but if nothing else, as a

18  reminder of why I asked for these two questions to be

19  answered.

20          With respect to the causes -- the

21  potential causes of action, what I wanted to know

22  was -- and it was really more for the judicial

23  administrator, even more so than for the Gallery,

24  is that if under any cause of action that the

25  judicial administrator might be able to bring,

1   under any set of facts that could be possible,

2   that the statute of limitations had absolutely

3   unequivocally expired.  Then what I would have

4   expected the judicial administrator to do, is to

5   just drop it.  Okay.

6          What came back after the diligent work

7   that was done by the parties, was that there's

8   either one or three actions, that either may or

9   may not be barred by the statute of limitations.

10  It's an issue that has to be determined by

11  applying Brazilian law.

12          Of course, as Mr. Grossman said,

13  there's been no discovery yet, but even assuming

14  that all the facts would click in to revocation,

15  let's say, Mr. Jarvinen, your argument is that

16  the statute of limitations has run, and

17  Mr. Grossman's argument is that assuming that any

18  of these causes of action were available, which I

19  don't know because I haven't done my discovery,

20  the statute of limitations has not run.

21          So I don't have a slam dunk

22  unequivocal, which was the reason that I asked

23  the first question, not so much to see what the

24  nature of the dispute was, but was to determine

25  whether there was any dispute, okay, because if

1    there wasn't any dispute we were done, finished.

2    Okay.

3            The second was to find out whether the

4    sequestration order, or now any iteration that

5    had followed, had any impact whatsoever on this

6    dispute, because, once again, if there was -- if

7    the sequestration order unequivocally was over

8    and there was no subsequent order that had been

9    issued, whatever happened to it, then I just

10   didn't have to worry about that, that wouldn't

11   play into my analysis of all the other arguments.

12           But what has happened here, and what is

13   very clear from the presentations that both of

14   you have made today, is that the sequestration

15   order, or something, is very much possibly still

16   in play.

17           And I think that Mr. Jarvinen, you're

18   absolutely correct, the only answer to my

19   question at this point is you don't know, because

20   there's no way to determine it until a couple of

21   things have happened, one, the Appellate Court

22   issues its ruling; and number two, there's a

23   determination as to what impact that has on

24   future proceedings and other orders that have

25   been issued by the Court.

1          You've made some very good arguments

2    and compelling arguments, Mr. Jarvinen, both with

3    respect to why the sequestration order shouldn't

4    have applied, and shouldn't have named the three

5    pieces of art that it does name that are relevant

6    to this dispute, and also, recognized that -- or

7    articulated well potential defenses that your

8    client could raise, the very same defenses that

9    you want to raise in a New York State Court.

10          But, frankly, what has absolutely been

11   made clear to me today is that, at least with

12   respect to the three pieces of artwork that are

13   named in the sequestration order, there is

14   nothing that any court in the United States can

15   do, nothing.

16          Even if you are correct, Mr. Jarvinen,

17   that the three pieces of artwork should never

18   have been named in the sequestration order,

19   assuming it still has validity, that is not

20   something that any court, other than the Court

21   that issued the sequestration order could rule

22   on.

23          Now, assuming that the sequestration

24   order is no longer in effect, because it was

25   affected by the 2006 -- December 2006 order, I

1    think is what you called it, the impact of the

2    reverse and possible remand, or whatever the

3    Appellate Court is going to do, on what that

4    December 2006 order did with respect to the three

5    pieces of artwork, is, again, something that only

6    either the Brazilian Courts can do, once the

7    Appellate Court has ruled, or a United States

8    court applying Brazilian law, which is what they

9    would have to do.

10           There's a third argument that you

11   raised, Mr. Jarvinen, which also may be a

12   legitimate argument, based on your comment about

13   could it take another ten years for all this to

14   occur, and it could be that under Brazilian law,

15   just like we have in the United States, and I'm

16   just guessing, because we don't know, there may

17   be a way to pull something out from the cloud,

18   pull assets out from the cloud of a pending

19   criminal action.

20           I mean, having represented John Kozayk

21   as a trustee in the Financial Federated case,

22   where that whole case was pending under a cloud

23   of criminal forfeiture, and what happens in the

24   United States when there's a criminal case before

25   conviction, I mean, frankly, as a non-criminal

1  lawyer, I was appalled at the breadth of what the

2  government can do even before a conviction.

3         I don't know if that's the case in

4  Brazil.  I do know, however, that in order to try

5  to pull assets out from under that cloud, that

6  determination can only be made by a Brazilian

7  court.  There's just no way that any court in the

8  United States, federal or state, and especially

9  not state, could adjudicate whether three pieces

10  of artwork, specifically named in a Brazilian

11  court order, are or are not continued to be

12  covered.

13         So what does that mean for purposes of

14  what you've asked me to determine?  I appreciate,

15  Mr. Jarvinen, that you believe that your

16  preliminary motion, the presentations you made at

17  length, and very well and strongly in February,

18  in your written pleadings that preceded today,

19  and those that were filed in anticipation of

20  today, and your arguments today, are well

21  articulated, but candidly, I don't agree with

22  them.

23         I think that your argument, that the plan

24  administrator doesn't need the protections of the

25  automatic stay anymore is true, in terms of the

1    determination of the asset -- the rights to the res,

2    the four pieces of artwork.  There's no question, I

3    mean, like you said, they sued in Switzerland, so

4    they're ready to rumble; right?

5            And I even said at the February hearing,

6    this has to be decided somewhere, somehow, but I

7    truly believe, Mr. Jarvinen, that you have not --

8    made absolutely no showing of a probability of

9    success on the merits, and the reason is, is because

10   based on what I've stated, I absolutely believe that

11   the only place that your client can go, with respect

12   to at least the three pieces of art, is the Brazilian

13   Court, and that's no matter what happens between the

14   plan administrator and your client.

15           Because I think if the plan administrator

16   completes his discovery, and determines that your

17   client is absolutely correct, that the plan

18   administrator under those three statutes, even if

19   they would in theory apply to any cause of action

20   that the plan administrator might believe are not

21   supported by any facts, because your client is able

22   to demonstrate that there would be no success, your

23   client is still going to have to go to Brazil and try

24   to get at least three of those four pieces of artwork

25   out from under this cloud, and the only place that

1    you can do that is Brazil.

2         With respect to the balancing of the

3    hardships, your client going into state court, as far

4    as what has been presented to me, is a futile act.

5    It's a colossal waste of time and money.  There is

6    absolutely nothing that the New York State Court

7    could find, because if you were able to absolutely

8    slam dunk show that under New York law your client

9    was entitled to certain defenses with respect to

10   New York law, that would have no bearing on the

11   Brazilian causes of action, because the defenses with

12   respect to the three pieces of artwork, would have to

13   be defenses that the Brazilian Court would recognize

14   and so, once again, we find ourselves in the

15   Brazilian Court with respect to three of the four

16   pieces of art.

17        And so there was one other point that you

18   made, that I think I've already addressed, which is

19   that even if you're correct that these three pieces

20   of art should not be under this cloud, the only place

21   you're going to get that cloud removed is to go to

22   Brazil, your client.

23        There's not a court here that can do that,

24   and absolutely not a state court in New York, and

25   that's not to take anything away from the state court

1   judges in New York.

2          So I am going to deny your motion for

3   relief from stay, Mr. Jarvinen, and I'm going to do

4   it without prejudice.  Although, as I said before, I

5   truly -- I just don't know what, even in the future,

6   until you get some kind of resolution in Brazil, it

7   would -- it would make a difference.

8          Perhaps that will work to your benefit, if

9   there are facts that are of some concern to the

10  trustee, you could say, here, you take them and you

11  figure out how to get them away from the Brazilian

12  Government, I don't know, that's for another day.

13         But I'm going to deny the motion for relief

14  from stay without prejudice.  Obviously, as

15  Mr. Grossman said, you're not required to have stay

16  relief to go down to Brazil.  The timing of your

17  decision, your client's decision to do that is

18  completely up to you.

19         If you -- my understanding, I think I saw

20  matters on the docket already that there is discovery

21  going forward.  Did I -- I thought I saw -- I could

22  be mixing up cases, I was looking at a lot of cases

23  today.

24         MR. JARVINEN:  Your Honor, before we talk

25  about discovery, may I ask, your ruling applies to

1    all four pieces, all four works of art, including ---

2         THE COURT:  Let me back up.  So with

3    respect to the Sea Scape piece of art, okay, the ---

4         MR. JARVINEN:  Sea Strip.

5         THE COURT:  I'm sorry, Sea Strip, the one

6    piece of art.  With respect to the Sea Strip, again,

7    the cause of action is under Brazilian law, if the

8    plan administrator has a claim, and to have you go

9    into court with respect to one piece of artwork on a

10   matter that requires -- at least the plan

11   administrator should be given the opportunity to

12   determine whether there is a cause of action, for a

13   limited amount of time, at least, then I'm going to

14   give the plan administrator, which is why you're

15   getting stay relief without prejudice with respect to

16   the motions, but it would really -- really is

17   applying to that particular piece of artwork.

18        And to the extent that there comes a

19   time that the plan administrator -- and I think

20   it should be on a fairly short -- if there's

21   cooperation with discovery, and we don't get into

22   those issues, I think the plan administrator -- I

23   will expect the plan administrator to act fairly

24   promptly to advise your client whether it

25   believes it has a cause of action with respect to

1    the artwork.

2              And if at that time, the plan

3    administrator doesn't act, then I would consider

4    granting stay relief with respect to the piece of

5    artwork, but I want to make clear that I'm not,

6    if I were so inclined to grant stay relief, be

7    endorsing in any way the suggestion that New York

8    law would apply to the adjudication of the

9    rights.  I'm not saying it wouldn't, I'm just

10   saying that would not be a part of any stay

11   relief that I would consider in the future.

12             But I believe that the plan

13   administrator should be allowed to conduct its

14   discovery subject to the limitations that have

15   been imposed by Judge Gerber, and I think he told

16   me to deal with the rest of it, if I'm

17   remembering correctly, and that's my ruling.

18             So, Mr. Jarvinen, do you have any other

19   questions that you wanted to ask me?

20             MR. JARVINEN:  Not at this time, Your

21   Honor.

22             THE COURT:  All right.  Mr. Grossman?

23             MR. GROSSMAN:  Your Honor, Greg Grossman

24   for the judicial administrator.

25             I'm going to segue to the point Your

1   Honor discussed about what's on the docket.  We

2   had filed a motion for status conference, it's

3   not scheduled for today, on the discovery.  What

4   we would be requesting -- we have two issues,

5   Judge Gerber's order, which we did do a notice of

6   filing Judge Gerber's order, and if you read the

7   transcript he's -- he made a comment, I have no

8   problem taking on things to put on my own

9   calendar, but I never impose obligations on

10   another judge.

11          So if you read his order, he has

12   asked -- he has asked whether this Court is

13   willing to be the arbiter of any discovery issues

14   that may still arise, or in the future arise with

15   respect to the current 2004 Examination, and

16   there was a consent by the Gallery to you

17   handling that.  We, of course, consent to you

18   handling it.

19          We just need to be able to tell

20   Judge Gerber that you have said you were willing

21   to report for duty on that particular point, and

22   that he would -- I think the order was written

23   such that he would stand down, and he would be

24   sort of relieved of having to deal with that

25   going forward.

1              The other -- so we would need that
2    threshold, and I don't know if the Court wants us
3    to work out a -- it's really, in my way of
4    thinking, it's a three-sentence order that says,
5    the Court -- if Your Honor is so inclined, a
6    three-sentence order that says, that you're
7    willing -- ready, willing and able to handle any
8    discovery disputes regarding the pending
9    subpoenas, that will then -- then we can tell
10   Judge Gerber we no longer need his services.  He
11   is in a state of somewhat -- I think he's in
12   partial retirement or he's working half days or
13   half weeks, I'm not sure.
14              THE COURT:  Yeah, now he's only working
15   five days a week instead of seven.
16              MR. GROSSMAN:  Right, I guess you know
17   Judge Gerber well.  For him a half day is like the
18   rest of us, like Hercules.
19              The other reason we did file the motion
20   was really to get a hearing date.  I've talked to
21   Mr. Jarvinen about when that could be.  We have
22   had some difficulty.  We're not scheduled for a
23   hearing today, I hope to be able to work them out
24   with counsel, but I am of the belief that having
25   deadlines where you have to go see the Judge

1    usually gets people moving towards resolution of

2    whatever it is that they might be having a

3    dispute.

4              So what we would request is to get a

5    hearing date.

6              THE COURT:  Okay.  Mr. Jarvinen, did you

7    have anything to add to Mr. Grossman's presentation

8    on that point?

9              MR. JARVINEN:  Your Honor, with respect to

10   Mr. Grossman's motion to set a status conference with

11   respect to discovery, I think we had discussed the

12   possibility of your Court hearing that motion during

13   the week that begins on June 29th.

14             THE COURT:  Okay.  But what I'm hearing

15   from Mr. Grossman is, this is sort of like a mini

16   status conference, and what you gentlemen really want

17   is a date at which if there's still outstanding

18   discovery disputes, you could vet them, and we could

19   address them, is that a fair understanding?

20             MR. JARVINEN:  Correct.

21             THE COURT:  Okay.  Well, one, because I'm

22   one of the people that have suggested to Judge Gerber

23   that working five days a week instead of seven is not

24   part time, and not wanting to contribute to his

25   sickness anymore, I will absolutely take over the

1    discovery disputes, especially in light of the fact

2    that you both consent or all of you consent to that.

3              MR. JARVINEN:  Your Honor ---

4              THE COURT:  Yes, sir.  You don't consent?

5              MR. JARVINEN:  Christopher Jarvinen.  Since

6    I do want -- because I have Mr. Cahill on the line

7    and he's conducting -- he's leading the litigation, I

8    just want to state that the motion that was

9    requested, that was filed by the judicial

10   administrator, hasn't yet been noticed, so I do want

11   to preserve the rights of Mr. Cahill and of the

12   Gallery in the event that there is an objection to

13   having this Court hear discovery disputes.

14             But at the moment, I really just wanted

15   to be efficient in front of the Court, and say,

16   you know, let's -- let's notice that, let's see

17   what we can do before this Court were to hear

18   that motion, and not prejudge what the client

19   would do.

20             THE COURT:  Why don't we do this, I'm

21   totally open on June 30th, I have nothing on that day

22   because I had a trial that was scheduled that

23   settled.  I'm going to set aside the morning of

24   June 30th, but if you take a whole morning on

25   discovery disputes, I may -- I may become self

1    emolliated or something, is that the word,

2    emolliated, and if -- and this will give Mr. Cahill a

3    chance to confer with you, Mr. Jarvinen, and with

4    your client, and make a determination.

5            If there is an objection to my hearing

6    the discovery disputes, let's try to get that

7    heard earlier than June 30th, okay, you

8    understand what I'm saying?  That issue, the

9    issue -- because I'm assuming what I'm hearing is

10   that if there's not agreement on me hearing the

11   discovery disputes, then I need to rule on it, is

12   that your understanding, Mr. Jarvinen?

13           MR. JARVINEN:  Yes, Your Honor.  Is there a

14   particular date you would like us to ---

15           THE COURT:  I'll get to that in a minute,

16   let me finish this thought because if I don't, I'm

17   gone and I'll just be sitting here thinking, I know

18   there was something I was going to say.

19           What I'm going to do is I'm going to

20   set aside the morning of June 30th, and since

21   it's open all day, if need be, I know I'm going

22   to staple my head when I say this, we could go

23   into the afternoon if we needed to.  Okay.  So

24   that's going to be set aside, that's your day, if

25   you need it, you gentlemen, for discovery

Page 59

1    disputes.

2           As far as disagreement, if there is a

3    disagreement, you can contact Ms. Schuler

4    tomorrow, and ask for -- I don't think it's going

5    to take more than 15 minutes, so it can be on the

6    regular motion calendar, the status conference.

7           And if there is no disagreement as to

8    my taking -- adjudicating the discovery disputes,

9    in other words, if there is an agreement, then

10   I'll -- then we can just take the status

11   conference off.  Is that a bad week for you

12   Mister ---

13          MR. GROSSMAN:  No, Your Honor, the timing

14   is not a problem.  In fact, I had suggested it

15   because I'm actually going to be in Yellowstone the

16   week before, but I do want to ---

17          THE COURT:  You know there's going to be

18   snow.  Okay.  I'm just saying, okay, go ahead.

19          MR. GROSSMAN:  And apparently they

20   discovered that Yellowstone is sitting on the largest

21   volcano in the world or something like that, but

22   there's only a one in 400,000 chance that it will

23   erupt while we're there, according to National

24   Geographic.

25          On the point that -- that Your Honor

1  has, and I know Mr. Cahill is on the phone, and I

2  think Mr. Cahill might have either been in the

3  courtroom or on the phone when we were in

4  New York, this issue has already been determined,

5  there was consent on the record in New York.

6           THE COURT:  Okay.

7           MR. GROSSMAN:  It's in Paragraph 4 of the

8  order that we provided.  We did the notice of filing

9  the order, Judge Gerber's order, and it's

10 Paragraph 4, and in the transcript, which we also

11 filed, there was an explicit consent by Mr. Power on

12 behalf of his client, the Gallery, to have you

13 decide.

14          THE COURT:  Well, since Mr. Cahill is on

15 the phone, and since Mr. Jarvinen is at a

16 disadvantage on that --

17          MR. GROSSMAN:  Of course.

18          THE COURT:  -- Mr. Cahill, do you have any

19 different recollection or perception than

20 Mr. Grossman on this particular issue?

21          MR. CAHILL:  Your Honor, this is

22 John Cahill.  I was not in the courtroom with

23 Judge Gerber, nor was I on the telephone.  I can only

24 say that my understanding, as described by our local

25 bankruptcy counsel, was that Judge Gerber said, if

1   Your Honor wishes to take on discovery, he would --

2   he would stand down, you know, without any objection

3   to your doing so, that was my understanding, but he

4   did not -- he did not express an opinion one way or

5   the other, but I admit that I was not there.

6              THE COURT:  Okay.  Mr. Grossman, can

7   you ---

8              MR. CAHILL:  What 4 -- what 4 says, it says

9   that the Court yields, to the extent necessary, to

10  the power of the Florida Bankruptcy Court, to

11  exercise exclusive jurisdiction over matters relating

12  to discovery.

13             So my understanding was Judge Gerber

14  said that, of course, if Your Honor wants to

15  exercise jurisdiction, that he would -- that is

16  Your Honor's prerogative, and the New York Court

17  would not stand in the way of that.

18             MR. GROSSMAN:  Your Honor, Greg Grossman

19  for the judicial administrator.

20             If you look at your Docket Entry 110,

21  Page 5 of 19, which is where we have the order,

22  this is the Paragraph 4, the lead in to

23  Paragraph 4 says, incident to the consent of

24  movants and the judicial administrator, and that

25  the operative Part A and Part B is where

1   Judge Gerber says that all of what he's done is

2   without prejudice to you, Judge, Judge Isicoff,

3   to decide to reconsider, change, modify, and then

4   Part B is he was yielding the power, but all of

5   that was incident to consent.

6         The transcript was also filed, and that

7   is Docket Entry 88 that we filed with this Court,

8   and I'm going to look for the word consent in the

9   word -- I apologize, I wasn't prepared for ---

10         THE COURT:  All right.  I'm looking at the

11   docket, the transcript, Page 36, but I want to see

12   who's talking here, so let me go back.  Just give me

13   a moment.

14         Okay.  It was Mr. Grossman speaking.

15         MR. GROSSMAN:  If you go to Page 40 of the

16   transcript, which is your Page 42 of 94 of your

17   Docket Entry, this will be Mr. Power speaking, and

18   this is at Line 16 of Page 40.

19         THE COURT:  Okay.  Hold on just a minute.

20   Okay.  I see it.  We clearly -- okay.  This is

21   Mr. Powers speaking:  "We clearly recognize that had

22   Your Honor," meaning Judge Gerber, "granted the first

23   argument technicality, that they could file a

24   subpoena in Florida, and we would make the motion to

25   quash, and we would be there anyway, quite frankly,

1  that would be where we would end up.  So, yes, Your

2  Honor, we would consent to that, we actually do think

3  it makes more sense."

4          And this is in response to the Court

5  asking Mr. Power, I asked Mr. Grossman about

6  whether both sides would consent to me yielding

7  any further jurisdiction to let her, meaning me,

8  decide matters related to this subpoena.

9          So it appears there's already been

10 consent.  So here's what I'm going to do, I'm

11 setting June 30th aside for you all to come in

12 and litigate any discovery issues, please feel

13 free to have none, okay, and so advise me.

14          All right.  If, in fact, after

15 reviewing the transcript and speaking to

16 Mr. Power, Mr. Cahill or Mr. Jarvinen, there's

17 some perception that Mr. Power was misunderstood,

18 I'll deal with it and you can just file

19 something, okay, but other than that, I will see

20 you all, but feel free not to see me on

21 June 30th.

22          Mr. Grossman, have a wonderful time in

23 Yellowstone.  I will tell you that when I went to

24 Yellowstone at the end of June, we were hiking in

25 snow drifts up to our thighs, but you go ahead

Page 64

1    and have a great time, just remember to bring

2    snow shoes.

3            So on the phone, gentlemen, do either

4    of you have anything else that you wish to state

5    or add before we adjourn?

6            MR. CAHILL:  No, Your Honor, this is

7    John Cahill.

8            THE COURT:  Okay.  Well, thank you very

9    much, and Mr. Marques, anything from you, sir?

10           No, okay.  Mr. Jarvinen?

11           MR. JARVINEN:  Nothing, Your Honor.

12           THE COURT:  All right.  Mr. Grossman?

13           MR. GROSSMAN:  No, Your Honor.

14           THE COURT:  Mr. Lacayo?

15           MR. LACAYO:  No, Your Honor.  Thank

16   you.

17           THE COURT:  All right.  I want to thank you

18   all very much for, as always, excellent and

19   articulate arguments.  This will end court, and folks

20   on the phone, I'm going to hang up now.  Thank you

21   very much.

22           (Thereupon, the hearing was concluded.)

23

24

25

Page 65

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY   OF   DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and   Notary   Public in  and for the State of Florida

9    at  Large,  do  hereby  certify  that  the  foregoing

10   proceedings   were   taken  before  me  at the date and

11   place   as   stated   in  the caption hereto on  Page 1;

12   that the  foregoing  computer-aided transcription  is

13   a true record  of  my  stenographic notes taken at

14   said  proceedings.

15                     WITNESS  my  hand  this  29th  day  of

16   May, 2015.

17

18

19        _____
                    Margaret  Franzen
20             Court  Reporter  and Notary Public
           in and for the State of Florida at Large
21          My Commission Expires:  April 14, 2018

22

23

24

25